**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| CAROLYN BARNES, | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 1:15-cv-00298-RP |
| | § | |
| KATHLEEN GITTEL, *et al.,* | § | |
| *Defendants.* | § | |

<u>**SUPPLEMENTAL COMPLAINT**</u>

Plaintiff, while still objecting to the fraudulent removal of this action and the tortious interference with Plaintiff's contract rights with the State of Texas and breaches of the Texas Bill of Rights contract between the people and their government, and while still complaining of the lack of jurisdiction of this court over these purely state law claims and causes of action, and lack of standing of the United States and its intrusion on state affairs in violation of the 9th and 10th amendments to the United States Constitution, and subject to and without waiving any of her rights set forth in the Objection to Notice of Removal and Motion to Remand, Brief in Support thereof, and Motion to Reconsider the substitution of the United States as the defendant in this cause, Motion to Reconsider the denial of her objection and motion to disqualify Andy Austin, and her Motion Challenging Standing, Plaintiff files this supplemental complaint because the Assistant Attorney General has recast Plaintiff's pleadings, causes of actions, and claims in an illegal usurpation of the rights belonging exclusively to Plaintiff to determine who she sues, what claims she brings, and what causes of action she asserts.  Plaintiff has not ever alleged any claim against the United States and had no claim or cause of action against the United States until two Assistant United States Attorney Generals made fraudulent

1

misrepresentations of material fact to two separate tribunals to perpetuate a fraud on the court, obstruct justice, cause further delay of the proceedings, increase the costs of litigation, hinder and harass Plaintiff, deprive Plaintiff of her constitutional, common law, and statutory rights, remedies, and relief as set forth in the Texas Constitution and Texas statutory laws, in violation of the U.S. Const. Amends 9 and 10. And in support of these claims and causes of action would show this court as follows:

1.      Plaintiff's state constitutional, common law, and statutory claims were against Kathleen Gittel in her individual capacity. At no time did Plaintiff assert any claims or causes of action against the United States or make any claims against Kathleen Gittel in any official capacity. At all relevant times, Kathleen Gittel chose to commit one crime after another of her own free will and for her own personal benefit. At no time was Kathleen Gittel acting within the scope of her employment and any claim to the contrary is a fraud on the court made for the purposes of forum shopping and to change the applicable law that would provide qualified immunity, at the most, to Kathleen Gittel and transform that protection into absolute supreme sovereign immunity.

2.      The United States has failed to meet its burden of proof with respect to its standing in this Court or in the State court whose jurisdiction and power it usurped. The United States cannot lawfully or constitutionally engage in any conduct that would violate the Texas Bill of Rights or internal statutes of the State or alter the duties, responsibilities, or rights of and between or among its citizens. No issue in this case affects interstate commerce.

3.      The United States cannot commit crimes against the citizens of Texas or their property. The United States cannot trespass on clearly marked private property.

The United States cannot invade the sanctity of someone's home and curtilage or invade a citizen's right to privacy and peaceful enjoyment of their home. The United States cannot engage in unreasonable searches and seizures in violation of the constitutional right to be left alone. The United States cannot invade the residence and privacy of a Texas citizen or enter upon Texas soil and clearly marked private property without a warrant and reasonable cause to believe that a crime is being committed against the laws of the United States.

4.    There is no evidence that Plaintiff was engaging in any illegal activity on her own private personal property. There is no evidence that the United States had probable cause to believe that Plaintiff was committing crimes against the United States or the laws of the United States. There is no evidence that the United States had a valid and lawful warrant to enter upon the clearly marked private property of Plaintiff.

5.    The United States cannot engage in a conspiracy to target, frame, maliciously prosecute, and wrongfully convict an innocent citizen of Texas.

6.    The United States cannot misappropriate state funds or receive a bribe in exchange for changing testimony to implicate an innocent citizen.

7.    The United States cannot falsely swear under oath and committed aggravated perjury for the purpose of convicting an innocent citizen.

8.    The United States cannot put on false and perjured testimony in order to convict an innocent person.

9.    The United States cannot commit aggravated perjury and claim that they were lawfully on Plaintiff's property discharging a lawful duty when that is not true.

10.     The United States cannot permit its agents, representatives, employees, and attorneys to continue to commit fraud on the courts, obstruct justice, withhold or secret relevant and critical documents and evidence that would prove the truth and reveal the fraud on the court.

11.     The United States is not free to break its own laws and breach its own constitutional contract with the States and its citizens in order to engage in criminal activity to harm, injure, damage, and destroy the life, liberty, freedom, license, reputation, peace of mind, safety, security, wellbeing, real property, private property, intellectual property rights, and right to earn a livelihood of an innocent citizen of Texas.

12.     Plaintiff has not engaged in interstate commerce and the United States had no authority to invade her clearly marked private property.  The United States has no standing in this court and no right to invade Plaintiff's privacy and private property or to invade the sanctity of her home or curtilage, or to participate in a malicious conspiracy to frame, indict, commit, convict, and disbar her in retaliation for speech-only conduct, advocacy, assembly, association, or petitioning the government for redress of grievances.

13.     The United States cannot protect, promote, and participate in Star Chambers and summary psychiatric commitments and torture of political prisoners.  The United States cannot outlaw, isolate, torture, and disfranchise its citizens based on gender and the political retaliation for the free exercise of rights and privileges protected by the 1st, 4th, and 14th amendments to the United States Constitution.

14.     The United States cannot violate international treaties concerning Human Rights or commit crimes against the peace and security of mankind.  Crimes against the peace and security of mankind are crimes under international law and punishable as such,

4

whether or not they are punishable under national law. If the judicial admissions made by the two Assistant United States Attorney Generals are true, then these claims rightfully belong in the international courts because these actions, if taken by the United States against an innocent citizen in order to retaliate and suppress speech, are political crimes of violence by the United States against its own citizens.

15.    The following rights were infringed, impinged, or interfered with and qualified immunity[1] does not prevent these claims from going forward, especially now that the two Assistant United States Attorney Generals have admitted that the United States committed these crimes of violence against a citizen of Texas:

(1) equal rights under the laws,[2]

(2) procedural and substantive due course of law,[3]

---

[1] State officials may, of course, be sued in both their official and individual capacities. Judgments against state officials in their individual capacities will not bind the state. *See Alden v. Maine*, 527 U.S. 706, 757, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) ("Even a suit for money damages may be prosecuted against a state officer in his individual capacity for unconstitutional or wrongful conduct fairly attributable to the officer himself, so long as the relief is sought not from the state treasury but from the officer personally.").

[2] Texas Constitution, Art. I, §§ 3, 3a, 9, 10, 11, 11b, 15, 15-a, 19, 28, and 29. Plaintiff was entitled to equal rights under the law according to Tex. Health & Safety Code, Title 7, Subtitle C, Chapter 574; the Castle Doctrine, which was passed by the Texas Legislature to protect citizens from these prosecutions; Plaintiff will show that her rights were violated based upon gender and beliefs. Plaintiff was selectively and maliciously prosecuted in violation of the equal rights and due course of law protections. In his 1761 attack on Writs of Assistance, James Otis asserted that "one of the most essential branches of English liberty is the freedom of one's house. A man's house is his castle; and whilst he is quiet, he is as well guarded as a prince in his castle." James Otis, "Against Writs of Assistance," (Feb. 1761) http://www.nhinet..org/ccs/docs/writs.htm. At the heart of the warrant requirement is Tex. Const. Art. I, §9.

[3] Texas Constitution, Art. I, §§ 3, 3a, 9, 10, 11, 11b, 13, 15, 15-a, 19, 28, and 29. Defendants acted in concert and engaged in conduct that was arbitrary, or conscience shocking, in a constitutional sense. These rights that were violated are fundamental--rights that are implicit in the concept of ordered liberty. All of the Texas Bill of Rights protects such fundamental rights. A fair trial in a fair tribunal is a basic requirement of due course of law. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To perform its high function in the best way "justice must satisfy the appearance of justice." *Offutt v. United States*, 348 U.S. 11, 14. *See, In re Murchison.* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases."). The accused in a criminal case is constitutionally entitled to the same rights as civil litigants to object to the assignment of a clearly biased judge, especially when a visiting judge has no accountability to the voters, and is often brought in to manipulate or deprive the accused of justice, due process, equal protection under the law, and due course of law. Plaintiff was entitled to a hearing on her objection to the assignment. Plaintiff also had a constituionally protected right and duty to raise her

(3) reasonable pre-trial bail (and to be free of the unilateral breach of a surety bail bond contract by the State),[4]

---

objections to his lack of oath in a timely manner without retaliation for doing so. Further, since 100% of the detrimental discussions that resulted in the eggregious harm to Plaintiff occurred outside her presence and in private meetings, she was forever deprived of equal rights and due course of law. Plaintiff's substantive and procedural due process rights were violated in a continuous misogynous conspiracy that has yet to abate. Plaintiff's damages, injuries, and losses continue to accrue to her detriment and all avenues to mitigate her damages have been shut, blocked, or cut off. Plaintiff at all relevant times was deprived of a hearing on any of her pending motions, deprived of her right to represent herself or to have counsel of her choice, and deprived of her right to be heard as secured by Tex. Const. Art. I, §§ 3a, 10, 13, 15, 15-a, 19, 27, and 29. Plaintiff was deprived of her right to appeal and denied her right to seek *habeas corpus* in violation of the Tex. Const. Bill of Rights. Plaintiff was forced into a Star Chamber and held in a Star Chamber from February 28, 2011 until she filed this lawsuit in 2015. At all times, during that four-year period the conspiracy took actions to obstruct justice, commit fraud on the courts, and block Plaintiff's access to the courts in violation of the Texas Open Courts doctrine, equal rights, and due course of law. Plaintiff was deprived of all her rights, remedies, and review as set forth in the Texas Health and Safety Code, Title 7 Subtitle C. Plaintiff was forever deprived of *Brady* material, a speedy and fair trial, and right to put on her own defense. Plaintiff did not learn until after the irreparable harm, injury, and damage had been inflicted that these acts were done by the state actors with the aid and assistance of the United States government in violation of international law. Plaintiff was not made aware of the international crimes against humanity until 2015 when the federal court found that the United States had committed these atrocities and human rights violations. Up until that time, Plaintiff had been led to believe, and still believes, that these crimes were committed by Kathleen Gittel and other governmental employees who aided, abetted, and asssted her in committing and covering up for her crimes. Now, Plaintiff has learned that these were really acts of the United States and that it was the United States who willfully violated the Texas Bill of Rights and the other common law and statutory rights of Plaintiff and her children, costing over $7,000,000.00 in damages, losses, and injuries. All of these actions undertaken by the United States not only violated international law, but also, violated the U.S. Const. amends. 9 and 10. The United States, acting through two of its Assistant Attorney Generals has now admitted that these acts were committed by the United States and as such are international crimes against humanity and atrocities committed against an innocent citizen for political reasons based on gender bias and misogyny rampant in the Southern part of the United States and these actions were taken willfully to silence, suppress, and subdue a female attorney in good standing with the State Bar of Texas for nearly 30 years at the time of the unwarranted assault.

[4] Texas Constitution, Art. I, §§ 3, 3a, 9, 10, 11, 11b, 13, 16, 19, 28, and 29. The purpose of pre-trial bail is to secure the defendant's attendance at trial, and the power to require bail should not be used as an instrument of oppression. *Ex parte Ivey*, 594 S.W.2d 98, 99 (Tex. Crim.App. [Panel Op.] 1980). Excessive bail is prohibited by the Texas Constitution and Code of Criminal Procedure, which also prevent the use of bail as an instrument of oppression or punishment. *See* TEX. CONST. art. I, §§ 11, 13. The actions of Shaver, who was acting without any jurisdiction and being on notice of the lack of oath of office, which is a constitutional infirmity rendering his acts void *ab initio*, were unconstitutional because TEX. CONST. art. I, § 11b provides that there must be a "preponderance of the evidence at a subsequent hearing that the person violated a condition of release related to the safety of the victim of the alleged offense or to the safety of the community." There was no subsequent hearing or any notice or opportunity to be heard prior to the revocation, and there was no evidence that any term or condition or condition of release related to the safety of the victim or the safety of the community was violated. Any alleged condition that the court implied was violated did not relate to the safety of the alleged victim or the community and anticipatory violations do not fulfill the constitutional requirements. The capricious whim of a visiting judge acting in the absence of all jurisdiction is too low a standard for the deprivation of a significant liberty interest. This action also violated substantive and procedural due process because it imposed indefinite pretrial detention without a hearing or opportunity to be heard. Pretrial release is a substantive and fundamental right secured by TEX. CONST. art. I, § 11. The right to pretrial release "embodies that principle that the presumption of innocence abides in the accused for all purposes while awaiting trial." *Paul v. State*, 783 So.2d 1042, 1045 (Fla. 2001), citing *State v. Arthur*, 390 So.2d 717, 720 (Fla. 1980). "The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of fact finding, is to 'instruct the fact

finder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.'" *Addington v. Texas,* 444 U.S. 418, 423, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323 (1979). "In cases involving rights, whether criminal or civil, the standard of proof reflects the value society places on individual liberty." *Santosky v. Kramer,* 455 U.S. 745, 756, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). The test for determining the constitutionality of a standard of proof was established in *Matthews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). The standard was unrelated to any legitimate concern over Plaintiff's appearance at any future hearing. Further, Article 17.15 of the Code of Criminal Procedure provides a framework for setting a defendant's bail:

    1. The bail shall be sufficiently high to give reasonable assurance that the undertaking will be complied with.

    2. The power to require bail is not to be so used as to make it an instrument of oppression.

    3. The nature of the offense and the circumstances under which it was committed are to be considered.

    4. The ability to make bail is to be regarded, and proof may be taken upon this point.

    5. The future safety of a victim of the alleged offense and the community shall be considered.

When a liberty interest is at stake, the accused must be afforded due process notice and an opportunity to be heard at a hearing on a motion to revoke bond or to deny bail. See *Robinson v. State,* 700 S.W.2d 710, 712 (Tex.App.-Houston [14th Dist.] 1985, no pet.). The statute does require presentation of evidence and that the revocation be based on that evidence. In *Robinson,* this court noted that the Court of Criminal Appeals held that an appellant has a liberty interest in bail which requires the protection of the due process clause of the Fourteenth Amendment. *See id.* at 712-13 (*citing Hunter v. State,* No. 770-85 (Tex.Crim.App. October 23, 1985), dismissed, May 7, 1986). Therefore, due process requires the trial court to provide a defendant with reasonable notice that it intends to deny bail and to allow a defendant a meaningful opportunity to be heard. *See id.* at 713. These defendants willfully violated the due course of law applicable in Texas criminal proceedings by summarily depriving Plaintiff of pretrial bail and reasonable bail pending appeal. The purpose of bail is to assure the attendance of the accused, when his or her appearance is required in court, whether before or after conviction. Bail is not a means of punishing the accused. The amount of the bail has two general limitations: First: The purpose of bail is not to penalize or punish the accused, but only to secure the appearance of the accused, and it should be set with that in mind. Second: Excessive bail, not warranted by the circumstances or the evidence at hand, is not only improper but a violation of constitutional rights. In fixing the amount of the bail, the court takes into consideration the seriousness of the charge, the previous criminal record of the accused, and the probability of the accused appearing at the trial or hearing. The bail amount set by the court must be within the minimum range amount of bail that would reasonably assure the accused's appearance, NOT the Maximum. The bail bond is in the nature of a contract between the state on one side and the accused and his sureties on the other. The agreement basically is that the state will release the accused from custody, the sureties and the accused will undertake that the accused will appear at a specified time and place to answer the charge made against him. If the accused fails to appear, the sureties become the absolute debtor of the state for the amount of the bond. The repetitive unilateral breaches of the surety bail bond contracts and repetitive arrests to increase media sensationalism, deprive Plaintiff of her liberty, taint the potential jury pool, permanently defame Plaintiff, and dissipate Plaintiff's funds, were unconstitutional acts to punish, oppress, demean, and humiliate Plaintiff. These were not good faith prosecutorial acts or judicial acts within constitutional jurisdiction, but went far outside judicial discretion to set the conditions of bail because they breached the contract and violated the clear letter of the law. Even the discretion to set the terms and conditions of a pretrial bond is not unlimited. A condition of pre-trial bail is judged by three criteria: it must be reasonable; it must be to secure the presence of the accused at trial; and it must be related to the safety of the alleged victim or the community. *Ex parte Anderer,* 61 S.W.3d 398, 401-02 (Tex.Crim.App.2001) (making a distinction between pre-trial bail and bail pending appeal); *see* TEX.CODE CRIM. PROC. ANN. art. 17.40(a) (Vernon Supp.2008) (authorizing trial court to impose "any reasonable condition of bond related to the safety of a victim of the alleged offense or to the safety of the community" in order to "secure a defendant's attendance at trial"). All of these criteria were already more than accommodated with the initial $50,000.00 surety bail bond contract, and there was no legitimate *bona fide* reason to breach those conditions or to add punitive conditions at a later date or to summarily and abusively revoke the bail, re-arrest Plaintiff, or hold her with NO BAIL. The conditions of bail "may not impinge unreasonably upon rights guaranteed by the Constitution." *Anderer,* 61 S.W.3d at 402 (quoting *Estrada,* 594 S.W.2d at 447). In that respect, the courts

(4) an examining trial,[5]

---

must be mindful that one of the purposes of release on bail pending trial is to prevent the infliction of punishment prior to conviction. *Anderer*, 61 S.W.3d at 405. It is undisputed that Plaintiff was cruelly and unusually punished and tortured for over two years prior to trial, which was designed to deprive her of her right to a fair and speedy trial and to secure a wrongful conviction. The primary purpose for setting a bond is to secure the accused's presence in court. *Ex parte Garcia*, 100 S.W.3d 243, 245 (Tex.App.-San Antonio 2001, no pet.). The unilateral addition of punitive conditions by CARNES on June 28, 2010, (1) did nothing to ensure her appearance at trial over and above the initial bond; (2) constituted punishment; (3) was oppressive; (4) constituted a fine; and (5) was contrary to the presumption of innocence. Further, this interpretation of the C.C.P. would make it facially unconstitutional because it violates equal protection, due process, TEX. CONST. art. I, §§ 3, 3a, 9, 10, 11, 11b, 13, 19, and 29, and would impose conditions clearly meant for drug abusers in an arbitrary and capricious manner to punish or deprive others of their pretrial liberty. The oppressive and tyrannical abuse of bond by SHAVER was shocking and outrageous. SHAVER acted without any jurisdiction or authority and so far outside the bounds of common decency that his acts were criminal. SHAVER could not summarily breach the surety bond contract and breach the Bill of Rights contract simply due to his retaliatory, misogynous hatred. SHAVER could not hold Plaintiff in solitary confinement with NO BAIL before trial, set up a Star Chamber with misogynous and punitive intent, summarily commit Plaintiff without a trial or due course of law over her objections, summarily disbar her, or commit these acts of violence, torture, and tyranny on Texas soil. SHAVER and CARNES, acting in concert with the predatory prosecutors, lying "victim"—and now with what appears to be the participation of the United States—committed repeated acts of pure evil, corruption, graft, oppression, suppression, misogyny, and punitive, retaliatory tyranny and torture. The statutes of Texas must be construed consistent with the State and federal constitutions and the legislative intent. The courts are not free to ignore the will of the people as that will is expressed in the Constitution and laws of the State. "The courts of this state have no inherent powers that permit them to ignore express statutory provisions. They are bound to follow the will the people as it is expressed in the Constitution and the laws enacted by the legislature." *See Queen v. State*, 842 S.W.2d 708, 711 (Tex.App.-Houston [1st Dist.] 1992, no pet.). Any action taken by any court, even the appellate courts, that is contrary to the Texas Constitution or statutory laws is "void *ab initio*," i.e., from its inception. *See Ex Parte Kirby*, 626 S.W.2d 533, 534 (Tex.Cr.App. 1981); *Ex parte Schuessler*, 846 S.W.2d at 850, 852-53 (1993). These violations and abuse of bond requirements continued throughout the term of the conspiracy such that Plaintiff was even deprived of a reasonable bail pending appeal. Due to the fraud on the court and the false finding of a deadly weapon enhancement and fraudulent deprivation of probation and parole, Plaintiff was forced to serve her sentence day-for-day. Now, that the United States has admitted their involvement in this conspiracy, it is far wider and larger than it first appeared. The federal judge has referred to it as a "vast" conspiracy because he knew that the United States and several of its agencies and officers were involved. Plaintiff was not ever made aware of the participation of the United States in these crimes of violence and crimes against humanity until 2015, when two United States Attorney Generals entered that judicial admission against interest in a court of law. The acts in furtherance of this conspiracy continue unabated and Plaintiff continues to accrue damages, losses, and injuries. Now, the United States, acting through two Assistant United States Attorney Generals have thrust the United States upon Plaintiff by fraud and the federal courts have aided, abetted, and assisted in these crimes of violence and the continuing cover-up, outlawry, and retaliation against Plaintiff.

[5] *Franks* v. *Delaware*, 438 U. S. 154 (1978). United States Constitution, Amends. 4, 5, 6, and 14; Texas Constitution, Art. I, §§ 3, 3a, 9, 10, 12, 13, 16, 19, 28, and 29. "This due process of law includes, among other things, not only the right of a party to be properly brought into court, but also the right then and there, to avail himself of the constitutional protection thrown around life, liberty, and property; the right to be heard before being condemned, and which proceeds upon inquiry, and to have judgment rendered only after trial." Cooley's Constitutional Lim. (4th Ed.) c. 11; *Grigsby v. Peak*, 57 Tex., loc. cit. 148. Texas C.C.P. art. 16.01 "...The accused in any felony case shall have the right to an examining trial before indictment in the county having jurisdiction of the offense, whether he be in custody or on bail, at which time the magistrate at the hearing shall determine the amount or sufficiency of bail, if a bailable case..." Plaintiff was forever deprived of an examining trial because it would have nipped this conspiracy in the bud and prevented the years of continuing damage and destruction. Plaintiff was completely blocked from securing

(5) due process and fairness in the pre-indictment, investigation, warrant, and grand jury procedures,[6]

---

the exculpatory evidence and witnesses and presenting the truth to clear her name and mitigate damages. Plaintiff was vilified and tried in the media and everyone simply adopted and believed what the predatory prosecutors spoon fed to the media to broadcast, amplify, and sensationalize. Every "judge" involved took this lazy man's short-cut rather than reading the pleadings, record, and testimony. No one concerned themselves with the truth or the fact that they were destroying a life, 30 year career, business, law practice, and family. These were crimes against humanity and against the peace and security of mankind. Now, the United States admits that they were behind and participated in, aided, abetted, and assisted this malicious criminal conspiracy in direct violation and breach of the Texas Bill of Rights and several amendments to the United States Constitution, as well as violation of criminal statutes of this State and nation.

[6] Texas Constitution, Art. I, §§ 3, 3a, 9, 10, 11, 11b, 13, 16, 19, 23, 27, 28, and 29. Justice Lewis Powell, in *United States v. Calandra*, 414 U.S. 338, 343 (1974), said this: "The institution of the grand jury is deeply rooted in Anglo-American history. In England, the grand jury served for centuries both as a body of accusers sworn to discover and present for trial persons suspected of criminal wrongdoing and as a protector of citizens against arbitrary and oppressive governmental action. In this country, the Founders thought the grand jury so essential to basic liberties that they provided in the Fifth Amendment that federal prosecution for serious crimes can only be instituted by "a presentment or indictment of a Grand Jury." *Cf. Costello v. United States*, 350 U.S. 359, 361-362 (1956). The grand jury's historic functions survive to this day. Its responsibilities continue to include both the determination whether there is probable cause to believe a crime has been committed and the protection of citizens against unfounded criminal prosecutions. *Branzburg v. Hayes*, 408 U.S. 665, 686-687 (1972)." So the grand jury has two purposes, says Justice Powell: deciding whether a crime has been committed and protecting the citizen from the government. It gets better. In United *States v. Williams*, 504 U.S. 36 at 47 (1992), Justice Antonin Scalia, delivered the opinion of the Supreme Court: "[R]ooted in long centuries of Anglo-American history," *Hannah v. Larche*, 363 U. S. 420, 490 (1960) (Frankfurter, J., concurring in result), the grand jury is mentioned in the Bill of Rights, but not in the body of the Constitution. It has not been textually assigned, therefore, to any of the branches described in the first three Articles. It "'is a constitutional fixture in its own right.'" *United States v. Chanen*, 549 F. 2d 1306, 1312 (CA9) (quoting *Nixon v. Sirica*, 159 U. S. App. D. C. 58, 70, n. 54, 487 F. 2d 700, 712, n. 54 (1973)), cert. denied, 434 U. S. 825 (1977)." Scalia says this: ". . . In fact, the whole theory of its function is that it belongs to no branch of the institutional Government, serving as a kind of buffer or referee between the Government and the people. See *Stirone v. United States*, 361 U.S. 212, 218 (1960); *Hale v. Henkel*, 201 U.S. 43, 61 (1906); G. Edwards, The Grand Jury 28-32 (1906). Although the grand jury normally operates, of course, in the courthouse and under judicial auspices, its institutional relationship with the Judicial Branch has traditionally been, so to speak, at arm's length. Judges' direct involvement in the functioning of the grand jury has generally been confined to the constitutive one of calling the grand jurors together and administering their oaths of office. *See United States v. Calandra*, 414 U.S. 338, 343 (1974); Fed.Rule Crim.Proc. 6(a). [504 U.S. 36, 48]." The only thing the judge should do, says the Supreme Court, is assemble the grand jurors and swear them in; the court does not preside over it. The grand jury goes to work "as a kind of buffer or referee between the Government and the people." The grand jury protects the people. It oversees the government. It does that by investigating the government, by rooting out government corruption. In the *Creighton Law Review*, Vol. 33, No. 4 1999-2000, 821, in an article entitled, *If It's Not a Runaway, It's Not a Real Grand Jury*, attorney Roger Roots says this: "In addition to its traditional role of screening criminal cases for prosecution, *common law grand juries had the power to exclude prosecutors from their presence at any time and to investigate public officials without governmental influence.* These fundamental powers allowed grand juries to serve a vital function of oversight upon the government. The function of a grand jury to ferret out government corruption was the primary purpose of the grand jury system in ages past." (Emphasis added). In the Williamson County prosecution, the grand jury was selected for the purpose of securing a rubber-stamp on the predatory prosecutors vindictive retaliation. Linda McDaniel, a political supporter of both the recused judge and the prosecutor, was selected to serve as the foreman, while the identities of all other members were kept from Plaintiff. To this day, Plaintiff has been unable to obtain the identity of the other members of this constructed grand jury, which she was blocked from testifying before. Thus, there is no way to ascertain the composition of the grand jury. In Travis County, Plaintiff sent four separate packages via certified,

(6) a public jury trial before a fair and impartial jury,[7]

(7) a speedy trial and fair ability to timely and meaningfully present defense,[8]

---

return receipt requested mail to four separate grand juries and each of those packets were illegally intercepted by the predatory prosecutors and kept from the grand jury. In both Travis County and Williamson County, Plaintiff was prevented from presenting the facts to the respective grand juries, and the District Attorneys had sole access to the grand juries and dictated what they would "investigate" and controlled the testimony and evidence presented, so that the grand juries were stripped of the true intent of constitutional protection for the citizens to be free from malicious, vindictive, or selective prosecutions based upon false evidence and perjured testimony. Neither grand jury received relevant evidence and testimony that would have proven the aggravated perjury contained in the deliberately false and misogynous probable cause affidavits, or evidence of the other crimes committed by the law enforcement personnel who authored the false probable cause affidavits and their misogynous, retaliatory motives. The prosecutors teach and coach the law enforcers to draft probable cause affidavits as press releases, with little regard for the truth; and then present those knowingly false and misleading probable cause affidavits to the media and the grand jury—represented as the truth—knowing that both these entities will blindly accept the lies. The habit, custom, practice, and policy of Travis and Williamson Counties is to reduce the grand juries to a ruse and extension of the prosecutors. The grand juries end up rubber-stamping whatever the prosecutors place in front of them without any semblance of true investigation; therefore, there is no longer a constitutional protection from these malicious prosecutions and the prosecutors are intentionally and knowingly obstructing justice and converting and subverting the intended role of the grand jury into an obscure system or mere formality without any real purpose or meaningful substance. The conversion and subversion has totally undermined the intent of the Texas Constitution, Art. I, §§ 10, 19, and 29. Plaintiff was unaware of the participation of the United States at the time of these incidents. In fact, Plaintiff had sought the assistance of the FBI and Justice Department. Now, it is clear why they would not assist in the investigation of these crimes—they were actively involved in the conspiracy and covering-up for and protecting Kathleen Gittel so that she would not ever answer for her crimes and willful lies. The United States has entered a judicial admission in this cause that it breached the constitutional contract between the people of Texas and Texas as well as the constitutional contract between the people of Texas and the United States.

[7] Texas Constitution, Art. I, §§ 10, 15, 15-a, 19, and 29. Supreme Court Justice Byron White put it this way: "A right to jury trial is granted to criminal defendants in order to prevent oppression by the Government. Those who wrote our constitutions knew from history and experience that it was necessary to protect against unfounded criminal charges brought to eliminate enemies, outspoken critics, and against judges too responsive to the voice of higher authority. The framers of the constitutions strove to create an independent judiciary but insisted upon further protection against arbitrary action. [The framers of the constitutions knew how the judiciary would constantly usurp and infringe upon the rights of the people. The people must have safeguards to protect themselves from the oppression and tyranny of the judiciary.] Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt overzealous prosecutor and against the compliant, biased, or eccentric judge..." Art. I, §§10, 15-a guarantees the right to a trial before an impartial jury. *Franklin v. State,* 138 S.W.3d 351, 354 (Tex.Crim.App.2004). Plaintiff was deprived of both the grand jury protection and the fair and impartial jury safeguards due to the corrupt manipulation by the predatory prosecutors, dishonest deputies, maniacal media, and the corrupt tyrants usurping the judicial office. The United States now admits that it was aware of these unconstitutional abuses and aided, abetted, and assisted in this criminal conspiracy in violation of international law, the United States Constitution, and the Texas Constitution. In doing so, the United States has perpetrated a fraud on the international community and proven its duplicity, deceit, and dishonesty in the field of human rights, civil liberties, and the peace, safety, dignity, and security of mankind.

[8] Texas Constitution, Art. I, §§ 10, 15, 15-a, 19, and 29. The case law is clear that a criminal defendant is entitled to receive a speedy trial under both the United States and Texas constitutions. *U.S. Const. Amends. VI, XIV; Tex.Const. art. I, Section 10.* The right to a speedy trial is fundamental. *Klopfer v. N.C.,* 386 U.S. 213, 223, 87 S.Ct. 988, 993 (1967); *Hull v.* State, 699 S.W.2d 220, 221 (Tex.Crim.App. 1986); *Zamorano v. State,* 84 S.W.3d 643, 649 (Tex.Crim.App. 2002). A defendant has no duty to bring himself to trial. *Barker v. Wingo,* 407 U.S. 514, 527, 92 S.Ct. 2182, 2190 (1972). *Chapman v. Evans,* 744 S.W.2d 133 (Tex.Crim.App.

(8) presumption of innocence (and freedom from the use of false probable cause affidavits as press releases to manipulate the media, and substantially impair and abridge the rights and privileges protected by Texas Constitution Art. I, §§3, 3a, 8, 9, 10, 11, 11b, 12, 13, 14, 15, 15-a, 16, 19, 20, 23, 27, 28, and 29),[9]

---

1988). The Texas Bill of Rights guarantees that if you are accused of a crime, you will be tried quickly. This clause was added to the Bill of Rights by the Founding Fathers to protect people from lengthy periods of incarceration before they were tried for a crime. The idea that the government cannot imprison people without giving them access to a review by a court goes back far into jurisprudential history. The Assize of Clarendon of 1166 and the *Magna Carta* of 1215 both touch on this. The *English Habeas Corpus Act of 1679* required speedy hearings when the accused person was out on bail. The intention was to prevent a lengthy period of incarceration before a trial. The right to a speedy trial became a bedrock principle of English common law that was carried to America by the colonists and this right is included in the Texas Bill of Rights as a right that shall forever remain inviolate both in criminal cases and in involuntary commitment cases. See Art. I, §§10 and 15-a. *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1973); *Ex Parte Brandley*, 781 S.W.2d 886, 891 (Tex.Crim.App.1989); *See Palmer v. State*, 902 S.W.2d 561, 563 (Tex.App.-Houston [1st Dist.] 1995, no pet.); *Ex Parte Brandley*, 781 S.W.2d 886, 891 (Tex.Crim.App.1989); *United States v. Capaldo* (2 Cir. 1968), 402 F.2d 821. Plaintiff immediately filed written demands for a speedy trial in both malicious prosecutions; yet, she was forever deprived of this critical, basic, and fundamental right, which led to a structural defect in the proceedings. Now, it is clear why Andy Austin went out of his way to stall the civil case, obstruct justice, and forever deprive Plaintiff of any timely or meaningful remedy—because the United States was involved in the conspiracy. Plaintiff was not aware of the involvement of the United States in the conspiracy in 2010, 2011, 2012, 2013, or 2014 when she repeatedly attempted to get assistance from the federal courts to stop these atrocities and crimes of violence and crimes against humanity. When the United States joins a local conspiracy due to the misogyny of the men involved, it forever and permanently deprives the targeted citizen of all internationally recognized human rights and threatens the basic security and peace of mankind.

[9] Texas Constitution, Art. I, §§ 8, 9, 10, 15-a, 19, 28, and 29. The Latin expression *Ei incumbit probatio qui dicit, non qui negat* (the burden of proof lies with who declares, not who denies), is the foundational principle of many nations that hold to the belief that justice can only be achieved when one is presumed innocent until the accuser proves them guilty—through legally obtained, admissible evidence and sworn, live testimony in an open court subject to cross-examination and fair confrontation. This precept was adopted in Roman law. The sixth century *Digest* of Justinian (22.3.2) provides, as a general rule of evidence: *Ei incumbit probatio qui dicit, non qui negat*—"Proof lies on him who asserts, not on him who denies". In sources from common law jurisdictions, the expression appears in an extended version, in its original form and then in a shortened form. As extended, it is: *Ei incumbit probatio, qui dicit, non qui negat; cum per rerum naturam factum negantis probatio nulla sit*—"The proof lies upon him who affirms, not upon him who denies; since, by the nature of things, he who denies a fact cannot produce any proof." As found in its original form, it is (as above): *Ei incumbit probatio qui dicit, non qui negat*—"The proof lies upon the one who affirms, not the one who denies." Then, shortened from the original, it is: *Ei incumbit probatio qui*—"the onus of proving a fact rests upon the man". Although the Constitution of the United States does not cite it explicitly, presumption of innocence is widely held to follow from the 5th, 6th, and 14th amendments. *See Coffin v. United States*, 156 U.S. 432; 15 S. Ct. 394 (1895); *In re Winship*, 397 U.S. 358 (1970); *Apprendi v. New Jersey*, 530 U.S. 466, 477 (2000); *Sullivan v. Louisiana*, 508 U.S. 275, 278 (1993). The Universal Declaration of Human Rights, article 11, states: "Everyone charged with a penal offence has the right to be presumed innocent until proved guilty according to law in a public trial at which they have had all the guarantees necessary for their defence". The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law. [156 U.S. 432, 454] It is stated as unquestioned in the textbooks, and has been referred to as a matter of course in the decisions of this court and in the courts of the several states. See 1 Tayl. Ev. c. 5, 126, 127; Wills, Circ. Ev. c. 5, 91; Best. Pres. pt. 2, c. 1, 63, 64; Id. c. 3, 31-58; Greenl. Ev. pt. 5, 29, etc.; 11 Cr. Law Mag. 3; Whart. Ev. 1244; 2 Phil. Ev. ( Cowen & Hill's Notes) p. 289; *Lilienthal's Tobacco v. U. S.*, 97 U.S. 237; *Hopt v. Utah*, 120 U.S. 430 , 7 Sup. Ct. 614; *Com. v. Webster*, 5 Cush. 320; *State v. Bartlett*, 43 N. H. 224; *Alexander v. People*, 96 Ill. 96; *People v. Fairchild*, 48 Mich. 31, 11 N. W. 773; *People v. Millard*, 53 Mich. 63, 18 N. W. 562; *Com. v. Whittaker*,

11

(9) timely and meaningful discovery to adequately prepare the defense,[10]

131 Mass. 224; *Blake v. State*, 3 Tex. App. 581; *Wharton v. State*, 73 Ala. 366; *State v. Tibbetts*, 35 Me. 81; *Moorer v. State*, 44 Ala. 15; *McKinley's Case* (1817) 33 State Tr. 275, 506. In Texas it has been held that it is the duty of the court to state the presumption of innocence along with the doctrine of reasonable doubt, even though no request be made to do so. *Black v. State*, 1 Tex. App. 369; *Priesmuth v. State*, *Id.* 480; *McMullen v. State*, 5 Tex. App. 577. The principle presumes and ensures that suspects are treated well and are offered good defense conditions. Typical infringements include: trial by media where the prosecution's case is published without legal restraints of rules of evidence and procedure and without proper defense confrontation creating a presumption of guilt; lengthy pretrial detentions, which constitute, in practice, a hardship, irreparable damage to the reputation of innocent suspects, and an imposition of undeserved punishment for the suspect, even though they have not been tried or sentenced; delays in discovery being produced by the prosecution, which deprives the accused of a speedy trial; and forcing the accused to choose between their rights so that they are deprived of the full panoply of rights—such as being forced to choose between obtaining exculpatory evidence and obtaining a speedy trial. Plaintiff was deprived of all of these rights when the prosecutors and coconspirators immediately tried her in the press, where there are no rules of evidence, procedure, or fairness. This abuse of the media to try Plaintiff and permanently mar and vilify her continued unabated throughout the conspiracy and the harm, injury, and damage continue to accrue because of the permanent publication of the defamation *per se* on the Internet. Plaintiff was at all times presumed guilty and treated accordingly by being subjected to cruel and unusual pretrial punishment without any semblance of due process. Plaintiff was outlawed and banished to a psychiatric asylum for the criminally insane and manifestly dangerous—the only facility of its kind for the entire state of Texas. Plaintiff would still be there if it had not been for six key people who worked to secure her release from captivity and torture on Texas soil. These rights were also violated in the summary involuntary commitment *in abstentia* that violated both Art. I, §15-a of the Texas Bill of Rights but also the Texas Health and Safety Code, Title 7, Subtitle C. This harsh stigmata illegally and unconstitutionally forced on Plaintiff deprived her of a fair trial, provided the predatory prosecutors with their motive, and continues to prevent Plaintiff from obtaining gainful employment. The stigma is permanently branded on her driver's license and is revealed by any background check. Plaintiff timely advised the defendants and the courts of these constitutional rights, to no avail. Plaintiff was deprived of her right to be heard or to appeal or to seek *habeas corpus* in all State courts and in the federal district and appellate courts. These misogynous men all established a Star Chamber, outlawed Plaintiff and banished her to a psychiatric facility without any semblance of due process, and deprived her of every conceivable right. Plaintiff did not learn until 2015 that the United States failed and refused to prevent these abuses or stop these misogynous crimes of violence because they were involved and participating in the conspiracy and that the actions that seemed to be the individual crimes of Kathleen Gittel were actually those of the United States. Plaintiff never knew that Kathleen Gittel was sent out to Plaintiff's property to trespass and falsely accuse her and frame her for a crime she did not commit in order to retaliate against her for her exercise of 1st amendment rights. It is shocking and outrageous that the United States would so willfully, blatantly, and brutally violate international law and the Texas Bill of Rights and its own constitutional and criminal laws.

[10] Texas Constitution, Art. I, §§ 9, 10, 15-a, 19, 27, 28, and 29. The Texas concept of due course of law includes both substantive and procedural due process and equal protection under the law. Due course of law requires "the opportunity to participate meaningfully in a judicial proceeding," *Ake v. Oklahoma*, 470 U.S. 68, 76 (1985), and "access to raw materials integral to the building of an effective defense, " *Id.* At 77. The accused has a right to the "basic tools of an adequate defense" and "assistance" of counsel crucial to the defendant's ability to marshal his defense." *Id.* At 80. The prosecutors and coconspirators impounded and concealed the evidence, witnesses, and other tangible evidence and statements necessary to prepare an adequate defense, despite Plaintiff's diligent and repeated attempts to discovery and obtain access to this evidence and witnesses. See, e.g. Brennan, The Criminal Prosecution: Sporting Event or Quest for Truth, 1963 Wash.U.L.Q. 279; Everett, Discovery in Criminal Cases—In Search of a Standard, 1964 Duke L.J. 477; Fletcher, Pretrial Discovery in State Criminal Cases, 12 Stan.L.Rev. 293 (1960); Goldstein, The State and the Accused: Balance of Advantage in Criminal Procedure, 69 Yale L.J. 1149, 1172–1198 (1960); Krantz, Pretrial Discovery in Criminal Cases: A Necessity for Fair and Impartial Justice, 42 Neb.L.Rev. 127 (1962); Louisell, Criminal Discovery: Dilemma Real or Apparent, 49 Calif.L.Rev. 56 (1961); Louisell, The Theory of Criminal Discovery and the Practice of Criminal Law, 14 Vand.L.Rev. 921 (1961); Moran,

(10) preservation and timely disclosure of exculpatory evidence,[11]

---

Federal Criminal Rules Changes: Aid or Illusion for the Indigent Defendant? 51 A.B.A.J. 64 (1965); Symposium, Discovery in Federal Criminal Cases, 33 F.R.D. 47–128 (1963); Traynor, Ground Lost and Found in Criminal Discovery, 39 N.Y.U.L.Rev. 228 (1964); Developments in the Law—Discovery, 74 Harv.L.Rev. 940, 1051–1063. Full judicial exploration of the conflicting policy considerations will be found in *State v. Tune,* 13 N.J. 203, 98 A.2d 881 (1953) and *State v. Johnson,* 28 N.J. 133, 145 A.2d 313 (1958); cf. *State v. Murphy,* 36 N.J. 172, 175 A.2d 622 (1961); *State v. Moffa,* 36 N.J. 219, 176 A.2d 1 (1961); *United States v. B. Goedde and Co.,* 40 F.Supp. 523, 534 (E.D.Ill.).  Plaintiff's right to discovery was blocked in the Star Chamber by Shaver and company; blocked in Travis County by Bill Swaim, and blocked in federal court by Andy Austin, who was rubberstamped by Lee Yeakel and summarily acquiesced in by the 5th Circuit because, as a result of the conspiracy, Plaintiff was wrongfully branded an indigent prisoner. Only 2% of the cases branded "indigent prisoner" ever make it past the courthouse steps. 98% of the cases filed by this suspect class are summarily and brutally dismissed in a standard short shrift system.  The United States has admitted that they aided, abetted, and assisted in the destruction and withholding of *Brady* material in both of these malicious prosecutions with a misogynous motive to commit, convict, and disbar Plaintiff.

[11] Texas Constitution, Art. I, §§ 3, 3a, 9, 10, 19, and 29.  *Brady v. Maryland,* 373 U.S. 83, 87-88 (1963)("Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly....A prosecution that withholds evidence on the demand of the accused which, if made available, would tend to exculpate him or reduce the penalty helps shape the trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice"); *Kyles v. Whitley,* 514 U.S. 419, 433 (1995); *Berger v. United States,* 295 U.S. 78, 88 (1935); *Curry v. United States,* 658 A.2d 193, 197 (D.C. 1995)("*Brady* is not a discovery rule but a rule of fairness and minimum prosecutorial obligation."); *Miller v. United States:* "the most dreaded and devastating example of justice gone awry is the conviction and prolonged incarceration...of an innocent defendant, and the rule of *Brady v. Maryland,* is designed to prevent such miscarriages of justice." *See, e.g., United States v. Bagley,* 473 U.S. 667, 675 (1985); Bennett C. Gershman, *Litigating Brady v. Maryland: Games Prosecutors Play,* 57 CASE WESTERN L. REV. 531, 533 (Prosecutorial resort to strategy of "delay and conquer" is not acceptable); *Boss v. Pierce,* 263 F.3d 734, 742 (7th Cir. 2001)("[T]he prosecutor's obligation [is] to seek justice before victory."); *Edelen v. United States,* 627 A.2d 968, 970 (D.C. 1993)(The Constitution requires that disclosure be made "at such time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case."); *Curry,* 658 A.2d at 197-198 ("almost a year elapsed between that indictment and the disclosure of Jones' statement. Such a delay may imperil a defendant's right to a fair trial, and a conscientious prosecutor will not countenance it."); *Perez v. United States,* 968 A.2d 39, 66 (D.C. 2009); *James v. United States,* 580 A.2d 636, 643-44 (D.C. 1990); The American Bar Association's Standards for Criminal Justice, The Prosecution Function, §§ 11-2.1(c) & 11-2.2(a) (2d Ed. 1980), specify that disclosure of exculpatory information is to be made "at the earliest feasible opportunity" and "as soon as practicable following the filing of charges." *Cone v. Bell,* 129 S.Ct. 1769, 1783 n. 15 (2009); Rule 3.8 of the Rules of Professional Conduct, provides in pertinent part, under the heading of "Special Responsibilities of the Prosecutor," that counsel for the prosecution in a criminal case shall not (e) Intentionally fail to disclose to the defense, upon request and at a time when use by the defense is reasonably feasible, any evidence or information that the prosecutor knows or reasonably should know tends to negate the guilt of the accused or to mitigate the offense." *See, Boyd v. United States,* 908 A.2d 39, 57 (D.C. 2006)("the practice of delayed production must be disapproved and discouraged"); *Banks v. Dretke,* 540 U.S. 668, 696 (2004)("[a] rule...declaring [that the] prosecution may hide, defendant must seek, is not tenable in a system constitutionally bound to accord defendants due process."); *Strickler v. Greene,* 627 U.S. 263, 281-82 (1999); *Leka v. Portuondo,* 257 F.3d 89, 99 (2d Cir. 2001); *Lindsey v. United States,* 911 A.2d 824, 839 (D.C. 2006); *DiSimone v. Phillips,* 461 F.3d 181, 197 (2d Cir. 2006); *See Brown v. Miller,* 519 F.3d 231, 238 (5th Cir. 2008) (police and laboratory technician liable under § 1983 for withholding *Brady* material from prosecutors and thereby from the defense); *Newsome v. McCabe,* 319 F.3d 301, 304 (7th Cir. 2003) (police liable for *Brady* violations); *Jean v. Collins,* 221 F.3d 656, 663 (4th Cir. 2000) (en banc); *Spurlock v. Satterfield,* 167 F.3d 995, 1005 (6th Cir. 1999); *Zahrey v. Coffey,* 221 F.2d 352, 355 (2d Cir. 2000) (action appropriate against prosecutor who during the investigation of a case fabricated evidence for use at trial). *See also Pierce v. Gilchrist,* 359 F.3d

13

1279, 1292 (10th Cir. 2004) (plaintiff properly stated claim under § 1983 against forensic chemist for maliciously withholding exculpatory evidence and fabricating inculpatory evidence); *Douglas v. City of New York*, 595 F. Supp. 2d 333, 345 (S.D.N.Y. 2009) (action appropriate for violation of fair trial right where police "forwarded false information" to the prosecutor's office). Swaim and Tumlinson and others failed to preserve or actively hid or destroyed the videotaped recording that proved the assault by Tumlinson on Plaintiff, and the videotape was destroyed after the District Judge ordered them to preserve it. Brinkmann, Hernandez, Travis, Richter, De la Vega, Bartz, Bogan, Foster, Waggoner, Newell, Foster, McDonald, McCabe, and Bradley failed to preserve or actively hid or destroyed the map, address print-out, Census Enumerator manual, cell phone records, and other clearly exculpatory evidence that proved that Gittel was not on Plaintiff's property as a Census enumerator or public official; and they actually fabricated evidence and coached testimony against Plaintiff and tampered with governmental records to implicate Plaintiff. It has been over five years and all diligent and repetitive efforts made by Plaintiff to secure these documents that are clearly *Brady* material, have been systemically thwarted. We now know that the United States, Gittel, Loftin, and Poppa were involved in these *Brady* violations and actively aided, abetted, and assisted in these *Brady* violations. Both the state court and the federal court have obstructed justice and deprived Plaintiff of this critical evidence. Apparently, the United States was involved in this conspiracy and they have probably destroyed it as well. The United States, the Justice Department, the Census Bureau, and the FBI had these documents. The conspirators also misappropriated state funds to tamper with a witness and suborn perjury. Now, the United States admits it was involved in this misappropriation of state funds in fraud of the people and in violation of the Texas Constitution. Swaim, Reno, Puryear, Bradley, McCabe, and McDonald failed to make timely disclosure of exculpatory evidence, and there is a reasonable probability that, had the evidence been disclosed, the result of the proceedings would have been different. In combination with the false and misleading probable cause affidavits, the failure of the prosecutors to comply with the December 19, 2010 discovery order and other discovery orders and produce the clearly exculpatory evidence, (which would have proven that Tumlinson brutally assaulted Plaintiff from behind as she was leaving the courthouse; and would have proven that Gittel was not ever at Plaintiff's residence and initially did not claim that she was, prior to the coaching by the deputies and prosecutors on Saturday, May 8, 2010 and later in 2011 when they took her out to Plaintiff's property to further tamper with the witness, suborn perjury, and secure her testimony), and the continuing failure and refusal to produce these documents, all lead to the subterfuge that the district court had jurisdiction over Plaintiff, as well as the malicious abuse of 46B and the wrongful commitments, and the cruel, unusual, oppressive and punitive captivity that Plaintiff was subjected to on February 28, 2011 through July 2014, because these state actors know that the Texas Department of State Health Services punishes, diagnoses, and mistreats people for the crime they are accused of and do not ever presume innocence and they follow the dictates, desires, wishes, and whims of the State. Had the defendants timely produced the exculpatory evidence, Plaintiff could have moved for a dismissal or proceeded to trial on February 28, 2011, and the Defendants, especially Bradley, McCabe, McDonald, Swaim, Shaver, Carnes, Humes, Coons, Schreiber, Dudley, Hooks, and the various defendants and deputies, embellished by the maniacal media, would not have had the opportunity to cause all the irreparable loss, harm, and damage to Plaintiffs. *Zanders v. United States*, 999 A.2d 149, 163-64 (D.C. 2010)("it should by now be clear that in making a judgment about whether to disclose potentially exculpatory information, the guiding principle must be that the critical task of evaluating the usefulness and exculpatory value of the information is a matter primarily for the defense counsel, who has a different perspective and interest from that of the police or prosecutor. *See Perez* [968 A.2d at 66](noting that *Brady* disclosures are "for the purpose of allowing defense counsel an opportunity to investigate the facts of the case and, with the help of defendant, craft an appropriate defense"). It is not for the prosecutor to decide not to disclose information that is on its face exculpatory based on an assessment of how that evidence might be explained away or discredited at trial, or ultimately rejected by the fact finder."). *See United States v. Douglas*, 525 F.3d 225, 245 (2d Cir. 2008)("*Brady* material that is not 'disclos[ed] in sufficient time to afford the defense an opportunity for use' may be deemed suppressed within the meaning of the *Brady* doctrine.") (quoting *Leka v. Portuondo*, 257 F.3d 89, 103 (2d Cir. 2001)); In the underlying criminal case against Plaintiff, the case was originally set for jury trial on February 28, 2011, and the court had ordered the prosecutors to produce this exculpatory evidence on December 19, 2010. The case did not proceed to trial solely because of Defendants' failure and refusal to produce the exculpatory evidence. These defendants continue, over five years later, to obstruct justice and suppress the exculpatory evidence that would prove Plaintiff is not guilty of any felony or other crime, and that the district court had no

jurisdiction over Plaintiff or the case. But for the fraud, false probable cause affidavits, knowing suppression of clearly exculpatory evidence, and aggravated perjury, these damages, losses, and injuries would not have been incurred or sustained. All actions were undertaken in the absence of all jurisdiction by and through Shaver, who was timely objected to and timely shown to have no oath of office on file anywhere in the State. The suppressed exculpatory evidence would have shown that the probable cause affidavits were knowingly false because Tumlinson and his supervisors had the video recordings; and Gittel, Loftin, and Poppa had the exculpatory evidence with them when they met with Hernandez and the other male deputies on Saturday, May 8, 2010, which proved that Gittel was sent to enumerate another person at 33 Indian Trail, Liberty Hill, Texas and not sent to Plaintiff's residence at 419 Indian Trail, Leander, Texas. The suppressed exculpatory evidence would have proven that the police report and all the governmental records were intentionally changed to make it look like Gittel had reported shots fired at 419 Indian Trial and that she had gone to that address to see Plaintiff when the Defendants knew from the inception that this was a fabrication and not true. The defendants knew they were sent to Plaintiff and her address by Scheffler due to his long-standing misogynous hatred towards Plaintiff. The exculpatory evidence would also prove that Gittel had a cell phone on her and did not ever call 911 to report that shots were fired; and would prove that the deputies did not show up at Plaintiff's residence until four hours after the alleged incident, and that they used deadly force against Plaintiff and maliciously violated her rights under the Texas Bill of Rights, including Art. I, §§3a, 9. The suppressed exculpatory evidence will prove that Gittel was a criminal trespasser, if in fact she was at 419 Indian Trial, Leander, TX rather than 33 Indian Trial, Liberty Hill, TX and that she was not there as a public servant as the probable cause affidavit and indictment alleged. The exculpatory evidence will also prove that Gittel did not ever mention Plaintiff's name or address, and that it was not until Scheffler maliciously directed the deputies to Plaintiff's residence that they came there with their weapons drawn and stared in Plaintiff's open windows of her residence in a violent and threatening manner. The United States now admits that these criminal acts of trespass, invasion of privacy, and conspiracy to frame an innocent person were undertaken and committed within the scope of employment and were acts for which the United States is responsible. In 2013, Travis finally admitted at trial that the deputies had no probable cause to surround Plaintiff's residence or invade her right to privacy. In 2013, Travis also admitted that they only had a very vague description of the woman. *Boss v. Pierce*, 263 F.3d 734, 742 (7th Cir. 2001)("Evidence is suppressed for *Brady* purposes…if (1) the prosecution failed to disclose evidence that it or law enforcement was aware of before it was too late for the defendant to make use of the evidence, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence."). In this case, the Defendants actively hindered Plaintiff from discovering the existence of the exculpatory evidence and altered the reports, governmental records, and audio-video recordings to deliberately exclude any hint of the existence of the exculpatory evidence. They even hid the fact that Gittel had eye surgery and hip or knee surgery and that she had been paid at least $5,000.00 from misappropriated funds. One must concentrate on the gaps in discovery because it is only in detecting where the gaps are that one can ascertain where the exculpatory evidence is hidden or has been redacted or excluded from production. The defendant prosecutors actively suppressed all the exculpatory evidence and altered or fabricated inculpatory evidence. In this case, the suppressed exculpatory evidence was material to the outcome and caused the delay and unconstitutional pretrial punishment and captivity as well as the wrongful conviction and unconstitutional disbarments. *See also Thomas v. State*, 841 S.W.2d 399 (Tex.Crim.App. 1992); *Ex Parte Brandley*, 781 S.W.2d 886, 891 (Tex.Crim.App.1989). The duty to timely disclose exculpatory evidence includes disclosure of any favorable information in the possession of police agencies or other parts of the "prosecutorial team." *Ex parte Mitchell*, 977 S.W.2d 575, 578 (Tex.Crim.App. 1998) (citing *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). A reasonable probability of a different result is shown when the government's evidentiary suppression undermines confidence in the outcome of the trial. *Kyles*, 514 U.S. at 435, 115 S.Ct. 1555. *See also California v. Trombetta* 467 U.S. 479 (1984) and *Arizona v. Youngblood* 488 U.S. 51 (1988). Included in fundamental structural rights is the protection against prosecutorial suppression of exculpatory evidence and other prosecutorial and judicial failures to make "material" evidence or witnesses available to the defense at trial, when "materiality" is defined as at least a "'reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley*, 514 U.S. at 435 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985) (plurality opinion); id at 685 (White, J., concurring in judgment)). In addition to *Bagley*, which addresses claims of prosecutorial suppression of evidence, the decisions listed below – all arising in

(11) confront and cross-examine the evidence and witnesses against one,[12]

---

"what might loosely be called the area of constitutionally guaranteed access to evidence,'" *Arizona v. Youngblood*, 488 U.S. 51, 55 (1988) (quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982)) – require proof of "materiality" or prejudice. *See, e.g., Arizona v. Youngblood*, supra at 55 (recognizing due process violation based on state's loss or destruction before trial of material evidence); *Pennsylvania v. Ritchie*, 480 U.S. 39, 57-58 (1987) (recognizing due process violation based on state agency's refusal to turn over material social services records; "information is "material" if it "probably would have changed the outcome of his trial" (citing *United States v. Bagley*, supra at 682 (plurality opinion); id at 685 (White, J., concurring in judgment)); *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985) (denial of access by indigent defendant to expert psychiatrist violates Due Process clause when defendant's mental condition is 'significant factor' at guilt-innocence or capital sentencing phase of trial); *California v. Trombetta*, 467 U.S. 479, 489-90 (1984) (destruction of breath samples might violate Due Process Clause if there were more than slim chance that evidence would effect outcome of trial and if there were no alternative means of demonstrating innocence); *United States v. Valenzuela-Bernal*, supra at 873-874 ("As in other cases concerning the loss [by state or government] of material evidence, sanctions will be warranted for deportation of alien witnesses only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact."); *Chambers v. Mississippi*, 40 U.S. 284, 302 (1973) (evidentiary rulings depriving defendant of access to evidence "critical to [his] defense" violates "traditional and fundamental standards of due process"); *Washington v. Texas*, 388 U.S. 14, 16 (1967) (violation of Compulsory Process Clause when court arbitrarily deprived defendant of "testimony [that]j would have been relevant and material, and .... vital to the defense"). The United States has now entered a judicial admission that it participated in this criminal conspiracy and aided, abetted, and assisted this conspiracy to commit, convict, and disbar Plaintiff and it was in the scope of duty for the United States' agents, representatives, employees, and attorneys to do so.

[12] Texas Constitution, Art. I, §§ 10, 15-a, 19, 28, 29; *Pointer v. Texas*, 380 U.S. 400 (right of confrontation); Because these rights are basic to our adversary system of criminal justice, they are part of the "due course of law" that is guaranteed by the Texas Bill of Rights Art. I, §§13, 19, to defendants in the criminal courts of the States. *Faretta v. California*, 422 U.S. 806 (1975). Texas Constitution, Art. I, §10 extends greater rights than those stated in *Faretta*. However, Plaintiff was deprived of any her *Faretta* rights. The purpose of these rights to represent oneself and to have the assistance of competent counsel is to ensure a fair trial and these rights cannot be disregarded as they were in Plaintiff's case. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 145 (2006). The right to confront the evidence and cross-examine the witnesses is vital for a fair trial. Plaintiff was at all times deprived of these valuable forever inviolate rights. This right to confront serves two main purposes. First, it protects the defendant from statements allegedly made outside of the court being used against him when he has no opportunity to test or challenge the alleged statement, and second, it gives a defendant the opportunity to cross-examine the witness, allowing him to test the memory, accuracy and sincerity of the witness. These rights were denied Plaintiff in the successive commitments and in the eventual trial itself, as was the intent of a Star Chamber. *Crawford v. Washington*, 541 U.S. 36, 59, 124 S. Ct. 1354, 1369, 158 L. Ed. 2d 177 (2004). Plaintiff was not ever allowed to put on her defense or to confront the sole piece of evidence and witness, Kathleen Gittel, or to confront her accomplices who mislead the jury to aid, abet, and assist the knowing lie. Witnesses should be timely disclosed if they will be used by the State at any stage in the trial. *Young v. State*, 547 S.W.2d 23, 26 (Tex.Crim.App. 1982); *See* concurring opinion in *Hoagland v. State*, 494 S.W.2d 186, 189 (Tex.Crim.App. 1973); *Hendricks v. State*, 610 S.W.2d 932 Tex.Crim.App. 1982). The conspirators never disclosed the witnesses because they would also have proven that Dennis Tumlinson, Jereme Brinkmann, and Kathleen Gittel were lying, had committed aggravated perjury, and that their accomplices were aiding and abetting the fraud on the court and deception of the jury. Everyone lied and claimed that the Census Bureau sent Kathleen Gittel out to Plaintiff's address to enumerate Plaintiff. Plaintiff knows this is a lie and that Kathleen Gittel was never on her property. However, now the United States insist that it did send her out or at least participated in the conspiracy to frame Plaintiff for a crime she did not commit by falsely claiming that it sent her out to enumerate Plaintiff and to trespass on Plaintiff's property, invade her privacy, frame her, and commit aggravated perjury for a bribe—these were all just acts within the scope of her employment for the United States. Perhaps this is the reason the exculpatory documents were never produced—the United States was involved in this malicious conspiracy

(12) have compulsory process for obtaining witnesses and evidence in one's favor,[13]

---

from its inception. This would also explain why the FBI agent claimed that the FBI aided and assisted these predatory prosecutors and dishonest deputies in putting Plaintiff away. The entire texture of the case and the claims have dramatically changed with the judicial admission by the United States claiming their involvement in this continuing conspiracy and succession of crimes against humanity and the peace and security of an innocent citizen of Texas. These claims involve alleged activity on Texas soil on clearly marked private property owned by Plaintiff on which she was not engaged in any criminal activity and to which she was entitled to the peaceful and quiet enjoyment thereof, to be left alone, and to be free from unreasonable searches and seizures. There were a series and succession of clear unreasonable searches and seizures in this case on January 8, 2010, March 8, 2010, May 11, 2010 and all times thereafter and a major unreasonable search and seizure on February 28, 2011 through July 2014. The unreasonable search and seizure continues unabated due to the stigmata permanently attached to Plaintiff that prevents her from obtaining any gainful employment and tortiously interferes each and every day with her right to earn a livelihood. The summary disbarment without any semblance of due process by members of the conspiracy is a continuing injury day after day. The injuries, damages, and loses intentionally inflicted by these malicious conspirators is ongoing and accruing each and every day that they fail and refuse to produce the exculpatory evidence, tell the truth, reverse the conviction, and remove the malicious stigmata of "convicted felon" "use of deadly weapon" "felony assault" and "3 episodes of involuntary mental commitments" that permanently obstruct Plaintiff's ability to earn a livelihood, in addition to the wrongful summary disbarment without any semblance of due process and in violation of the equal rights provision of the Texas Bill of Rights contract.

[13] Texas Constitution, Art. I, §§ 10, 15-a, 19, 28, 29; *Washington v. Texas*, 388 U.S. 14 (right to compulsory process). *See also In re Oliver*, 333 U.S. 257, 273. This right is also subsumed in the Texas Bill of Rights' due course of law that is guaranteed by Art. I, §§10, 13, and 19. The compulsory process clause guarantees you the right to call witnesses to testify in your behalf if you are charged with a crime, and to compel those witnesses to testify if they refuse. Plaintiff was deprived of this right in all the successive commitments and in the trial itself. This is the predictable impact of a Star Chamber and the reason that a third-rate white male competitor was forced on Plaintiff who could not hold a candle to Plaintiff's competence and experience in the courtroom. The white male competitors were selected by the predatory prosecutors because they would conspire, collude, and conform with the dictates of the predatory prosecutors. The predatory prosecutors were able to select and control the grand jury, the "visiting judge," the court-appointed attorney, and the jury. The predatory prosecutors control every part of the process and Plaintiff was not able to participate in the jury selection process, to make an opening statement, or call her witnesses or put on her defense. Plaintiff's defense was hijacked and destroyed. Plaintiff was held in captivity so that the predatory prosecutors could intercept and read her mail and discover her trial strategy, work product, and thought processes and thereby, completely destroy her defense. The predatory prosecutors even discovered Plaintiff's alibi witnesses while she was being held in captivity and met with and discuss the case with them without any representation for the defense being present. The predatory prosecutors took Kathleen Gittel out to Plaintiff's property while she was being held in the unconstitutional and illegal pretrial captivity and coach her to change her testimony to implicate Plaintiff and describe Plaintiff's property. This was another knowing, intentional, and willful criminal trespass on Plaintiff's clearly marked private property and the illegal abuse of their position with the county to obtain the private security code to the security gate in order to willfully trespass on the private property and curtilage of Plaintiff while she was being illegally detained in captivity. No representative of Plaintiff was present during this coaching and tampering with the witness. It was during that time that Kathleen Gittel was also promised and paid compensation to secure her testimony implicating Plaintiff. Kathleen Gittel contracted for and received at least $5,000 to change her testimony and implicate Plaintiff and change the description given to match Plaintiff and her home and property and to change the address from the one originally reported. The conspirators simply changed the address to Plaintiff's address and destroyed the exculpatory evidence that would prove the real address where Kathleen Gittel was sent and where she really was on the day in question. The United States has now confessed that it was involved in this frank breach of the Texas Bill of Rights contract between Texas and its citizens wherein the citizens retained all the rights, power, and authority that were so woefully and willfully trampled.

(13) represent one's self (and be free from having a court-appointed attorney forced on you under false or fraudulent pretenses), and of being heard by himself or counsel, or both,[14]

---

[14] Texas Constitution, Art. I, § 8, 9, 10, 19, 28, and 29. If a person proceeds *pro se* in a court case, it is usually because either he is a lawyer himself, he believes he can adequately navigate the court system and represent himself well, or because he is for some reason unable to obtain a lawyer. The court may appoint standby counsel, but cannot mislead or force a court appointed lawyer on the accused under false pretenses. The accused's right to self-representation is not violated so long as the accused can maintain control over their case, have their defense and decisions respected, and so long as the accused can: (1) Control the theory of their defense and how it's presented in court, (2) Make motions, (3) Participate in voir dire - the jury selection process, (4) Question witnesses, and (5) Speak to the judge and the jury . *See Faretta v. California*, 422 U.S. 806, 817 (1975) ("the question is whether a State may constitutionally hale a person into its criminal courts and there force a lawyer upon him, even when he insists that he wants to conduct his own defense. It is not an easy question, but we have concluded that a State may not constitutionally do so." Also "forcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so."). *See also Godinez v, Moran,* 509 U.S. 389, 400-401 (1993) (ability to make a waiver turns on the comprehension of a right and making an uncoerced choice). The courts will consider the totality of the circumstances to determine if a waiver was coerced or obtained in a misleading manner. *See also People v. Nelson,* 72 A.D.2d 64, 67-68, 424 N.Y.S.2d 543, 546 (1980); *Cappetta v. State,* 204 So.2d 913 (Fla. App. 1967) rev'd. on other grounds, 216 So.2d 749 Fla. 1968); *State v. Woodall,* 5 Wn. App. 901, 904, 491 P.2d 680, 682 (1971); and *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 ("The right to assistance of counsel and the correlative right to dispense with a lawyer's help are not legal formalisms. They rest on considerations that go to the substance of an accused's position before the law. . . .

".. . What were contrived as protections for the accused should not be turned into fetters. . . . To deny an accused a choice of procedure in circumstances in which he, though a layman is as capable as any lawyer of making an intelligent choice, is to impair the worth of great Constitutional safeguards by treating them as empty verbalisms.

". . . When the administration of the criminal law . . . is hedged about as it is by the Constitutional safeguards for the protection of an accused, to deny him in the exercise of his free choice the right to dispense with some of these safeguards . . . is to imprison a man in his privileges and call it the Constitution." *Id.,* at 279-280).

The holding of Adams was reaffirmed in a different context in *Carter v. Illinois*, 329 U.S. 173, 174 -175, where the Court again adverted to the right of self-representation:

"Neither the historic conception of Due Process nor the vitality it derives from progressive standards of justice denies a person the right to defend himself or to confess guilt. Under appropriate circumstances the Constitution requires that counsel be tendered; it does not require that under all circumstances counsel be forced upon a defendant." (Emphasis added.) *See also Moore v. Michigan*, 355 U.S. 155, 161 .

Such a result would sever the concept of counsel from its historic roots. The first lawyers were personal friends of the litigant, brought into court by him so that he might "take `counsel' with them" before pleading. 1 F. Pollock & F. Maitland, The History of English Law 211 (2d ed. 1909). Similarly, the first "attorneys" were personal agents, often lacking any professional training, who were appointed by those litigants who had secured royal permission to carry on their affairs through a representative, rather than personally. *Id.,* at 212-213.    The Founders believed that self-representation was a basic right of a free people. Underlying this belief was not only the antilawyer sentiment of the populace, but also the "natural law" thinking that characterized the Revolution's spokesmen. *See* P. Kauper, The Higher Law and the Rights of Man in a Revolutionary Society, a lecture in the American Enterprise Institute for Public Policy Research series on the American Revolution, Nov. 7, 1973, extracted in 18 U. of Mich. Law School Law Quadrangle Notes, No. 2, p. 9 (1974). For example, Thomas Paine, arguing in support of the 1776 Pennsylvania Declaration of Rights, said:

"Either party . . . has a natural right to plead his own cause; this right is consistent with safety, therefore it is retained; but the parties may not be able, . . . therefore the civil right of pleading by

proxy, that is, by a council, is an appendage to the natural right [of self-representation] . . . ." Thomas Paine on a Bill of Rights, 1777, reprinted in 1 Schwartz 316.

*See,* Hashimoto, Defending the Right of Self-Representation: An Empirical Look at the Pro Se Felony Defendant, 85 N.C.L.Rev. 423, 427, 447, 428 (2007) (noting that of the small number of defendants who chose to proceed *pro se* –"roughly 0.3% to 0.5%" of the total, state felony defendants in particular "appear to have achieved higher felony acquittal rates than their represented counter parts in that they were less likely to have been convicted of felonies"). *See,* Annot., Right of Defendant to Conduct Defense in Person, or to Participate with Counsel, 77 A.L.R. 2d 1233 (1961). Some courts have held that an improper denial of the right of self-representation is reversible error without a need to show prejudice. *See, e.g., United States v. Price,* 474 F.2d 1223, *reh'g denied,* 484 F.2d 485 (9th Cir, 1973); *United States v. Dougherty,* 473 F.2d 1113 (D.C. Cir. 1972); *Ferrel v. Superior Court,* 20 Cal.3d 888, 576 P.2d 93, 144 Cal.Rprtr. 610 (1978); *Coleman v. State,* 617 P.2d 243 (Okla.Crim. 1980). The choice must be a defendant's, not a choice made ostensibly on a defendant's behalf by someone else. *See Faretta v. California,* 422 U.S. 806, 834 (1975)("It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage."). *Faretta* addressed and rejected the argument that lack of technical legal knowledge could preclude a defendant from representing himself if he chose. 422 U.S. at 836. Further, and most importantly, *Faretta* recognized that the right to counsel and the right to self-representation were separate and independent constitutional rights, (422 U.S. at 819-820, n. 15), just as the framers of the Texas Constitution had 100 years earlier. Texas Constitution, Art. I, § 10 clearly protects the "right of being heard by himself or counsel, *or both.*" (emphasis added) because the framers did not say "but not both" as McCabe represented, Shaver imposed, and the appellate courts rubber-stamped. However, clearly the framers chose to add "**or both**" to emphasize and clarify the options this valuable and "inviolate" right protected. Texas Constitution, Art. I, § 29. When interpreting the Texas Constitution, we "rely heavily on its literal text and must give effect to its plain language." *Stringer v. Cendant Mortgage Corp.,* 23 S.W.3d 353, 355 (Tex.2000); *Republican Party of Tex. v. Dietz,* 940 S.W.2d 86, 89 (Tex.1997). The Texas Constitution specifically provides the right of dual representation, unlike the facts in *Faretta* where California had voted and removed the right of self-representation from their State Constitution. Texans do not have to resort to the 6th Amendment to protect this inviolate right because it is an inherent part of our State's Constitutionally protected right to due course of law. Texas Constitution, Art. I, §§ 10, 19, and 29. "I consider my own participation decisive for my defense. One might argue that since I am determined to play an active role in the trial, I should fire my lawyers and assume the entire burden of the defense. This is to say, if I wish to exercise my constitutional right to defend myself, I must relinquish the right to [assistance of] counsel. This either/or situation flies blatantly in the face of justice. Rigorously speaking, neither is a *right,* if one must be renounced in order to exercise the other. Should I be penalized because I do not possess the legal knowledge, experience or expertise necessary to proceed entirely *pro se*?" A. DAVIS, IF THEY COME IN THE MORNING, 253 (1971) quoted and discussed in NOTE, THE RIGHT TO DEFEND PRO SE IN CRIMINAL PROCEEDINGS—FARETTA V. CALIFORNIA, 37 OHIO STATE L.J. 220, 237-239 (1976). *See also* Kimberly Helene Zelnick, In Gideon's Shadow: The Loss of Defendant Autonomy and the Growing Scope of Attorney Discretion, 30 AM.J.CRIM. L. 363, 370–71 (2003). *See United States v. Plattner,* 330 F.2d 271, 274 (The right to the assistance of counsel, the court concluded, was intended to supplement the other rights of the defendant, and not to impair "the absolute and primary right to conduct one's own defense in *propria persona.*"); *See also, Faretta v. California,* 422 U.S. 806, 820 (1975) ("the question is whether a State may constitutionally hale a person into its criminal courts and there force a lawyer upon him, even when he insists that he wants to conduct his own defense. It is not an easy question, but we have concluded that a State may not constitutionally do so." and also "It [the 6th amendment] speaks of the "assistance" of counsel, and an assistant, however expert, is still an assistant. The language and spirit of the Sixth Amendment contemplate that counsel, like the other defense tools guaranteed by the Amendment, shall be an aid to a willing defendant - not an organ of the State interposed between an unwilling defendant and his right to defend himself personally. To thrust counsel upon the accused, against his considered wish, thus violates the logic of the Amendment. In such a case, counsel is not an assistant, but a master; and the right to make a defense is stripped of the personal character upon which the Amendment insists.... An unwanted counsel "represents" the defendant only through a tenuous and unacceptable legal fiction. Unless the accused has acquiesced in such representation, the defense presented is not the defense guaranteed him by the Constitution, for, in a very real sense, it is not his defense."). *Faretta* recognized that the right to counsel and the right to self-representation were separate

(14) practice one's livelihood, earn a living, support one's children, and practice law free from retaliation,[15]

and independent constitutional rights, (422 U.S. at 819-820, n. 15), just as the framers of the Texas Constitution had 100 years earlier. *See also* Teresa A. Scott, Recent Development, The Role of Standby Counsel: The Road from *Faretta* to *Wiggins*, 27 HOW. L.J. 1799, 1801 (1984) (explaining Faretta's opinion as to why public defender would be ineffective). It is simply against the clear language of the Texas Constitution and the rules of construction to misinterpret the words "or both" to mean "but not both."

[15] Texas Constitution, Art. I, §§ 3, 3a, 8, 9, 13, 15-a, 16, 19, 27, 28, and 29. The "liberty" guaranteed by the due process clause includes personal, political and social rights and privileges. *Hampton v. Mow Sun Wong*, 426 U.S. 88, 102 & n.23 (1976). The right to earn a living was protected at common law as far back as the Magna Carta (1215), *see* Section 41. *Darcy v. Allen,* 77 Eng. Rep. 1260, 1269 (1602); *City of London's Case,* 77 Eng. Rep. 658, 663 (1610); *Parry v. Berry,* 92 Eng. Rep. 1066 (1718); *Chamberlain of London's Case,* 77 Eng. Rep. 150 (1592); *Chesman et ux v. Nainby,* 93 Eng. Rep. 819, 821 (1727); *Allen v. Tooley,* 80 Eng. Rep. 1055, 1057 (1614); *The Case of the Tailors,* 77 Eng. Rep. 1218 (1615). The wording in the Declaration of Independence was changed during drafting from "life, liberty, and estate/property" to "life, liberty, and the pursuit of happiness" to encompass the right to pursue a livelihood and all that makes a man a man because anything that "takes away a man's trade, taketh away his life, and therefore, is ... odious." In short, "no man ought to be put from his livelihood without answer." *See Corfield v. Coryell,* 6 F. Cas. 546, 551-52 (1823); *Sewall v. Jones,* 26 Mass. 412, 413 (1830); *Walter v. Hanger,* 72 Eng. Rep. 935 (1602) (right to earn a living included in the phrase "privileges and liberties"); *City of Memphis v. Winfield,* 27 Tenn. 707, 709-710 (1848) (where a new law was struck down because it was "high handed and oppressive, and…an attempt to impair the liberty of a free person unnecessarily, to restrain him from the exercise of his lawful pursuits, and to make an innocent act a crime, and to exact a penalty therefor both by fine and imprisonment, without trial before any tribunal."); *Griffin v. State,* 799 P.2d 521 (Kan. Ct. App. 1990); *Phillips v. District of Columbia,* 458 A.2d 722 (D.C. 1983); *United Steel Workers of America v. Milstead,* 705 F.Supp 1426 (D. Ariz. 1988); *Kraft v. City of Bettendorf,* 359 N.W.2d 466 (Iowa 1984). Plaintiff was fined over $10,000 and still forced into indefinite pretrial captivity without any trial before any tribunal. This action was taken to separate Plaintiff from her ability to earn a livelihood or access her funds or protect her property. Another judge in Williamson County enjoined Plaintiff's agent from acting under a duly executed power of attorney to prevent Plaintiff or her agent from protecting her property, assets, and home, which the Defendants repeatedly went after. Due to the injunction Plaintiff was unable to access or control anything and the home was repeatedly burglarized and vandalized, causing over $500,000.00 in losses and damages. Plaintiff's children and all of her clients were left in a sudden and violence lurch. Plaintiff was also unable to access her funds to pay her retained counsel. Thus, she was deprived of both her right to represent herself and her right to assistance of competent counsel. Plaintiff had a constitutional right that shall forever remain inviolate to conduct her own affairs and pursue gainful occupation without violent interference and impingement by these defendants. Plaintiff's right to practice law was summarily stripped from her on February 28, 2011 and she has been hindered, prevented, and obstructed from representing or assisting her clients ever since causing extreme mental anguish and emotional distress. One author has noted that "long before the adoption of the Fourteenth Amendment, British and American courts protected many facets of the individual's right to pursue a gainful occupation against encroachment by the government." (McCormack, Wm. 1994, Economic Substantive Due Process and the Right of Livelihood. *Kentucky Law Journal* 82: 399-400); "…a citizen has a right to aspire to office, or to pursue any lawful avocation." *In re Dorsey,* 7 Port. 293 (1838); *Cummings v. Missouri,* 71 U.S. 277, 320 (1866) (Justice Field, writing for the Supreme Court, stated "The theory upon which our political institutions rests is, that all men have certain inalienable rights—that among these are life, liberty, and the pursuit of happiness; and that in the pursuit of happiness all avocations, all honors, all positions, are alike open to every one, and that in the protection of these rights all are equal before the law. Any deprivation or suspension of any of these rights for past conduct, is punishment, and can be in no otherwise defined." *See* Rep. Hamilton in *Congressional Record,* 43rd Cong., 1st sess., App. 363 (1874); and *Congressional Globe,* 42 Cong., 2d sess., 844 (1872); *Powell v. Pennsylvania,* 127 U.S. 678, 684 (1888); *Dent v. West Virginia,* 129 U.S. 114, 121 (1889); *Yick Wo v. Hopkins,* 118 U.S. 356, 365, 370 (1886) ("a naked arbitrary power to give or withhold"—"[T]he very idea that one man may be compelled to hold his life, or the means of living, or any material right essential to the enjoyment of life, at the mere will of another, seems to be

(15) assistance of competent and ethical counsel to present your own defense (and to be free from having case and defense hijacked by court appointed counsel),[16]

---

intolerable in any country where freedom prevails, as being the essence of slavery itself." *See also May v. People,* 27 P. 1010, 1012 (1891); *Allgeyer v. Louisiana,* 165 U.S. 578, 590 (1897) (quoting from *Butcher's Union Co. v. Cresant City Co.,*111 U.S. at 746, 762 (1884); *Meyer v. Nebraska,* 262 U.S. 390, 399-400 (1939)(["Liberty"] denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men."); *Barsky v. Bd. of Regents of the State of New York,* 347 U.S. 442, 472 (1954)(Justice Wm Douglas in the dissent wrote "The right to work I had assumed, was the most precious liberty that man possesses. Man has indeed as much right to work as he has to live, to be free, to own property...It does many men little good to stay alive and free and propertied, if they cannot work. To work means to eat. It also means to live...[S]o the question here is not what government must give, but rather what it may not take away."). Texas courts have held that citizens "[have] a vested property right in making a living" (*Smith v. Decker,* 158 Tex. 416 (1958). Shaver, Bradley, McCabe, McDonald, Swaim, Schreiber, Borynski, Johnson, Humes, DeBerry, Reno, Puryear, Tumlinson, Hightower, Hobbs, Rye, the deputies, and other defendants acting in concert tortiously interfered with that vested property right and have trespassed on that right and Plaintiff's intellectual property rights.

[16] Texas Constitution, Art. I, §§ 3, 3a, 8, 9, 10, 15-a, 19, 28, and 29. *See U.S. v. Chronic,* 466 U.S. 648, 104 S.Ct. 2039 (1984). Schreiber, Dudley, and Hooks affirmatively acted against Plaintiff's best interest by failing and refusing to (1) file and present an application for writ of *habeas corpus,* (2) communicate with Plaintiff, (3) discuss and disclose his unilateral decision to go along with the State's motive and deprive Plaintiff of her defense and speedy trial, (4) notify Plaintiff of the filing of and hearing on the motion for sanity examination, (4) communicate with Plaintiff or answer her questions, (5) prepare the defense or investigate the facts, (6) conduct discovery or secure the evidence, (8) interview the witnesses, (9) take timely action to recall a warrant, (10) visit Plaintiff in jail, (11) consult with or advise Plaintiff prior to taking adverse and detrimental action or entering into binding agreements, (12) enforce Plaintiff's constitutional rights, (13) discuss the withdrawal with Plaintiff or provide her with notice of same, (14) properly file a motion for new trial or seek to protect or advance Plaintiff's rights on appeal, (15) remain loyal to Plaintiff and represent her best interests, (16) comply with Texas Health and Safety Code, Title 7, Subtitle C, and (17) ascertain and disclose the truth to the court, (18) secure Plaintiff's presence at the hearing or discussions concerning the case, (19) confront the witnesses and evidence against Plaintiff, (20) zealously represent Plaintiff or consider her advice, direction, wishes, or decisions. These three third-rate competitors were mere *pro forma* attorneys, who were never intended to be effective assistance of counsel because the intent was to get controllable counsel in to deprive Plaintiff of all her rights. These pro forma counsel were senile, sycophant, and superficial. Schreiber even made material misrepresentations of fact, testified against Plaintiff, and introduced hearsay against Plaintiff in aid of the malicious abuse of process and to advance the object of the conspiracy in order to deprive Plaintiff of a fair and speedy trial, while completely destroying her defense and handing the malicious prosecutor his desired motive. Schreiber, Dudley, and Hooks simply went against Plaintiff's wishes, unilaterally waived her rights against her will, and dismantled, destroyed, and hijacked her defense promoting their own best interest and sacrificing Plaintiff and her familial relations and responsibilities, welfare, business, clients, property, safety, security, liberties, and reputation. Schreiber, Dudley, and Hooks were not **assistance** of counsel. Not one of these white male competitors would even listen to Plaintiff even though she had far more experience, knowledge, and expertise than they had and she was far more competent that they were—combined. Plaintiff was entitled to effective **assistance** of counsel, not just the bare subterfuge or artifice of a warm body in possession of a bar card who forgets his fiduciary role and ethical duty to the client and hijacks her defense and waives all her rights. The purpose of the **assistance** of counsel is to aid, assist, and advise, not arrogantly dictate, refuse to communicate, and completely hijack or fabricate a defense to match the prosecutor's theme and trial strategy. This was the intent of the Star Chamber and the object of the conspiracy to obtain the result of commitment, conviction, and disbarment through a pro forma process. Because this was the object of the conspiracy, Plaintiff was not ever able to present her defense, cross-examine witnesses, confront the false evidence, or call witnesses and present evidence on her own behalf.

Plaintiff had a right to present her own defense and not have it hijacked by a court-appointed lawyer who was forced on her over her strenuous objections. It is axiomatic that knowledge of and experience with the criminal laws and courtroom procedures often makes the difference between a conviction and an acquittal. No one would chose to navigate the treacherous waves of a criminal trial without the assistance of a knowledgeable and loyal guide or agent; however, the well-documented reality is the lack of diligent, zealous representation by court-appointed lawyers, coupled with the appalling lack of ethics, honesty, and integrity, which leaves a vast majority of individuals accused of serious crimes in a position of being forced to choose to embark with an arrogant know-it-all who does not listen to them or communicate with them, and who is obviously lazy, unconcerned, and uncaring, or to try to set sail alone—the quintessential Scylla and Charybdis. This is an untenable choice—one that the framers of the Texas Constitution took care to prevent, when they provided the clear choice "or both" and the language of the 6th amendment referred to as the right "to have **Assistance** of Counsel for **his** defense." This is what a true ethical and honest defense should be—an equal, collaborative relationship of trust, candor, and mutual respect. A court appointed lawyer must give his undivided loyalty and attention to the defendant and must make a good faith effort to assist the defendant. The court appointed attorneys were artifices to give an appearance, but they were incompetent, lazy, unethical, and dishonest, pursuing their own best interests at the expense of their alleged client—to not have to try the case and to force Plaintiff to plea bargain, to make money without doing any work, to appease the court and prosecutors in order to secure more court appointments—because "defense lawyers" who are willing to plea bargain, get assigned more cases, than those who provide a vigorous and zealous defense. These court appointed attorneys made the proceedings a farce and a mockery of justice. Court-appointed attorneys like these three are a dime a dozen and they do not provide any semblance of effective **assistance** of counsel. The "representation" provided amounts to no representation at all and a complete disservice to their clients and society in general. A complete denial of the constitutional right to trial counsel is a structural defect, and "prejudice is presumed because the trial has been rendered inherently unfair and unreliable." *See Williams v. State,* 194 S.W.3d 568, 578-79 (Tex. App.--Houston [14th Dist.] 2006), *aff'd,* 252 S.W.3d 353, 357 (Tex. Crim. App. 2008). Thus, it is reversible error, not subject to a harm analysis. *Id.* at 357-59; *see* Tex. R. App. P. 44.2(a). When the artifice or subterfuge of a court-appointed attorney is utilized, clients are coerced into plea bargaining and admitting to crimes they did not commit or face the punitive alternative of being 46B'd until they do finally relinquish and agree to forego their right to a jury trial, speedy trial, and right to be free from pretrial punishment and captivity. Captivity under a malicious abuse of process under 46B results in forced medication, chemical restraint, and chemical lobotomy to assist in the mental coercion to forfeit rights and passively obey the court-appointed attorney. With Shaver allowing Connell and McCabe to decide who to appoint as the defense attorney was a denial of due course of law *per se*. Shaver did nothing more than provide the subterfuge of an "expansive gesture" of representation without actually providing for **assistance** of counsel. This subterfuge and abuse of 46B happens when the prosecution is politically motivated, or when it is vindictive, selective, or retaliatory, or when there is potential civil liability for the abuses in law enforcement, such as use of excessive force or deadly force or searches and seizures without warrants, or violations of other constitutional rights because it allows the State to (1) impose pretrial punishment and control the accused with chemical restraints, (2) discredit the suspect's version of events, (3) coerce or force the accused to forego valuable rights and plea bargain to regain their life and freedom, and (4) keep the accused in captivity until after the short statute of limitations has expired on potential civil liability. The Supreme Court decisions, that were intended to assist the accused in protecting their rights, have been twisted into weapons to deprive the accused of valuable constitutional protections. The Supreme Court has determined that the Right to Counsel Clause guarantees not only the right to have an attorney in a criminal proceeding, but also to have an effective attorney. Courts can replace attorneys if they believe it is in the best interest of the defendant. Some reasons that a court may conclude that an attorney is ineffective include lack of knowledge of judicial and legal proceedings, conflicts of interest that prevent the attorney from being fully loyal to the interests of the defendant or a breakdown of communication between the defendant and his lawyer. The basic obligation of an attorney to render effective assistance of counsel to his client in the protection of life, liberty or property, and the right of the client to receive such effective assistance is a long established concept. In the case of *Von Moltke v. Gillies,* 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309 (1948), the opinion of Justice Black includes the following statement: "Undivided allegiance and faithful, devoted service to a client are prized traditions of the American lawyer." A footnote reference to such statement in the opinion sets out Canons 15 and 4 of the American Bar Association Canons of Professional and Judicial

Ethics, as follows:  "Canon 15. The lawyer owes 'entire devotion to the interest of the client, warm zeal in the maintenance and defense of his rights and the exertion of his utmost learning and ability,' to the end that nothing be taken or be withheld from him, save by the rules of law, legally applied. No fear of judicial disfavor or public unpopularity should restrain him from the full discharge of his duty. In the judicial forum the client is entitled to the benefit of any and every remedy and defense that is authorized by the law of the land, *and he may expect his lawyer to assert every such remedy or defense."* (Emphasis supplied). The Canons of Ethics which govern members of the State Bar of Texas contain several provisions relating to the subject of effective assistance of counsel. Canon 6 refers to "The obligation to represent the client with undivided fidelity." Canon 7 provides, in part, that "…it is the right of any member, without fear or favor, to give proper advice to those seeking relief against unfaithful or neglectful counsel…" Canon 8 provides, in part, that "A member should endeavor to obtain full knowledge of his client's cause before advising thereon …" Canon 19 provides, in part, that "The conduct of a member before the court and with other members should be characterized by candor and fairness." Canon 21 provides, in part, that "A member should not do anything repugnant to his own sense of honor and propriety." Canon 40 provides that an attorney may withdraw from employment under certain conditions, including "even if a member finds himself incapable of conducting the case effectively."  If the conduct of an attorney "is so incompetent as to deprive his client of a trial in a real sense---render the trial a mockery and a farce is one descriptive expression,---the accused must have another trial, or rather, more accurately, is still entitled to a trial." *Mitchell v. United States,* 104 U.S.App.D.C. 57, 259 F.2d 787 (1957), *cert.* denied, 358 U.S. 850, 79 S.Ct. 81, 3 L.Ed.2d 86. Effective assistance of counsel contemplates the conscientious services of competent counsel and mere perfunctory appearance for a defendant is not enough. *United States v. Wight,* 176 F.2d 376 (2d Cir. 1949), *cert.* denied, 338 U.S. 950, 70 S.Ct. 478, 94 L.Ed. 586; to like effect, *Turner v. State of Maryland,* 303 F.2d 507 (4th Cir. 1962), *cert.* denied, 364 U.S. 885, 81 S.Ct. 173, 5 L.Ed.2d 105. "Where the defense is substantially weakened because of the unawareness on the part of defense counsel of a rule of law basic to the case, the accused is not given the effective representation guaranteed him by the Constitution." *Poe v. United States,* 233 F.Supp. 173 (D.D.C.1964), opinion by Judge Skelly Wright, Circuit Judge sitting by designation, in which services of legal-aid counsel were held to be ineffective. The guarantee of the Fourteenth Amendment is not satisfied by a mere formal appointment of competent counsel and that a denial of opportunity to confer, consult with the accused and to prepare his defenses, could convert the trial into a "sham". *Avery v. State of Alabama,* 308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377. The parroted "we cannot have hybrid representation" has lead to a situation where the accused must decide to surrender their rights or try to go *pro se*; however, if they try to file for appeal or *habeas corpus* when their court-appointed counsel has sold them up the river, the appellate courts ignore them and deny their relief.  There is literally no other way out except to obey the traitor court-appointed lawyer or lose your life.  This was the very situation that the framers of the Texas Constitution sought to prevent when they provided that an accused had a right to appear by himself or through counsel, or both.  This parroting of the federal language about "hybrid representation" has lead to a deplorable deprivation of equal protection under the law in violation of the 14th amendment, as well as violations of Texas Constitution Art. I, §§ 2, 3, 3a, 8, 9, 10, 11, 11b, 12, 13, 14, 15, 15-a, 16, 19, 20, 27, 28, and 29.  *See Powell v. Alabama,* 287 U.S. 45, 56-57 (1932) *See* Jeffrey Levinson, Note, Don't let Sleeping Lawyers Lie: Raising the Standard for Effective Assistance of Counsel, 38 AM.CRIM.L. REV. 147, note 18 at 151, 152 (2001) (commenting that although defendants in *Powell* had counsel, one was appointed on morning of trial, and other was not a member of the Alabama bar).  *See, Gideon v. Wainwright,* 372 U.S. 335, 339, 342 (1963); *Alabama v. Shelton,* 535 U.S. 654, 672 (2002) (holding if defendant is deprived of assistance of counsel during trial, no sentence can be given).  *See generally Bell v. Cone,* 535 U.S. 685, 695–96 (2002) (noting denial of counsel at "critical stage of the litigation creates a presumption of complete denial of counsel"); Jenny Roberts, A Conference on New York City's Criminal Courts: Too Little, Too Late: Ineffective Assistance of Counsel, the Duty to Investigate, and Pretrial Discovery in Criminal Cases, 31 FORDHAM URB. L. J. 1097, 1106 (2004) (arguing that in order to have effective representation under 6th amendment, defense counsel must have duty to investigate defenses and prosecution's potential case).  There are several Texas decisions involving the right to effective assistance of counsel in both civil and criminal cases, the necessity of judicial sensitivity to the protection of constitutional rights, and the relationship of such matters to constitutional due process. *See Lopez v. Calzado,* 281 S.W. 324 (Tex.Civ.App., 1926, wr. dism.) ; *Madero v. Calzado,* 281 S.W. 328, second case. (Tex.Civ.App., 1926, wr. dism.) ; *Rodriquez v. State,* 170 Tex.Cr.R. 295, 340 S.W.2d 61 (1960) ; *Ex parte Caldwell,* Tex. Cr.App., 383 S.W.2d 587 (1964) ; *Ex parte Davis,* 161 Tex.

(16) notice of, appearance at, and participation in a hearing before entry of detrimental orders,[17]

561, 344 S.W.2d 153 (1961). *See* also, *MacKenna v. Ellis,* 280 F.2d 592 (5th Cir. 1960), modified on *en banc* hearing, 289 F.2d 928 (1961); *Porter v. United States,* 298 F.2d 461 (5th Cir. 1962); *Randazzo v. United States,* 339 F.2d 79 (5th Cir. 1964); *Pineda v. Bailey, Sheriff of El Paso County, Texas, and Dr. George Beto, Director of the Texas Department of Corrections,* 340 F.2d 162 (5th Cir. Jan. 12, 1965). In *Rodriguez v. State,* 170 Tex.Cr.R. 295, 340 S.W.2d 61 (1960), the Court of Criminal Appeals stated: "Courts are slow to express an opinion as to whether a licensed member of the bar, authorized to practice law in the state, is competent to do so or has adequately represented and protected the rights of a client, but when it appears from the entire record that accused has not been adequately represented, courts should not hesitate to say so." In this case, a court-appointed lawyer was coerced onto Plaintiff under false pretenses, and he immediately dismantled and destroyed the defense and trial strategy by collaborating with the malicious prosecutors and giving the prosecutors the motive they sought from the inception of this malicious prosecution. This forced appointment was so patently concocted to deprive Plaintiff of due process because Plaintiff had already made an election under Texas Constitution, Art. I, § 10 and filed it of record on June 15, 2010 stating that she would represent herself and appear through counsel of choice BOTH and no objection has ever been made by the State; Plaintiff had her own co-counsel of choice (who had no objection to working as co-counsel with Plaintiff as Plaintiff was a licensed attorney and criminal defense lawyer herself—and there is no limit on the number of defense lawyers a defendant may have); and Plaintiff had not ever requested a court-appointed attorney or waived her right to represent herself. These rights are equal and Plaintiff asserted her right to represent herself in writing and never withdrew or waived that valuable right. The only way to prevent Plaintiff from obtaining the exculpatory evidence and *Brady* material, which would prove the conspiracy, was to set up the Star Chamber and deprive Plaintiff of all her rights to secure and accomplish the object of the conspiracy to commit, convict, and disbar was to revoke Plaintiff's bail, hold her with NO BAIL pretrial, and utilize a third-rate competitor to waive her rights and summarily put her away. The United States now admits that they aided, abetted, assisted, and participated in this shocking and outrageous unconstitutional conduct.

[17] Texas Constitution Art. I, §§ 9, 10, 15, 15-a, 19, 28, and 29. Texas Health and Safety Code, Title 7, Subtitle C, Chapter 571, 574. "[A] State must afford to all individuals a meaningful opportunity to be heard if it is to fulfill the promise of the Due Process Clause." *Boddie v. Connecticut,* 401 U.S. 371, 379, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965); *Grannis v. Ordean,* 234 U.S. 385, 394, 34 S.Ct. 779, 58 L.Ed. 1363 (1914).

"'Due process of law' ordinarily includes: (a) Hearing before condemnation ; (b) accordance of reasonable opportunity to prepare for the hearing. Mandate of reasonableness of opportunity may not be attenuated to mere formal observance by judicial action, …'" *Ex parte Hejda,* 118 Tex. 218, 13 S.W.2d 57.

Due process requires that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case. Where the state can feasibly provide a pre-deprivation hearing, it must do so regardless of the post-deprivation remedies available. Further, the existence of adequate post-deprivation remedies does not bar a substantive due process claim. *See Snyder v. Massachusetts,* 291 U.S. 97 105-106 (1934), the Court held that the Confrontation Clause of the Sixth Amendment gives the accused a right to be present at all stages of the proceedings where fundamental fairness might be thwarted by his absence. This right to "presence" was based upon the premise that the "defense may be made easier if the accused is permitted to be present at the examination of jurors or the summing up of counsel, for it will be in his power, if present, to give advice or suggestion or even to supersede his lawyers altogether and conduct the trial himself." *Id.,* at 106. *Young v. Martinez,* 685 S.W.2d 361, 363 (Tex.App.-San Antonio 1984, no writ.). "The right to be heard assures a full hearing before a court having jurisdiction of the matter, the right to introduce evidence at a meaningful time and in a meaningful manner, and to have judicial findings based upon that evidence." It is universally conceded in each of the states and the federal government that it is essential to due process of law that a person whose life, liberty, or property is to be affected must have notice that he is being proceeded against, and he must be given an opportunity to be heard. Furthermore, if ample time to prepare defense is not given, there is no

(17) privacy,[18]

---

due process of law, and the judgment is a nullity, and also failure to allow such time is an abuse of discretion. *State v. Collins,* 104 La. 629, 29 South. 180, 81 Am. St. Rep. 150; *Helton v. Commonwealth (Ky.)* 87 S.W. 1073; *Hensley v. Same (Ky.)* 74 S.W. 677. As cumulative, it may be said that no procedure is either in accordance with the laws of nations or due process of law, which does not fully hear before it condemns. From Webster's Brief in *Dartmouth College Case,* 4 Wheat. 518, 4 L.Ed. 629, and down to date, this fundamental precept has never been disputed by any court of high authority. The United States has admitted that it has embarked upon this course of conduct and that this conduct is simply acts within the scope of employment.

[18] Texas Constitution, Art. I, §§ 2, 3, 3a, 9, 13, 15-a, 19, 28, and 29; "The evil of an unreasonable search or seizure is that it invades privacy, not that it uncovers crime, which is no evil at all." *Townes v. City of New York,* 176 F.3d 138, 148 (2d Cir.1999). These defendants repeatedly invaded Plaintiff's privacy and subjected her to repeated unreasonable searches and seizures. On the times that they did have a warrant, the arrest and search warrants were defective; and the deputies went far beyond the legal parameters of the search warrant and searched all of Plaintiff's vehicles and locked buildings; and also removed the entire safe from her home, damaging it in the process—all without a warrant or authority to do so. Texas courts have recognized Texas' own independent right of privacy under the Texas Constitution in *Texas State Employees Union v. Texas Dep't of Mental Health and Mental Retardation,* 746 S.W.2d 203, 205 (Tex.1987) (citing Roe ); see also *Diamond Shamrock Ref. and Mktg. Co. v. Mendez,* 844 S.W.2d 198, 203 (Hightower, J., concurring) (emphasizing the imperative nature of the right to privacy under the Texas Constitution); Amy Johnson, Abortion, Personhood, and Privacy in Texas, 68 Tex.L.Rev. 1521 (1990). The U. S. Bill of Rights reflects the concern of James Madison and other framers for protecting specific aspects of privacy, such as the privacy of beliefs, privacy of the home against demands that it be used to house soldiers, privacy of the person and possessions as against unreasonable searches, and the privilege against self-incrimination, which provides protection for the privacy of personal information. In addition, the Texas Bill of Rights shall forever remain inviolate. In 2003, in *Lawrence v Texas,* the Supreme Court, overruling an earlier decision, found that Texas violated the liberty clause of two gay men when it enforced against them a state law prohibiting homosexual sodomy. Writing for the Court in *Lawrence,* Justice Kennedy reaffirmed in broad terms the Constitution's protection for privacy: "These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment. At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life....The petitioners are entitled to respect for their private lives. The State cannot demean their existence or control their destiny by making their private sexual conduct a crime. Their right to liberty under the Due Process Clause gives them the full right to engage in their conduct without intervention of the government. 'It is a promise of the Constitution that there is a realm of personal liberty which the government may not enter.'" *See* the article by Samuel Warren and Louis Brandeis, The Right to Privacy, 4 Harvard L.R. 193 (1890). In 2001, in *Kyllo v. United States* (533 U.S. 27) it was decided that the use of thermal imaging devices that can reveal previously unknown information without a warrant does indeed constitute a violation of privacy. *"The right to privacy is our right to keep a domain around us, which includes all those things that are part of us, such as our body, home, thoughts, feelings, secrets and identity. The right to privacy gives us the ability to choose which parts in this domain can be accessed by others, and to control the extent, manner and timing of the use of those parts we choose to disclose."* Yael Onn, et. al., *Privacy in the Digital Environment* , Haifa Center of Law & Technology, (2005) pp. 1-12. An example of the legal basis for the right to physical privacy is the US Fourth Amendment which guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures". Trespass laws protect the right to privacy; yet, Plaintiff was completely deprived of this right in every respect. This valuable right to privacy had to be invaded just to concoct the alleged crime; and by being intentionally tried in the media forever deprived Plaintiff and her children of this valuable right. The United States now admits that this gross invasion of privacy was simply conduct in the scope of employment. Any seasonal, part-time, or temporary employee can trespass on Texas soil and invade the privacy of any Texan and destroy their constitutionally protected rights and forever destroy their life, peace, and security. This is a gross violation of international law, a crime of moral depravity, and a willful fraud on the international community by the United States.

(18) be left alone,[19]

(19) be secure in person, papers, home, and effects against unreasonable searches and seizures,[20]

---

[19] United States Constitution, Amends. 1, 4, 14; Texas Constitution, Art. I, §§ 2, 3, 3a, 9, 13, 15-a, 19, 28, and 29; "(The right to privacy is a person's) right to be left alone by the government... the right most valued by civilized men." - Former Supreme Court Justice Louis Brandeis. Samuel D. Warren and Louis D. Brandeis wrote that privacy is the "right to be let alone" (Warren & Brandeis, 1890). The State of Texas re-enforced this right with the passage of the Castle doctrine, intended to put an end to these malicious prosecutions—anyone can claim they trespassed on their neighbor's property and was told to leave and heard shots fired as they left. This simply is not a crime in Texas, even if you believe everything alleged by the State in this malicious prosecution and Plaintiff is being deprived of equal protection under the law, due process, and due course of law. The Universal Declaration of Human Rights, article 12, states: *"No one shall be subjected to arbitrary interference with his privacy, family, home or correspondence, nor to attacks upon his honor and reputation. Everyone has the right to the protection of the law against such interference or attacks."* All of these defendants conspired to invade Plaintiff's right to privacy and right to be left alone. Plaintiff was villified and tried on a false set of facts in the media. Due to the Star Chamber, Plaintiff was never able to put on her defense or call her witnesses and she was wrongfully convicted on the fabricated media creation. The media intentionally sensationalized a lie, embellished it, and amplified the message compounding the damages and forever depriving Plaintiff of a fair and impartial tribunal or untainted jury. The potential jury pool was repeatedly and willfully polluted. The permanent marring of reputation and permanent loss of her right to earn a livelihood is a direct and proximate result of the abusive media that aided, abetted, and assisted the predatory prosecutors in their malicious and retaliatory prosecution.

[20] United States Constitution Amends. 4th and 14th; Texas Constitution, Art. I, §§ 9, 15-a, 16, 19, 28, and 29. *See, Groh v. Ramirez,* 540 U.S. 551 (2004) (court noting that searches and seizures inside a home without a warrant are presumptively unreasonable). The Supreme Court has held that the Fourth Amendment proscription against unreasonable searches and seizures, *Mapp v. Ohio,* 367 U.S. 643 (1961), applies to the states. The evil of an unreasonable search or seizure is that it invades privacy, not that it uncovers crime, which is no evil at all." *Townes v. City of New York,* 176 F.3d 138, 148 (2d Cir.1999). The 4th Amendment has historically protected citizens from the general evidentiary search that was performed on BARNES' private property and the unlawful confiscation and conversion of her personal property when it had nothing whatsoever to do with the alleged crime. *Boyd v. United States,* 116 U.S. 746 (1886). *See also Soldal v. Cook County, Illinois,* 506 U.S. 56, 62 (1992); *Entick v. Carrington,*19 How. St. Tr. 1029, 95 Eng. Rep. 807, (K.B. 1765); "The Right to Privacy," 4 HARV.L.REV. 193 (1890); *Berger v. New York,* 388 U.S. 41, 67 (1967); *Gouled v. United States,* 255 U.S. 298, 309 (1921); *Silverthorne Lumber Co., Inc. v. United States,* 251 U.S. 385, 391 (1920) . *See* Sources of Our Liberties, (R. Perry & J. Cooper, eds., Rev. Ed., American Bar Foundation: 1978) and N.B. Lasson, The History and Development of the Fourth Amendment to the United States Constitution, (Johns Hopkins Press: 1937). Individuals may bring civil claims for damages resulting from violations of their Fourth Amendment rights under § 1983. *See Parkhurst v. Trapp,* 77 F.3d 707 (3d Cir.1996); *Gillard v. Schmidt,* 579 F.2d 825 (3d Cir.1978). In *Arizona v. Gant,* 556 U.S. 332 (2009), the Supreme Court ruled that a law enforcement officer needs a warrant before searching a motor vehicle after an arrest of an occupant of that vehicle, unless at the time of the search the person being arrested is unsecured and within reaching distance of the passenger compartment of the vehicle or police officers have reason to believe that the evidence for the crime the person is being arrested will be found in the vehicle. Moore, Kristina (April 21, 2009). "Limits on warrantless car searches, compensation to terrorism victims, veterans benefit disputes". SCOTUSblog. http://www.scotusblog.com/wp/a-new-rule-for-warrantless-car-searches/. An area is curtilage if it "harbors the intimate activity associated with the sanctity of a man's home and the privacies of life." *United States v. Dunn,* 480 U.S. 294, 300 (1987). Courts make this determination by examining "whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *Dunn* at 301 Theoretically, many structures might extend the curtilage protection to the areas immediately surrounding them. Plaintiff's home and curtilage was repeatedly invaded, burglarized, and vandalized over a

(20) be free from Warrants being issued without probable cause, or based upon false swearing or issued by a magistrate who is not neutral and detached,[21]

---

continuous course of conduct for over five years while Plaintiff was held in an illegal and unconstitutional captivity and tortured.

[21] United States Constitution, Amends. 4, 14; Texas Constitution, Art. I, § 9, 19, 29. Seeing the danger general warrants presented, the Virginia Declaration of Rights explicitly forbade the use of general warrants. This prohibition became precedent for the Fourth Amendment: "*That general warrants, whereby any officer or messenger may be commanded to search suspected places without evidence of a fact committed, or to seize any person or persons not named, or whose offense is not particularly described and supported by evidence, are grievous and oppressive and ought not to be granted.*" The Fourth Amendment proscribes unreasonable seizure of any person, person's home (including its curtilage) or personal property without a warrant. A seizure of property occurs when there is meaningful interference by the government with an individual's possessory interests. The standards of probable cause differ for an arrest and a search. The government has a probable cause to make an arrest when "the facts and circumstances within their knowledge and of which they had reasonably trustworthy information" would lead a prudent person to believe that the arrested person had committed or was committing a crime. *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225 (1964). Probable cause to arrest must exist before the arrest is made. Evidence obtained after the arrest may not apply retroactively to justify the arrest. *Johnson v. United States*, 333 U.S. 10, 92 L.Ed 436, 68 S.Ct 367 (1948). The knowing use of perjured testimony is a due process violation. Due process is violated when the prosecution knowingly presents materially false testimony to obtain a conviction. See *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *Ex parte Castellano*, 863 S.W.2d 476, 485 (Tex.Crim.App.1993). The rule regarding use of perjured testimony prohibits prosecutors from presenting testimony which any member of the "prosecution team," including both investigative and prosecutorial personnel, knows to be false. *Ex parte Adams*, 768 S.W.2d 281, 292 (Tex.Crim.App.1989); see also *United States v. Antone*, 603 F.2d 566 (5th Cir.1979); *Ex parte Castellano*, 863 S.W.2d at 485. Knowledge has been imputed not only from one prosecutor to another, but also from the police to prosecutors. *See Giglio*, 405 U.S. at 763; *Williams v. Griswald,* 743 F.2d 1533 (11th Cir.1984). A warrant must not issue until after the judicial officer has been supplied with sufficient information to support an independent judgment that probable cause exists for the warrant. Thus, the affidavit on which the warrant is based must provide a sufficient basis upon which a neutral and detached magistrate can make a finding of probable cause *[ Whiteley v. Warden of Wyoming Penitentiary, 401 U.S. 560, 564-565, 91 S. Ct. 1031, 28 L. Ed. 2d 306 (1971).* An affidavit that merely recites the elements of the crime charged, contains no affirmative allegations that the affiant spoke with personal knowledge of the matters contained in the affidavit, and fails to indicate any source for the affiant's conclusions is insufficient and cannot support the issuance of a warrant *[see Giordenello v. United States, 357 U.S. 480, 484-486, 78 S. Ct. 1245, 2 L. Ed. 2d 1503 (1958) ; Ware v. State, 724 S.W.2d 38, 41 (Tex. Crim. App. 1986) conclusory affidavit insufficient].* An affidavit in support of a search warrant must contain sufficient information to support the magistrate's finding of probable cause. *Hughes v. State*, 843 S.W.2d 591, 593 (Tex. Crim. App. 1992); *Keen v. State*, 626 S.W.2d 309, 312 (Tex. Crim. App. 1981); *Davis v. State*, 27 S.W.3d 664, 667 (Tex. App.—Waco 2000, pet. ref'd); *Mayfield v. State*, 800 S.W.2d 932, 934 (Tex. App.—San Antonio, 1990, no pet.). This is a requirement of the federal and state constitutions and Texas statutory law. U.S. Const. amends. IV, XIV; Tex. Const. art. I, § 9; Tex. Code Crim. Proc. Ann. arts. 1.06, 18.01(b) (West 1977 & Supp. 2003). Thus, a search warrant properly issues only when predicated upon probable cause. Probable cause to support the issuance of a search warrant exists where the facts submitted to the magistrate are sufficient to justify a conclusion that the object of the search is probably on the premises to be searched at the time the warrant is issued. *Cassias v. State*, 719 S.W.2d 585, 587 (Tex. Crim. App. 1984)*; Davis*, 27 S.W.3d at 667; *see also Tolentino v. State*, 638 S.W.2d 499, 501 (Tex. Crim. App. 1982). An affidavit for a search warrant is sufficient to establish probable cause if, from the totality of the circumstances reflected in the affidavit, the magistrate was provided with a substantial basis for concluding that probable cause existed. *Gates*, 462 U.S. at 238-39; *Bawer v. State*, 769 S.W.2d 887, 902 (Tex. Crim. App. 1989), *overruled on other grounds*; *Heitman v. State*, 815 S.W.2d 681 (Tex. Crim. App. 1991). A mere conclusory statement will not do. *Gates*, 462 U.S. at 239; *Trevino v. State*, 875 S.W.2d 373, 375 (Tex. App.—Corpus Christi 1994, no pet.). A defendant may attack the legality of an

(21) be free from being twice put in jeopardy, punished, or subjected to multiple arrests for the same offense,[22]

---

arrest by claiming that the arrest warrant was invalid because it was based on an affidavit that did not show probable cause. *[ Haynes v. State, 468 S.W.2d 375, 377-378 (Tex. Crim. App. 1971) , cert. denied, 405 U.S. 956 (1972)]*. There is no probable cause affidavit, arrest warrant, or search warrant on file in the court record, and no statement other than the criminal complaint.  Not only did these conspirators have no probable cause, they did not even have a search warrant and they committed burglary of a building, burglary of vehicles, and theft during their rampage and the subsequent trespass and theft after they broke into the building and vehicles and left them open so they could all come back and take what they wanted during Plaintiff's captivity.  These actors even had another Williamson County Judge enjoin Plaintiff from executing a lawful power of attorney so she could not designate an agent to protect her assets, property, and collections and to secure control over her funds in order to pay her retained counsel and secure her release from illegal and unconstitutional pretrial captivity.  As a direct and proximate result of the conspiracy, Plaintiff suffered the loss and destruction of over $500,000.00 worth of assets, property, and irreplaceable artwork and collections.

[22] United States Constitution, Amends. 5, 14.  Texas Constitution, Art. I, § 14 ("DOUBLE JEOPARDY. No person, for the same offense, shall be twice put in jeopardy of life or liberty."), 19, 29.  The Fifth Amendment to the United States Constitution provides:  "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Article I, section 14 of the Texas Constitution states:  "No person, for the same offense, shall be twice put in jeopardy of life or liberty, nor shall a person be put upon trial for the same offense, after a verdict of not guilty in a court of competent jurisdiction." Tex. Const. art. I, § 14;[(1)] *see also* Tex. Code Crim. Proc. Ann. art. 1.10. These protections apply to: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense. *See United States v. Halper*, 490 U.S. 435, 440 (1989), *rev'd on other grounds by Hudson v. United States*, 118 S. Ct. 488, 490-91 (1997). *See Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932); *Ex parte Ervin*, 991 S.W.2d 804 (Tex.Crim.App. 1999). Concerning the Fifth Amendment, the Supreme Court has said:  That guarantee has been said to consist of three separate constitutional protections. [1] It protects against a second prosecution for the same offense after acquittal. [2] It protects against a second prosecution for the same offense after conviction. [3] And it protects against multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969) (citations omitted). *See also Ex parte Peterson*, 738 S.W.2d 688, 689 (Tex.Crim.App.1987). Only the second protection is involved in this Concerning the Fifth Amendment, the Supreme Court has said:  That guarantee has been said to consist of three separate constitutional protections. [1] It protects against a second prosecution for the same offense after acquittal. [2] It protects against a second prosecution for the same offense after conviction. [3] And it protects against multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969) (citations omitted). *See also Ex parte Peterson*, 738 S.W.2d 688, 689 (Tex.Crim.App.1987). Only the third protection is involved in this case.  Plaintiff was tortured with cruel or unusual punishment with indefinite pretrial captivity because there is no presumption of innocence in a state forensic psychiatric facility for the criminally insane and manifestly dangerous; you are assumed guilty, punished, oppressed, and those committed on competency are treated far worse than those committed pursuant under a not-guilty-by-reason-of-insanity plea bargain. In *Dixon*, the Court held that the defendant could not be prosecuted for the same offense for which he was previously punished with criminal contempt. *Dixon*, 509 U.S. at 711, 113 S.Ct. at 2864. *See United States v. Dixon*, 509 U.S. 688, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993). *Ex parte Rhodes*, 974 S.W.2d 735 (Tex.Cr.App.1998). *Ex parte Busby*, 921 S.W.2d 389 (Tex.App.-Austin 1996, pet'n ref'd). The double jeopardy clause bars the later criminal proceeding. *See, e.g., United States v. Haggerty*, 528 F.Supp. 1286, 1295--1300 (D.Colo.1981) (contempt conviction of air traffic controller for violating restraining order against strike barred subsequent prosecution for striking against United States in violation of federal law); *People v. Lombardo*, 50 Cal.App.3d 849, 123 Cal. Rptr. 755 (1975) (contempt conviction for refusal to testify before grand jury barred criminal prosecution for same offense); *State v. Hope*, 449 So.2d 633 (La.App.1984) (contempt of court for violation of child visitation order barred later kidnapping charge); *People v. Colombo*, 31 N.Y.2d 947, 341 N.Y.S.2d 97, 293 N.E.2d 247 (1972) (contempt conviction for refusal to testify before grand jury barred criminal prosecution for refusal to obey court order to testify,

(22) be free of being compelled to be a witness against oneself,[23]

(23) familial relationships (loss of consortium, support, companionship, comfort,

---

where both required identical proof). *See also State v. Thompson,* 294 Or. 528, 659 P.2d 383 (1983) (discussing double jeopardy clause but apparently basing decision on statute that forbids separate prosecutions for multiple offenses arising from same episode if appropriate prosecutor knew of the offenses when first case was commenced). "A flat confinement as punishment for an act constituting contempt does constitute such a conviction, and cannot lawfully be imposed for the same act for which punishment has previously been imposed in a criminal prosecution. *See Menna v. New York,* 423 U.S. 61, 96 S.Ct. 241, 46 L.Ed.2d 195 (1975); *Ex parte Brown,* 574 S.W.2d 618 (Tex.Civ.App.---Waco 1978, no writ); Solender, *Family Law: Parent and Child,* 34 SW. L.J. 176 (1980)." *Ex parte Englutt,* 619 S.W.2d at 282 (Tex. App.---Texarkana 1981, no writ). Each time she has been arrested, Plaintiff has been handcuffed and at times shackled as well while being videotaped in prison garb. Plaintiff was forced to walk barefoot on filthy, germ-ridden floors and forced into the medical side where she is exposed to more diseases and germs by being forced to walk barefoot into these filthy areas and not allowed anything for personal hygiene other than a ragged worn towel and a toothbrush—no soap, shampoo, deodorant, lotion, or toothpaste. As a result of the unsanitary conditions of the jail, Plaintiff suffered a permanent ear impairment due to a serious and irreversible ear infections in both ears, a serious fungus or bacterial infection on her face, and Hepatitis B. Further, during the June 9, 2010 false arrest without probable cause and with utmost malice, Plaintiff was videotaped by a male officer while two female officers sexually assaulted her, opened her blouse, forcefully pulled her arms behind her back and turned her facing the camera to expose her breast to the male officer and the camera knowing it would be videotaped. Plaintiff's privacy and HIPAA rights were repeatedly, knowingly, intentionally, and deliberately violated by videotaping the forced interrogation and publicizing private information through the media. The machinery and equipment at the jail are filthy and the deputies are provided with gloves to wear, but the inmates are not, so that they are repeatedly exposed to germs, bacteria, fungi, viruses, and disease. The deputies wear shoes, but the inmates are forced to walk around in their bare feet, further subjecting them to germs, bacteria, fungi, viruses, and disease. The slop they call food is not fit to give to a wild animal and the odor alone makes one nauseated. No one should be repeatedly subjected to this environment and the Constitution and Code of Criminal Procedure contemplate one arrest and one bond, without repeated re-arrests and bond increases at the whim and abuse of the Counties involved for improper purposes and with vindictive motives to punish and retaliate; and certainly without a complete breach of the surety bail bond contract, without due process, resulting in an indefinite pretrial captivity. The conditions at the psychiatric facility were filthy, grossly unhealthy, and vile. Plaintiff was held indefinitely in forced captivity, pretrial (from February 28, 2011), in a state maximum security psychiatric facility for the criminally insane and manifestly dangerous without ever being afforded any semblance of due process. The Star Chamber deprived Plaintiff of a reasonable bond pending appeal, denied her probation, fraudulently forced a deadly weapon enhancement on her by depriving her of her right of allocution in order to deprive her of parole, so that she was punished again and forced to serve day for day. First the conspirators sentenced her to pretrial captivity for the rest and remainder of her life without any semblance of due process. Then, when that finally failed due to the efforts of six key people, the conspirators put her in jeopardy again and sentenced her again to prison. All of these punishments were imposed with the full knowledge that Plaintiff had committed no crime and that Kathleen Gittel had been coached and bribed to give false testimony and engaged in aggravated perjury to wrongfully convict Plaintiff to retaliate against her for exercising her first amendment rights and to have a chilling effect on others similarly situated. The United States claims now that this was all within the scope of employment.

[23] United States Constitution, Amends. 5 and 14; Texas Constitution, Art. I, §§ 10, 19, and 29. At all times after February 28, 2011 Plaintiff was held in force captivity and forced and compelled to give evidence against herself, with numerous attempts to coerce her into plea bargaining and following the advice of Schreiber and to discontinue her insistence upon her right to a jury trial to clear her name; and she was subjected to cruel and unusual punishment and fraudulent charting, false accusations, and abuse to provide the malicious prosecutors with more twisted and fabricated "bad acts" to introduce against her. This was a gross violation of constitutional rights in many different facets, but the United States claims this was all within the scope of employment.

29

care, and solace),[24]

    (24) free speech, beliefs, ideas, opinions, and associations,[25]

    (25) petition the government for a redress of grievances,[26]

---

[24] United States Constitution, Amends. 4 and 14; Texas Constitution, Art. I, §§ 3, 3a, 8, 9, 10, 12, 13, 15, 15-a, 16, 19, 27, 28, and 29. The "liberty" guaranteed by the due process clause includes personal, political and social rights and privileges. *Hampton v. Mow Sun Wong*, 426 U.S. 88, 102 & n.23 (1976). The Supreme Court said in the 1977 case of *Moore v. East Cleveland* (431 U.S. 494, 97 S. Ct. 1932, 52 L. Ed. 2d 531(1977)) that "the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in the Nation's history and tradition."

[25] United States Constitution, Amends. 1, 14; Texas Constitution, Art. I, § 8, 27, 29. *See, Davenport v. Garcia*, 834 S.W.2d 4 (Tex.1992, orig. proceeding) ("Both this court and our sister court, the Court of Criminal Appeals have recognized the independent vitality of our Texas Constitution rather than relying exclusively on the federal judiciary. See, e.g., *LeCroy v. Hanlon*, 713 S.W.2d 335, 338-39 (Tex.1986); *In re Baby McLean*, 725 S.W.2d 696, 698 (Tex.1987); *Sax v. Votteler*, 648 S.W.2d 661, 664 (Tex.1983); *Heitman v. State*, 815 S.W.2d 681, 690 (Tex.Crim.App.1991).... Our Texas Constitution is not a collection of meaningless paper promises, mere surplusage to the federal guarantees. Rather we as jurists are summoned to give effect to its terms whenever liberty is threatened. *Ex Parte Tucci*, 859 S.W.2d 1, 14 (Tex. 1992) (plurality opinion)"). BARNES has been repeatedly retaliated against and punished for her speech, beliefs, ideas, opinions, and associations (including her decisions to disassociate). The right to freedom of expression is recognized as a human right under Article 19 of the Universal Declaration of Human Rights and recognized in international human rights law in the International Covenant on Civil and Political Rights (ICCPR). Article 19 of the ICCPR states that "[e]veryone shall have the right to hold opinions without interference" and "everyone shall have the right to freedom of expression; this right shall include freedom to seek, receive and impart information and ideas of all kinds, regardless of frontiers, either orally, in writing or in print, in the form of art, or through any other media of his choice". Article 19 goes on to say that the exercise of these rights carries "special duties and responsibilities" and may "therefore be subject to certain restrictions" when necessary "[f]or respect of the rights or reputation of others" or "[f]or the protection of national security or of public order (order public), or of public health or morals". *See* also Article 13 of the American Convention on Human Rights.

[26] United States Constitution, Amends. 1, 4, and 14; Texas Constitution, Art. I, §§ 9, 19, 27, and 29. In 1776, the Declaration of Independence cited King George's perceived failure to redress the grievances listed in colonial petitions, such as the Olive Branch Petition of 1775, as a justification to declare independence: "In every stage of these Oppressions We have Petitioned for Redress in the most humble terms: Our repeated Petitions have been answered only by repeated injury. A Prince, whose character is thus marked by every act which may define a Tyrant, is unfit to be the ruler of a free people." Plaintiff has at all relevant times been punished and retaliated against for her speech and efforts to petition for redress of grievances on behalf of her clients and her family. The right to petition government for redress of grievances is the right to make a complaint to, or seek the assistance of, one's government, without fear of punishment or reprisals. The actions of these malicious prosecutors are similar in intent to SLAPP litigation. A strategic lawsuit against public participation (SLAPP) is a lawsuit that is intended to censor, intimidate, and silence critics by burdening them with the cost of a legal defense until they abandon their criticism or opposition. The typical SLAPP plaintiff (prosecutor) does not normally expect to win the lawsuit. The plaintiff's (prosecutor's) goals are accomplished if the defendant succumbs to fear, intimidation, mounting legal costs or simple exhaustion and abandons the criticism. A SLAPP may also intimidate others from participating in the debate. A SLAPP is often preceded by a legal threat. The difficulty, of course, is that plaintiffs (prosecutors) do not present themselves to the Court admitting that their intent is to censor, intimidate or silence their critics. Hence, the difficulty in drafting SLAPP legislation (or dealing with prosecutorial misconduct), and in applying it, is to craft an approach which affords an early termination to invalid abusive suits (malicious prosecutions), without denying a legitimate day in court to valid good faith claims. Other widely mentioned elements of a SLAPP are the actual effectiveness at silencing critics, the timing of the suit, inclusion of extra or spurious defendants (such as relatives such as Plaintiff's children and clients), making claims that are very difficult to disprove or rely on no written record or tangible evidence, ambiguous or deliberately mangled wording that lets plaintiffs

(26) be free of oppression, retaliation, and harm from governmental employees, and right not to be framed,[27]

(27) be free from selective, retaliatory, malicious and vindictive prosecutions,[28]

---

(prosecutors) make spurious allegations without fear of perjury, refusal to consider any settlement (speedy trial or resolution to mitigate the damages), mischaracterization of all efforts by the accused to obtain exculpatory evidence and witnesses as insincere, extensive and unnecessary demands for discovery, attempts to identify anonymous or pseudonymous critics, engagement in *ex parte* communications, deliberate pollution of the potential jury pool and manipulation of witnesses' memories and testimony by the misuse of the media and trying the accused in the media where the rules of evidence and procedure do not apply, and attempts to run up defendants' costs even if this clearly costs more to the plaintiffs (local governments).

[27] United States Constitution Amends. 1, 4, and 14; Texas Constitution, Art. I, §§ 3, 3a, 8, 9, 12, 13, 16, 19, 27, 28, and 29. *See* briefs and oral argument transcript in Supreme Court case No. 08-1065 *Pottawattamie County v. McGhee*, which settled shortly after oral arguments. (An Iowa county has agreed to pay $12 million to two men who claimed in a pending U.S. Supreme Court case that prosecutors framed them for murder during the investigation, removing their immunity from suit. The men, Terry Harrington and Curtis McGhee, spent 26 years in prison. The settlement ends the case pending before the Supreme Court.). The "liberty" guaranteed by the due process clause includes personal, political and social rights and privileges. *Hampton v. Mow Sun Wong*, 426 U.S. 88, 102 & n.23 (1976). "For the very idea that one man may be compelled to hold his life, or the means of living, or any material right essential to the enjoyment of life, at the mere will of another, seems to be intolerable in any country where freedom prevails, as being the essence of slavery itself." *Yick Wo v. Hopkins*, 118 U.S. 356, 6 Sup. Ct. 1064, 30 L.Ed. 220 (affirmed in *U.S. v. Wong Kim Ark*, 169 U.S. 644, 18 Sup. Ct. 456, 42 L.Ed. 890). Plaintiff has a right not to be framed; and that right was clearly established prior to 2010: *Mooney v.* Holohan, 294 U.S. 103, 112 (1935) (per curiam); *Pyle v. Kansas*, 317 U.S. 213, 216 (1942); *Limone v. Condon*, 372 F.3d 39, 44 (1st Cir. 2004); Washington v. Wilmore, 407 F.3d 274, 282-83 (4th Cir. 2005); *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (en banc); *Wilson v. Lawrence County*, 260 F.3d 946, 954 (8th Cir. 2001); *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997); *Riley v. City of Montgomery*, 104 F3d 1247, 1253 (11th Cir. 1997); *Castellano v. Fragozo*, 352 F.3d 939, 958 (5th Cir. 2003) (en banc); *Jones v. Cannon*, 174 F.3d 1271, 1289 (11th Cir. 1999); *Gregory v. City of Louisville*, 444 F.3d 725, 738 (6th Cir. 2006); *Briscoe v. LaHue*, 460 U.S. 325 (1983); *Thomas v. Sams*, 734 F.2d 185 *rehr'g denied*, 741 F. 2d 783(5th Cir. 1984); *Spurlock v. Satterfield*, 167 F.3d 995, 1004 (6th Cir. 1999); *Dennis v. Sparks*, 449 U.S. 24, 28 (1980). Defendants GITTEL, POPPA, BRINKMANN, WILSON, FOSTER, HERNANDEZ, RICHTER, TRAVIS, BOGAN, FOSTER,, NEWELL, HUGHEY, WAGGONER, BARTZ, DE LA VEGA, HOBBS, BRADLEY, MCCABE, and MCDONALD, acting under color of state authority, maliciously fabricated, tampered with, and manipulated evidence and records not in general or in an abstract sense, but with the specific intent to arrest, charge, and indict BARNES; and coached, coaxed, and coddled GITTEL, not to provide information generally to aid a good faith investigation, but specifically to implicate BARNES. The nature of the misconduct here was the fabrication, manipulation, and tampering with the evidence against an already identified target. The fabrication of the evidence was part and parcel of the scheme to deprive BARNES of her liberty, property, and reputation. The constitutional line was crossed the moment the deputies shifted their focus from solving an alleged crime to framing BARNES. *See Procurement Liability - Pinkerton v. United States*, 328 U.S. 640, 647 (1946). The damage caused by this lie that got out of hand is continuing because it has stolen Plaintiff's right to earn a livelihood. Plaintiff has been enslaved, trafficked, outlawed, and disfranchised by a malicious conspiracy that deprived her of due course of law every step of the way for over five years and continuing. The United States now claims that this was within the scope of employment.

[28] United States Constitution, Amends. 4, 8, and 14; Texas Constitution, Art. I, §§ 3, 3a, 9, 10, 12, 13, 16, 19, 27, 28, and 29. Under the facts of this case, the prosecutor's charging decision is an unjustifiable penalty resulting solely from BARNES' exercise of a protected legal right. *Neal v. State*, 150 S.W.3d 169, 173 (Tex. Crim. App. 2004). *See* practices very similar to the ones exposed in *Pottawattamie County v. McGhee* in the Michael Morton case, involving ANDERSON and BRADLEY, at http://www.texastribune.org/texas-dept-criminal-justice/michael-morton/60-minutes-exoneree-seeks-

(28) be protected from defamation *per se*,[29]

(29) keep and bear arms,[30]

---

accountability-not-reven/ where the sworn affidavit of Bill White stated that "It is clear to me that conscious decisions were made to conceal evidence and/or ignore the truth." This is exactly what BRADLEY, MCDONALD, MCCABE, RENO, PURYEAR, and the dishonest deputies, including TUMLINSON, did in BARNES' case, and what RYE, HOBBS, HIGHTOWER, and the law enforcement personnel did in the Arnold Garza case, the Vanessa Marie Stalling case, and in the prior malicious prosecution of BARNES. It is truly the habit, custom, and practice of these conspirators—not only to maliciously prosecute, but to hide or impair exculpatory evidence, engage in obstructionist delay tactics, suborn perjury, and often fabricate evidence or manipulate witnesses' testimony or memories. The "liberty" guaranteed by the due process clause includes personal, political and social rights and privileges. *Hampton v. Mow Sun Wong*, 426 U.S. 88, 102 & n.23 (1976). All other Texans are protected by the passage of the Castle doctrine by the Legislature; and would not even have been prosecuted for a crime, let alone a 1st degree felony. "Though the law itself be fair on its face and impartial in appearance, yet if it is applied and administered by public authority with an evil eye and an unequal hand, so as to practically make unjust and illegal discrimination between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution." To the same effect are the following cases: *C., B. & Q. Ry. v. Chicago*, 166 U.S. 226, 17 Sup. Ct. 581, 41 L.Ed. 979; *Henderson v. Mayor*, 92 U.S. 259, 23 L.Ed. 543; *Chy Ling v. Freeman*, 92 U.S. 275, 23 L.Ed. 550; *Neal v. Delaware*, 103 U.S. 370, 26 L.Ed. 567; *Soon v. Crowley*, 113 U.S. 703, 5 Sup. Ct. 730, 28 L.Ed. 1145; *Ex parte Abrams*, 56 Tex. Cr. R. 478, 120 S.W. 883. Plaintiff was vilified and subjected to unequal treatment due to her gender and occupation. A white male farmer would not ever have been arrested or charged; in fact, the criminal trespasser would have been arrested and charged.

[29] United States Constitution, Amends. 4, 6, 8, and 14; Texas Constitution, Art. I, §§ 3, 3a, 8, 9, 10, 13, 15-a, 19, 27, and 29. The "liberty" guaranteed by the due process clause includes personal, political and social rights and privileges. *Hampton v. Mow Sun Wong*, 426 U.S. 88, 102 & n.23 (1976). BARNES is entitled to a fair and impartial jury and to be tried on the facts and not sensationalism, hatred, vilification, and defamation. *Irvin v. Dowd*, 366 U.S. 717 (1961); *Murphy v. Florida*, 421 U.S. 794 (1975); *Patton v. Yount*, 467 U.S. 1025 (1984); *Mu'Min v. Virginia*, 500 U.S. 415 (1991); *Sheppard v. Maxwell*, 384 U.S. 333 (1966); *Estes v. Texas*, 381 U.S. 532 (1965); *Nebraska Press Association v. Stuart*, 427 U.S. 539 (1976); *Gannett Company Inc, v. DePasquale*, 443 U.S. 368 (1979); *Richmond Newspapers Inc v. Virginia*, 448 U.S. 555 (1980); *Globe Newspaper Co. v. Superior Court*, 47 U.S. 596 (1982); *Chandler v. Florida*, 449 U.S. 560 (1981); *Press Enterprise Co. v. Superior Court*, , 478 U.S. 1 (1986); *Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991); *El Vorcero de Puerto Rico v. Puerto Rico*, 508 U.S. 147 (1993). Further, the equal protection clause of the 14th amendment includes the right to be treated fairly, equally, and democratically under the Constitution and laws of the State encompassed in the due course of law protection; and BARNES is entitled to the same right to recourse for defamation pursuant to TEX.CONST. Art. I, §§ 3, 3a, 8, 19, and 29. People who abuse their right to free speech and defame another with malice or pursuant to a conspiracy to harm another cannot hide behind aliases or pseudonyms to escape accountability and deprive the other of due course of law, due process, and right to redress in the courts.

[30] United States Constitution, Amends. 2 and 14; Texas Constitution, Art. I, §§ 3, 3a, 9, 10, 13, 19, 23, 27, 28, and 29. "The right to bear arms is essential to freedom. For it is the policy of governments to disarm the people, that they may have the opportunity to oppress them."—Robert Emmett Bledsoe Baylor, 1845. Hart, *The Bill of Rights: Safeguard of Individual Liberty*, 35 TEX. L. REV. 919, 924 (1957). "The test of whether a right is 'fundamental' lies in assessing whether it is '... explicitly or implicitly guaranteed by the Constitution.'" Sullivan v. University Interscholastic League, 599 S.W.2d 860, 864 (Tex. Civ. App.--Austin 1980), *aff'd in part, rev'd in part*, 616 S.W.2d 170 (Tex. 1981) (citing San Antonio School Dist. v. Rodriquez, 411 U.S. 1 (1973)). *See District of Columbia v. Heller*, 128 S.Ct. 2783 (2008); *Nordyke v. King*, 563 F.3d 439 (9th Cir.2009). Plaintiff was immediately stripped of her right to bear arms on May 11, 2010, when the dishonest deputies broke into and burglarized a locked 1500 sq. foot building owned by BARNES without a warrant and confiscated her shot guns and rifles, when GITTEL clearly stated that the weapon used by the assailant was a revolver. These arms had nothing whatsoever to do with the investigation and they were confiscated and converted and Plaintiff never saw them again. This was a

(30) be free from excessive force, oppressive treatment, or multiple bail,[31]

---

criminal theft by the conspiracy as a result of a burglary of a building and they continue to withhold this personal property from its rightful owner.

[31] United States Constitution, Amends. 4, 8 and 14; Texas Constitution, Art. I, §§ 3, 3a, 9, 11, 11b, 13, 16, 19, 28, and 29.  Plaintiff had a right to be free from use of excessive or punitive force. *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).  Both WILLIAMSON COUNTY and TRAVIS COUNTY, acting by and through WCSD and TCSD and their deputies, including but not limited to TUMLINSON, LERMA, UNIDENTIFIED THREE, TRAVIS, RICHTER, BOGAN, FOSTER, NEWELL, HERNANDEZ, HUGHEY, WAGGONER, BARTZ, BRINKMANN, DE LA VEGA, RYE, HOBBS, BROOKS, used excessive force for punitive purposes.  In *United States v. Salerno*, 481 U.S. 739 (1987), the Supreme Court held that the only limitation imposed by the bail clause is that "the government's proposed conditions of release or detention not be 'excessive' in light of the perceived evil."  *See*, Texas Code of Criminal Procedure article 1.07- right to bail, article 1.09- cruelty forbidden, article 17.01- Bail, and article 17.15- Rules for fixing amount of bail. **C.C.P. art. 17.15.2 specifically provides "The power to require bail is not to be so used as to make it an instrument of oppression." "Excessive Bail" *Is Tantamount To No Bail At All.*  "This traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction. . . . Unless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning."**  The primary object or purpose of a bail bond is to secure the presence of defendant at court upon trial of the accusation against him. *Fly v. State,* 550 S.W.2d 684 (Tex.Crim.App. 1977).  C.C.P. art. 17.02. The court had no discretion to require BARNES to post a surety bail bond and refuse to allow her to post a cash bond.  *Professional Bondsmen of Texas v. Carey,* 762 S.W.2d 691 (Tex.App.—Amarillo 1988, no writ); Op. Tex. Atty. Gen. JM-363 (1985); *Trammel v. State,* 529 S.W.2d 528 (Tex.Crim.App. 1975); C.C.P. art. 17.09; C.C.P. art. 17.151; C.C.P. art. 17.42, Sec. 5. This was established law by 2010 when both Williamson County and Travis County required Plaintiff to post two successive and separate $50,000.00 surety bail bonds, for a total of $100,000.00 in order to remove $10,000 cash from her imposing a fine at that time, and then breaching both surety bail bond contracts. These conspirators deliberately, intentionally, and willfully abused the bond process to harass, damage, injure, and economically punish Plaintiff.  Travis County violated the law by revoking the first bond without any due process; and both Williamson County and Travis County violated the law by not considering a personal bond and depriving Plaintiff of the right to post a cash bond because they both required a surety bail bond, so that Plaintiff would pay the penalty of $10,000.00.  The two $50,000 surety bail bonds, when Plaintiff owns property in Williamson County and has substantial ties to the community were intentionally and punitively excessive. The State appropriated over $10,000 in cash from Plaintiff during these latest false and malicious arrests without probable cause.  This was an excessive penalty, and these Counties imposed the maximum fine up front at the time of the arrest.  These Counties knew at the time they jointly imposed this punitive fine disguised as excessive bail that they had no probable cause to arrest or prosecute, so they acted maliciously to extract the maximum penalty from Plaintiff by denying her right to a personal recognizance bond.  Plaintiff was absolutely not a flight risk.  There is absolutely no risk that Plaintiff would not appear at hearings and trials.  There is no evidence whatsoever that she has ever failed to appear at any hearing or trial in over 15 years of similar retaliation, false arrests, and malicious prosecutions.  There was zero risk of flight as it was always in Plaintiff's best interest to face her accusers and prove her innocence, clear her name, and redress her grievances.  Plaintiff repeatedly promised the Courts to appear in any court at any time ordered in reference to this case or any other case these Defendants may bring.  These Defendants cannot show any time that Plaintiff has ever failed to appear when properly noticed of a hearing during all these malicious and retaliatory prosecutions.  The denial of personal recognizance bonds to Plaintiff violates her equal rights, the equal protection under the law and the equal treatment clauses of the United States Constitution (8th and 14th) and Texas Constitution Art. 9, 10, 11, 13, 16, and 19, as well as 42 U.S.C. Sections 1983 and 1985.  It was unconstitutional for CARNES and WILLIAMSON COUNTY, acting pursuant to a criminal conspiracy with BRADLEY, MCDONALD, MCCABE, HOBBS, RYE, BRINKMANN, DE LA VEGA, FOSTER, WILSON, and other employees of WCSD and WILLIAMSON COUNTY to add additional terms and conditions to the surety bond once it had been posted, approved, and filed of record.  The bail bond had not ever been revoked or violated.  Even

(31) be free from cruel and unusual punishment,[32]

---

though the house arrest, curfew, and criminal tagging are illegal, unconstitutional, oppressive, and caused extreme harm, injury, and damage to Plaintiff, her family, and her practice, Plaintiff complied under protest and sought legal redress through the courts with an application for writ of *habeas corpus*, which CARNES and later SHAVER refused to set or hear.  The curfew, house arrest, and criminal tagging were imposed to punish Plaintiff in violation of the 1st, 4th, 8th, and 14th Amendments; and were secured by force, threats, and oppression, especially by GRIFFITH, acting in concert with said Defendants.  The repetitive bad faith allegations to increase the bond, repetitive false arrests, and repetitive requirements for ever increasing bond amounts were designed and intended to penalize Plaintiff and extract repeated monetary fines and penalties without due process and due course of law in violation of the true intent of a bail/bond, which is only to secure the attendance of the accused at trial.  Plaintiff was repeatedly subjected to this malicious abuse of process concerning the bail bonds.  After posting these exorbitant bond amounts, both counties breached the bail bond contracts repeatedly in bad faith.  Plaintiff filed a written objection and request for protection from this malicious abuse of process, and stated in bold print the following:  **"Prior to entering any further punitive orders against Defendant, this Court should make a trip along the road that the complainant contends she took and take it in the manner she claims to have taken it, so that the Court can see how incredulous these allegations really are."**  Not only did the court refuse to do so, SHAVER refused Plaintiff's request for the jury to view the scene.  Everyone knew that no one would ever believe Gittel's lie if they saw the terrain or compared it with her initial reports.  Due to the Star Chamber, the jury never saw the terrain or the path she claimed to take.

[32] United States Constitution, Amends. 8 and 14; Texas Constitution, Art. I, §§ 13, 14, 19, 28, and 29. *Riggins v. Nevada,* 504 U.S. 127, 133-134, 136 (1992)(the 14th amendment protects a defendant's liberty "interest in freedom from unwanted anti-psychotic drugs.").  *Winston v. Lee,* 470 U.S. 753, 759 (1985)(involuntary medical treatment raises questions of clear constitutional importance because it "implicates expectations of privacy and security.").  *Cruzan v. Director, Mo. Dept. of Health,* 497 U.S. 261, 278-279 (1990).  *Washington v. Harper,* 494 U.S. 210, 221-222 (1990)(recognized that an individual had a "significant" constitutionally protected "liberty interest" in "avoiding the unwanted administration of antipsychotic drugs.").  *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 468 (1978).  *Sell v. United States,* 539 U.S. 166 (2003).  There can be no doubt that the summarily sentencing of an innocent citizen to the maximum security unit for the criminally insane and manifestly dangerous prior to trial without any semblance of due process is cruel and unusual punishment; especially when, as in this case, it was intended to be for life with a chemical lobotomy being forced on the citizen.  While the 8th amendment prohibits infliction of "cruel and unusual punishments," Article I, Section 13 of Texas Constitution prohibits "cruel OR unusual punishment," so that there is greater protection under the Texas Constitutional because it bars infliction of cruel or unusual punishment.  Cruel and unusual punishment is a form of governmental oppression and when inflicted by the State violates the 14th amendment to the United States Constitution, as well as the Proportionality Principle, which relates back to 1215 and the Magna Carta.  The principle that a punishment should be proportionate to the crime is deeply rooted and frequently repeated in common law jurisprudence.  The Supreme Court has held that implicit in the Eighth Amendment's prohibition against "cruel and unusual punishment" is that punishment not be grossly disproportional to the crime committed.  [*Weems v. United States*, 217 U.S. 349, 367 (1910)]  In *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459 (1947), the Supreme Court assumed *arguendo* that the Cruel and Unusual Punishments Clause applied to the states through the Due Process Clause of the Fourteenth Amendment.  In *Robinson v. California*, 370 U.S. 660 (1962), the Court ruled that it did apply to the states through the Fourteenth Amendment.  Proportionality principle relates back to 1215 and the Magna Carta the principle that a punishment should be proportionate to the crime is deeply rooted and frequently repeated in common law jurisprudence.  The punishment imposed on BARNES pretrial without any semblance of due process violates the 8th amendment under the proportionality principle, which requires the court to: First look to the gravity of the offense and the harshness of the penalty.  Second, compare the sentence imposed on other criminals in the same jurisdiction.  Third, compare the sentences imposed for the same crime in other jurisdictions.  If the sentence is significantly disproportionate to the crime then it violates the 8th amendment.  The cases under the 8th amendment to the United States Constitution have instructed that the court should: First, look to the gravity of the offense and the harshness of the penalty.  Second, compare the sentence imposed on other criminals in the same jurisdiction.  Third, compare the sentences imposed for the same crime in other

(32) be free from unreasonable searches and seizures, the use of Tex. C.C.P. art. 46B as a sham for punishment, and cruel and unusual punishment due to a denial of equal protection, procedural and substantive due process, and due course of law set forth in Tex. C.C.P. art. 46B and Tex. Health & Safety Code, Title 7, Subtitle C, Chapters 571

---

jurisdictions. If the sentence is significantly disproportionate to the crime then it violates the 8th amendment. The framers of the Fourteenth Amendment, such as John Bingham, had discussed this subject: "[M]any instances of State injustice and oppression have already occurred in the State legislation of this Union, of flagrant violations of the guarantied privileges of citizens of the United States, for which the national Government furnished and could furnish by law no remedy whatever. Contrary to the express letter of your Constitution, "cruel and unusual punishments" have been inflicted under State laws within this Union upon citizens, not only for crimes committed, but for sacred duty done, for which and against which the Government of the United States had provided no remedy and could provide none." In *Furman v. Georgia*, 408 U.S. 238 (1972), Justice Brennan wrote, "There are, then, four principles by which we may determine whether a particular punishment is 'cruel and unusual'."

- The "essential predicate" is "that a punishment must not by its severity be degrading to human dignity," especially torture.
- "A severe punishment that is obviously inflicted in wholly arbitrary fashion."
- "A severe punishment that is clearly and totally rejected throughout society."
- "A severe punishment that is patently unnecessary."

Continuing, he wrote that he expected that no state would pass a law obviously violating any one of these principles, so court decisions regarding the Eighth Amendment would involve a "cumulative" analysis of the implication of each of the four principles. In *Trop v. Dulles*, 356 U.S. 86 (1958), Chief Justice Earl Warren said: "The [Eighth] Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." Subsequently, the Court has looked to societal developments, as well as looking to its own independent judgment, in determining what are those "evolving standards of decency". The Court has then applied those standards not only to say what punishments are inherently cruel, but also to say what punishments that are not inherently cruel are nevertheless cruelly disproportionate to the offense in question. In *Trop v. Dulles*, 356 U.S. 86 (1958), the Supreme Court held that punishing a natural-born citizen for a crime by taking away his citizenship is unconstitutional, being "more primitive than torture" because it involved the "total destruction of the individual's status in organized society." In *Robinson v. California*, 370 U.S. 660 (1962), the Court decided that a California law authorizing a 90-day jail sentence for "be[ing] addicted to the use of narcotics" violated the Eighth Amendment, as narcotics addiction "is apparently an illness," and California was attempting to punish people based on the state of this illness, rather than for any specific act. The Court wrote: "To be sure, imprisonment for ninety days is not, in the abstract, a punishment which is either cruel or unusual. But the question cannot be considered in the abstract. Even one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold." In the case of *Solem v. Helm*, 463 U.S. 277 (1983), that the Supreme Court held that incarceration, standing alone, could constitute cruel and unusual punishment if it were "disproportionate" in duration to the offense. The Court outlined three factors that were to be considered in determining if the sentence is excessive: "(i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions." In *United States v. Bajakajian*, 524 U.S. 321 (1998), the Supreme Court ruled that it was unconstitutional to take $357,144 from a person who failed to report his taking of more than $10,000 in U.S. currency out of the United States. Judgments about what is a crime (Castle doctrine in State of Texas) and the appropriate punishment for an offense (after conviction) belong in the first instance to the legislature. *See, e.g., Solem v. Helm*, 463 U.S. 277, 290 (1983) ("Reviewing courts … should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes"); *see also Gore v. United States*, 357 U.S. 386, 393 (1958) ("Whatever views may be entertained regarding severity of punishment, … these are peculiarly questions of legislative policy"). *Rummel v. Estelle*, 445 U.S. 263, 271 (1980).

and 574,[33]

---

[33] United States Constitution, Amends. 4, 8 and 14; Texas Constitution, Art. I, §§ 3, 3a, 9, 13, 15, 15-a, 19, 28, and 29. In his Second Treatise, John Locke begins his chapter on property with the proposition that "every Man has a *Property* in his own *Person.* This no Body has any Right to but himself." J. Locke, Two Treatise of Government, II § 27 (Cambridge Univ., 2002). According to Locke, one's person is "the Great Foundation of Property," for an individual's "being master of himself and *Proprietor of his own Person.*" Justice Kennedy filed a concurrence in *Kansas v. Hendricks,* 521 U.S. 346, 360, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) and warned that mental and medical treatment should not be a sham for punishment. ("That distinction is necessary lest 'civil commitment' become a 'mechanism for retribution or general deterrence.'"). As applied C.C.P. art. 46B was punitive in purpose or manifest effect, under the facts of this case where Plaintiff had been a criminal defense lawyer for nearly 30 years and could not have been incompetent to stand trial as a matter of law; and this was a malicious abuse of process to deprive Plaintiff of her constitutional rights. The malicious abuse of process clearly embraces the primary objectives of criminal punishment: retribution and deterrence towards one who spoke out and exposed the corruption such as in the Arnold Garza case. This form of punitive and oppressive conduct has an unbearable chilling effect on others who may wish to speak out. This objective manifestation of the application of the law is punitive in nature, intent, and effect. This is particularly true when Plaintiff had not ever harmed anyone and was not a danger to the public such that any confinement in breach of the $50,000 surety bond contract, especially in an MSU and state psychiatric facility the criminally insane and manifestly dangerous, is well beyond restraints necessary to protect the public. Plaintiff has a liberty interest in her commitment proceedings. Both substantive and procedural due process are mandatory. *Foucha v. Louisiana* 504 U.S. 71, 78, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992). Involuntary commitment statutes must provide that the confinement takes place pursuant to proper procedures and evidentiary standards. *See Foucha* [*v. Louisiana*] *, supra,* [504 U.S. 71,] at 80, 112 S.Ct. [1780, 118 L.Ed.2d 437 (1992)]; *Addington v. Texas,* 441 U.S. 418, 426-27, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979); *O'Conner v. Donaldson,* 422 U.S. 563, 575, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975). The pretrial confinement in a maximum security unit of the State psychiatric facility is physical restraint that "resemble[s] the punishment of imprisonment, which is the paradigmatic affirmative disability or restraint." *Smith v. Doe,* 538 U.S. 84, 100, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003). BARNES has a liberty interest in not being transferred to a psychiatric institution for the criminally insane without appropriate procedures to prove she is mentally ill. *Id.* at 78-79, 112 S.Ct. 1780. "This Court has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington v. Texas,* 441 U.S. 418, 425, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). Competency claims can raise both substantive and procedural due process concerns. *Walton v. Angelone,* 321 F.3d 442, 459 (4th Cir. 2003); *Gilbert v. Mullin,* 302 F.3d 1166, 1178 (10th Cir. 2002). Due process dictates protection of the individual against arbitrary action of the state and ensures that adequate procedure exists to protect a substantive interest to which a person is entitled. *Thompson v. Cockrell,* 263 F.3d 423, 427 (5th Cir.2001). Due process contains a substantive component that bars certain arbitrary, wrongful government actions "regardless of the fairness of the procedures used to implement them." *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990); *see also Salerno,* supra, 481 U.S. at 746, 107 S.Ct. 2095; *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Freedom from bodily restraint has always been at the core of the liberty protected by due process from arbitrary governmental action. *Youngberg v. Romeo,* 457 U.S. 307, 316, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). "It is clear that commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Jones v. United States,* 463 U.S. 354, 361, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983). We should never "minimize the importance and fundamental nature" of the individual's right to liberty. *Salerno,* 481 U.S., at 750, 107 S.Ct. 2095; *Foucha,* 504 U.S. at 79-80, 112 S.Ct. 1780. Liberty interests emanate from either the Due Process Clause itself or from state law. *Id.* at 425. Substantive due process prevents the government from engaging in conduct that "shocks the conscience," citing *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952). Due process prevents governments from interfering with rights "implicit in the concept of ordered liberty." *Palko v. Connecticut,* 302 U.S. 319, 325-26, 58 S.Ct. 149, 82 L.Ed. 288 (1937). In 1979, the United States Supreme Court commanded the Texas Supreme Court to impose an elevated burden of proof in civil commitment cases to meet due process demands. *See Addington v. Texas,* 441 U.S. 418, 432-33, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). On remand, the Texas Supreme Court prescribed a heightened burden of

proof for civil commitment actions. *See State v. Addington*, 588 S.W.2d 569, 570 (Tex.1979). The court described the new burden of proof as the "clear and convincing evidence" standard. *Id.* States cannot provide for unconfronted testimony or affidavits to be used at trial, even if the court deems it/them reliable. *Crawford v. Washington*, 541 U.S. 36, 61 (2004). With respect to the right to a jury determination under these statutes, the Supreme Court Justice Byron White put it this way: "A right to jury trial is granted to criminal defendants in order to prevent oppression by the Government. Those who wrote our constitutions knew from history and experience that it was necessary to protect against unfounded criminal charges brought to eliminate enemies and against judges too responsive to the voice of higher authority. The framers of the constitutions strove to create an independent judiciary but insisted upon further protection against arbitrary action. Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt overzealous prosecutor and against the compliant, biased, or eccentric judge..." With respect to the right to confront and the unconstitutionality of using affidavits, the Supreme Court has ruled that: "The primary object of the constitutional provision in question was to prevent depositions of *ex parte* affidavits (outside testimony) ...being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." The applicable commitment statutes specifically mandated that the court shall hear live testimony and it was unlawful and unconstitutional to rely solely on affidavits. Under these statutes, Plaintiff also had a right to compulsory process to call her retained expert witnesses at any competency or commitment hearing. The Compulsory Process Clause protects people from unjust or unfair accusations by allowing them to call for witnesses who will testify in their behalf. If the defendant calls for a witness who refuses to testify, he can request that the state subpoena him. The witness will have to obey the subpoena and come in to testify, or be in contempt of court. It is very important that the witnesses can be compelled to come in. Plaintiff was also entitled to testify on her own behalf and to present evidence to impeach the State's affidavits. Plaintiff was also entitled to be present at any hearing. The law has provided how trials should be had, and any departure from the provisions of law in the conduct of trials becomes unlawful and prostitutes the courts to illegal purposes and makes of them engines of oppression, rather than resorts for legal trials as contemplated in all recognized society and government. The law is not designed to be a swift engine of oppression and vengeance, but it was and is designed to try men only after due hearing and fair trial. The Supreme Court has said often that "due process is flexible and calls for such procedural protections as the particular situation demands." *See Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). A procedural due process analysis proceeds in two steps. First, a liberty or property interest must be involved. *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). The civil commitment of a person is a significant deprivation of liberty to which procedural due process protections apply. *Vitek v. Jones*, 445 U.S. 480, 491-92, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980). The loss of liberty produced by involuntary commitment is more than a loss of freedom from confinement. *Vitek*, 445 U.S. at 492, 100 S.Ct. 1254. The second step involves the consideration of whether the utilized procedures satisfy due process. The analysis involves balancing (1) the private interest affected; (2) the risk of an erroneous deprivation of that interest and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the burdens that additional procedural requirements would place on the State. *Mathews*, 424 U.S. at 335, 96 S.Ct. 893. Although a person's interest in being free from confinement is substantial and the harm the person would suffer from an erroneous determination is great, those interests are adequately protected by the procedures afforded in the statute. However, Plaintiff was completely deprived of those procedural safeguards and statutory and constitutional rights. Statutes are given a construction consistent with constitutional requirements when possible because the legislature is presumed to have intended compliance with the constitution. *See Brady v. Fourteenth Court of Appeals*, 795 S.W.2d 712, 715 (Tex.1990). Substantive due process bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them. *Foucha v. Louisiana*, 504 U.S. 71, 80, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992); *O'Conner v. Donaldson*, 422 U.S. 563, 575, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975). Plaintiff was also denied equal protection under the law because she was deprived of all the procedural safeguards set forth in the Texas mental health code. See U.S. CONST. amend. XIV. Under Chapter 574 of the Texas Mental Health Code a person found to be mentally ill and requiring court-ordered extended mental health services must be

(33) have the same standard applied to Plaintiff that is applied to all other accused individuals under Tex. C.C.P. art. 46B in determining "incompetence to stand trial,"[34]

---

afforded a judicial hearing, with a jury trial and live testimony, to determine if a person meets the Mental Health Code's criteria for commitment. See TEX. HEALTH & SAFETY CODE ANN. §§ 574.035(a), (b)(2), 574.066(e) (Vernon 1992 & Supp.2003). Under the Mental Health Code, the State has the burden to prove each element of the applicable criteria by clear and convincing evidence. See TEX. HEALTH & SAFETY CODE ANN. § 574.031(g) (Vernon Supp.2003). Further, in a substantive due process analysis, the court determines (1) whether the party had a protected liberty interest, and (2) if the government deprived him or her of that interest capriciously and arbitrarily. See Dallas County v. Gonzales, 183 S.W.3d 94, 111 (Tex.App.-Dallas 2006, no pet.) (citing Foucha v. Louisiana, 504 U.S. 71, 80, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992)). The level of scrutiny depends on the nature of the right involved. If the right is a "fundamental right," the state must show a compelling interest to curtail it and must do so as narrowly as possible. See Reno v. Flores, 507 U.S. 292, 301-02, 113 S.Ct. 1439, 1447, 123 L.Ed.2d 1 (1993); Collins v. Harker Heights, 503 U.S. 115, 125, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992). If the right is not a fundamental right, substantive due process merely requires a rational relationship between the state's interest and the right being curtailed. Washington v. Glucksberg, 521 U.S. 702, 722, 117 S.Ct. 2258, 2268, 138 L.Ed.2d 772 (1997). Fundamental rights are those that are "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." Id., 521 U.S. at 721, 117 S.Ct. at 2268 (internal quotations and citations omitted). With respect to civil commitments, the Due Process Clause "requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." Jones v. United States, 463 U.S. 354, 361, 368 103 S.Ct. 3043, 3051-52, 77 L.Ed.2d 694 (1983)(quoting Jackson v. Indiana, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972)); see also Seling v. Young, 531 U.S. 250, 265, 121 S.Ct. 727, 736, 148 L.Ed.2d 734 (2001) ("Accordingly, due process requires that the conditions and duration of confinement under the Act bear some reasonable relation to the purpose for which persons are committed."). Commitment law is an area "fraught with medical and scientific uncertainties," and the Supreme Court has held that "courts should be cautious not to rewrite legislation." Jones v. United States, 463 U.S. 354, 370 103 S.Ct. 3053, 77 L.Ed.2d 694 (1983). Plaintiff's indefinite confinement without due process or due course of law violated the equal rights and equal protection clause because others similarly situated have a right to live in the least restrictive habilitation setting and to be treated and served in the least intrusive manner appropriate to their individual needs. Further, the trial evidence should have included either (1) expert testimony (2) evidence of a recent overt act or (3) a continuing pattern of behavior that tends to confirm the illness. See TEX. HEALTH & SAFETY CODE ANN. § 574.035 (Vernon 2000). The State produced no expert testimony or other evidence as required by the statute. There is simply no acceptable scientific or empirical basis for the unconstitutional pretrial confinement in breach of the $50,000 surety bail bond contract.

[34] United States Constitution, Amends. 4, 5, 6, 8, and 14; Texas Constitution, Art. I, §§ 3, 3a, 9, 10, 12, 13, 15, 15-a, 16, 19, 28, and 29. In re Gary W., 5 Cal.3d 296, 303 (1971); People v. Macias, 137 Cal.App.3d 465, 472 (1982). BARNES has at all times been held to a dramatically different standard than that applied to other defendants in denial of equal protection under the law and due process because of the vague, ambiguous, and uncertain language used in Dusky v. United States, 362 U.S. 402 (1960). "The focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the ability to understand the proceedings....The purpose of the "knowing and voluntary" inquiry, by contrast, is to determine whether the defendant actually does understand the significance and consequences of a particular decision and whether the decision is uncoerced." Godinez v. Moran, 509 U.S. 389, 401, n. 12 (1993)(emphasis in the original). See also Faretta v. California, 422 U.S. 806, 835 (1975)(citing Johnson v. Zerbst, 304 U.S. 458, 464-465 (1938); People v. Nelson, 72 A.D.2d 64, 67-68, 424 N.Y.S.2d 543, 546 (1980); Drope v. Missouri, 420 U.S. 162, 171 (1975); Smith v. Robins, 528 U.S. 259, 265 (2000). See also ABA Standards for Criminal Justice: Special Functions of the Trial Judge (3rd Ed. 2000), Standard 6-3.6, 6-3.7. Article 46B.003 (2)(B) T.C.C.P., states "A defendant is presumed competent to stand trial and shall be found competent to stand trial unless proved incompetent by a preponderance of the evidence." It is inconceivable that a criminal defense lawyer who has served as an officer of the court and as a trial lawyer for 30 years would be "incompetent to stand trial" and that was the sole reason for depriving BARNES of her right to a jury trial, right to confront, right to appear, and right to due process, due course of law, and

(34) be free from "sanity" exams when Plaintiff has not ever raised a sanity defense, (this was the malicious prosecutors' motive theory from the inception, not Plaintiff's defense),[35]

(35) be free from indefinite pre-trial captivity without any semblance of

---

equal protection; thereby, subjecting her to cruel or unusual punishment pretrial with indefinite captivity and liberty-threatening stigma of mental illness imposed in violation of Texas Constitution, Art. I, §§ 15-a and Texas Health and Safety Code, Title 7, Subtitle C, Chapter 574. *Jackson v. Indiana*, 406 U.S. 715, 738, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972) (holding that, to avoid violating due process, criminal defendant confined after being found incompetent to stand trial "cannot be held more than the reasonable period of time necessary" to determine whether he can regain competency). "'Due process of law,' within the meaning of the fourteenth constitutional amendment, is secured if the laws operated on all alike, and do not subject the individual to an arbitrary exercise of the powers of judgment. *Giozza v. Tiernan*, 148 U.S. 657 [13 Sup. Ct. 721, 37 L.Ed. 599]; *Minneapolis R. Ry. Co. v. Herrick*, 127 U.S. 210 [8 Sup. Ct. 1176, 32 L.Ed. 109]; *Leeper v. Texas*, 139 U.S. 462 [11 Sup. Ct. 577, 35 L.Ed. 225]; *Duncan v. Missouri*, 152 U.S. 377 [14 Sup. Ct. 570, 38 L.Ed. 485]; *LaHood v. State*, 171 S.W.3d 613, 617-18 (Tex.App.—Houston [14th Dist.] 2005, pet. ref'd), *citing Pate v. Robinson*, 383 U.S. 375, 385, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). *Durgan v. State*, 259 S.W.3d 219 (Tex.App.—Beaumont 2008, no pet.) (finding defendant's inclusion in a "special needs" SAFPF did not raise questions about whether she had a recent severe mental illness, was moderately retarded or had exhibited truly bizarre behavior); *Reeves v. State*, 46 S.W.3d 397, 399-40 (Tex.App.—Texarkana 2001, pet. Dism'd) (concluding evidence of defendant's drug addiction and suicide attempt did not reflect on her ability to understand or participate in the proceeding on that day). *See also Rojas v. State*, 228 S.W.3d 770 (Tex.App.—Amarillo 2007, no pet.) (no abuse of discretion in failing to conduct further informal inquiry or to appoint an expert to evaluate defendant when he made comments during voir dire and throughout trial, engaged in non-responsive answers on the stand and expressed view that police conspired to frame him). Art. 46B.074 (a) provides that BARNES can be committed "ONLY on COMPETENT medical or psychiatric testimony provided by an expert qualified under Art. 46B.022." (emphasis added). It violates equal protection under the law to hold BARNES to a different standard, especially when the clear intent is to impose pretrial punishment and forced captivity in an effort to coerce a surrender of constitutional rights.

[35] United States Constitution, Amends. 4, 5, 6, 8, and 14; Texas Constitution, Art. I, §§ 3, 3a, 9, 10, 12, 13, 15, 15-a, 16, 19, 28, and 29. BARNES has never raised a sanity defense or in any manner claimed that she is not guilty by reason of insanity. It has been the malicious prosecutors who have claimed from the outset that Plaintiff was guilty by reason of insanity—that she shot at GITTEL because she is a "disturbed individual" and thought that GITTEL was RYE, she has had a "complete break with reality" is "paranoid" suffers from "persecutory delusions" is "DANGEROUS" and "needs FORCED MEDICATION." The actions of SCHREIBER in aiding and abetting this fabricated motive is unethical, dishonest, unconstitutional, and criminal. Only the defendant can raise the insanity defense, it is not to be raised by the prosecutor as a motive for the crime. T.C.C.P. Art. 46C.051. NOTICE OF INTENT TO RAISE INSANITY DEFENSE. (a) A defendant planning to offer evidence of the insanity defense must file with the court a notice of the defendant's intention to offer that evidence. (b) The notice must: (1) contain a certification that a copy of the notice has been served on the attorney representing the state; and (2) be filed at least 20 days before the date the case is set for trial, except as described by Subsection (c). (c) If before the 20-day period the court sets a pretrial hearing, the defendant shall give notice at the hearing. Counsel must "consult with the client regarding 'important decisions,' including questions of overarching defense strategy." *Florida v. Nixon*, 543 U.S. 175, 187 (2004). SCHREIBER did not ever discuss any such "defense strategy" with BARNES—he did not discuss the "strategy" to raise incompetency or insanity with Plaintiff—these discussions were *ex parte* with the prosecutors and court because Plaintiff was not present or given any notice. *See* transcripts from May 19, 2011 and September 1, 2011. *See also*, *McKaskle v. Wiggins*, 465 U.S. 168, 174, 177-178 (1984) (proper function of standby counsel). These successive commitments were the result of the Star Chamber and all decisions were made *ex parte* in chambers off the record and then these male conspirators would enter the courtroom and make a fraudulent record, but it was all preplanned and decided in secret. Plaintiff was at all times deprived of her right to be present during these critical stages in the prosecution.

procedural or substantive due process or due course of law; and without *habeas corpus* relief in an *ex post facto* manner,[36]

---

[36] United States Constitution, Amends. 4, 5, 6, 8, and 14; Texas Constitution, Art. I, §§ 2, 3, 3a, 8, 9, 10, 11, 11b, 12, 13, 14, 15, 15-a, 16, 19, 20, 26, 27, 28, and 29. *Baxstrom v. Herold,* 383 U.S. 107, 110, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966); *Jackson v. Indiana,* 406 U.S. 715, 723-31, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972); *In re Moye,* 22 Cal.3d 457, 465 (1978). *See* transcripts from February 28, 2011, April 28, 2011, May 19, 2011 and September 1, 2011. *Griffin v. State,* 799 P.2d 521 (Kan. Ct. App. 1990); *Phillips v. District of Columbia,* 458 A.2d 722 (D.C. 1983); *United Steel Workers of America v. Milstead,* 705 F.Supp 1426 (D. Ariz. 1988); *Kraft v. City of Bettendorf,* 359 N.W.2d 466 (Iowa 1984). *See* also the numerous applications for writ of *habeas corpus* that Plaintiff filed in the trial court, third court of appeals, court of criminal appeals, supreme court, federal court for the Western District, and 5th Circuit court. *Jackson v. Indiana,* 406 U.S. 715, 738, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972) (holding that, to avoid violating due process, criminal defendant confined after being found incompetent to stand trial "cannot be held more than the reasonable period of time necessary" to determine whether he can regain competency). The great writ was suspended at all relevant times in violation of TEX. CONST. Art. I, § 12, which deprived Plaintiff of equal protection under the law (14th Amend.), equal rights, and access to the courts in violation of the due course of law. *Habeas* review is appropriate for denials of fundamental and constitutional rights. *Ex parte Sanchez,* 918 S.W.2d 526, 527 (Tex. Crim. App. 1996). "This Court has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington v. Texas,* 441 U.S. 418, 425, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). In *Addington,* the United States Supreme Court stated that the "individual should not be asked to share equally with society the risk of error when the possible injury to the individual is significantly greater than any possible harm to the state[,]" and held that a burden of proof in mental health commitments of clear and convincing evidence satisfies due process. *Addington,* 441 U.S. at 427, 432, 99 S.Ct. 1804. *See* also, *In re Linehan,* 557 N.W.2d 171, 180 (Minn.1996), vacated, 522 U.S. 1011, 118 S.Ct. 596, 139 L.Ed.2d 486 (1997); *In re Leon G.,* 200 Ariz. 298, 26 P.3d 481 (2001), vacated, 535 U.S. 982, 122 S.Ct. 1535, 152 L.Ed.2d 461 (2002); *Westerheide v. State,* 767 So.2d 637, 652-53 (Fla.Dist.Ct.App.2000), review granted, 786 So.2d 1192 (Fla.2001); and *In re Tittlebach,* 324 Ill.App.3d 6, 257 Ill.Dec. 826, 754 N.E.2d 484 (2001); *Lodge v. State,* 597 S.W.2d 773 (Tex.Civ.App.-San Antonio 1980), *aff'd* on other grounds, 608 S.W.2d 910 (Tex.1980); *Taylor v. State,* 671 S.W.2d 535 (Tex.App.-Houston [1st Dist.] 1983, no writ); and *Broussard v. State,* 827 S.W.2d 619 (Tex.App.-Corpus Christi 1992, no writ). Plaintiff was deprived of the "clear and convincing" standard as there was less than a scintilla of admissible evidence to support this pretrial torture and trafficking. In *Lodge,* the court reversed a judgment of commitment, because there was no evidence the appellant was in need of hospitalization for her own welfare and protection or the protection of others. *Lodge,* 597 S.W.2d at 779. *Citing Moss v. State,* 539 S.W.2d 936, 947-50 (Tex.Civ.App.-Dallas 1976, no writ), the *Lodge* court stated that the court in *Moss* "held that a mentally ill person could not be deprived of his liberty without a strong showing of a substantial threat of future harm founded on actual dangerous behavior manifested by some overt threat or act in the recent past...." *Lodge,* 597 S.W.2d at 778. More importantly, the court in *Moss* held that when an application for temporary hospitalization is opposed by the proposed patient, the order must be supported by the recommendation of a physician and a showing of the factual information upon which the recommendation was based. *Moss,* 539 S.W.2d at 951. In *Taylor,* the court held that "a person may not be deprived of his liberty by a temporary involuntary commitment unless there is a showing of a substantial threat of future harm to himself or others." *Taylor,* 671 S.W.2d at 538. In making this determination, the court relied on *Lodge and Seekins v. State,* 626 S.W.2d 97 (Tex.App.-Corpus Christi 1981, no writ). *Taylor,* 671 S.W.2d at 538. In *Seekins,* the court made the same finding, relying on *Lodge* and *Moss. See Seekins,* 626 S.W.2d at 99. In *Broussard,* the court held that "bare psychiatric expert opinion" of a "potential danger" to others is insufficient to support a commitment, and that the State failed to sustain its burden of presenting evidence of a recent overt act or a continuing pattern of behavior that tended to confirm the likelihood of the deterioration of Broussard's ability to function. *Broussard,* 827 S.W.2d at 622. Article I, section 15-a, of the Texas Constitution provides that no person shall be committed as a person of unsound mind except on competent medical or psychiatric testimony. See TEX. CONST. art. I, § 15-a. *See,* Texas Health and Safety Code, Title 7, Subtitle C, Chapter 574. These statutory provisions, when read together with the constitutional requirement that an involuntary commitment not occur in the absence of competent medical or psychiatric testimony,

(36) be free from permanent derogatory and liberty-threatening stigmata of "institutionalized," "criminally insane," "mental patient," and "mental commitments," and false psychiatric diagnoses that appear in permanent records and flagged on one's driver's license, subjecting one to repeated arrests, impounding of vehicle, searches and seizures, loss of property and funds, legal fees, and mental commitments at the whim of these same malicious defendants, and the resulting permanent decrease in earning ability and detrimental impact on future income,[37]

---

indicate the legislature intended there be competent medical or psychiatric testimony to support an involuntary commitment under the Act, and provided for it therein. *Baxstrom v. Herold*, 383 U.S. 107, 111, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966); *Humphrey v. Cady*, 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972). TEX. HEALTH & SAFETY CODE ANN. § 574.066 (Vernon 1992). It's especially important to remember, as journalist Edward R. Murrow once said of Senator McCarthy, that "accusation is not proof and that conviction depends on evidence and due process of law." Plaintiff was deprived of all her rights and subjected to indefinite, harsh, cruel, unusual, and inhumane pretrial punishment. Mental evaluations are inherently unreliable and uncertain because they are wholly subjective and easily influenced by the State, who is paying for them; often the evaluator is on the State's payroll. The accused is given no opportunity to prove competence with an objective test that is scientifically verifiable; and the criteria is vague, ambiguous, and uses sweeping overly broad language in describing the nefarious standard; and no scientific methodology is utilized; often leading to a bare opinion and conclusion without any concrete, relevant, verifiable facts or basis, in violation of the standards established in *Daubert*, *Robinson*, and *Kelly*. *See Daubert v. Merrell Dow Pharmaceutical, Inc.*, 113 S.Ct. 2790 (1993); *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549 (Tex. 1995); *Kelly v. State*, 824 S.W.2d 568 (1992); *Merrell Dow Pharmaceutical, Inc. v. Havner*, 953 S.W.2d 706 (Tex. 1997). Tex.Rules Evid. 702. Psychiatry and psychology are soft pseudo-sciences and require closer scrutiny because there is no objective basis for these speculative conclusions/opinions. *See* Mind Freedom at www.mindfreedom.org. Plaintiff filed her written demand to appear, to cross-examine and confront, and for jury trial, but was summarily denied these valuable rights due to the gross misrepresentation of material facts by SCHREIBER and his failure to comply with the law. *Ex parte Ullmann*, 616 S.W.2d 278 (Tex.Civ.App.-San Antonio 1981, writ. dism'd); *Humphrey v. Cady*, 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972). The writ of *habeas corpus* was suspended and was not speedy or effectual. See footnote with (31) & (32) &(36). The Star Chamber did not follow any rule of law or respect the Texas Constitution or statutory laws of this State.

[37] United States Constitution, Amends. 1, 4, 5, 6, 8, and 14; Texas Constitution, Art. I, §§ 3, 3a, 15-a, 9, 12, 13, 14, 15, 19, 20, 27, 28, and 29. Texas Health and Safety Code, Title 7, Subtitle C, Chapters 571, 574. Involuntary commitment to a mental health facility raises questions related both to a substantial liberty interest and to equal protection. A defendant found to be "incompetent to stand trial" under T.C.C.P. 46B and Texas Health & Safety Code, Title 7, Subtitle C is subject to as many years in a state psychiatric facility as the maximum potential prison sentence for a defendant found guilty of the same charged offense. Plaintiff was detained and tortured against her will in a psychiatric facility—the only maximum security facility of its kind in Texas—reserved for the criminally insane and manifestly dangerous; and she could have easily spent the rest of her life there undergoing a chemical lobotomy without ever being afforded a jury trial. A substantial liberty interest-a potentially long-term confinement in a mental health facility-may be implicated following a finding of "incompetent to stand trial." *See People v. Marshall*, 273 Ill.App.3d 969, 974-75, 210 Ill.Dec. 318, 652 N.E.2d 1294 (1995) (a substantial liberty interest is implicated when one is detained in a mental health facility). Commitment orders impose a collateral consequence that persists beyond the order itself. *See Vitek v. Jones*, 445 U.S. 480 (1980); *Campbell v. State*, 68 S.W.3d 747 (Tex.App. —Houston [14 Dist.] 2001); *Johnstone v. State*, 22 S.W.3d 408, 409 n. 1 (Tex.2000) (*per curiam*); *Pollard v. United States*, 352 U.S. 354, 77 S.Ct. 481, 1 L.Ed.2d 393 (1957); *Humphrey v. Cady*, 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972). Plaintiff's driver's license has been permanently flagged with the involuntary commitments and mental illness defamation *per se*, subjecting her to more false arrests, false imprisonments in state psychiatric facilities, loss of earning capacity, and other damages for the rest of her life. *See* Tex. Health and Safety Code, Title 7, Subtitle C, Chapter 573 (Sec. 573.001. APPREHENSION BY PEACE OFFICER WITHOUT WARRANT. (a) A peace officer, without a warrant, may take a person into custody if the officer: (1) has reason to believe and does believe

that: (A) the person is mentally ill; and (B) because of that mental illness there is a substantial risk of serious harm to the person or to others unless the person is immediately restrained; and (2) believes that there is not sufficient time to obtain a warrant before taking the person into custody. (b) A substantial risk of serious harm to the person or others under Subsection (a)(1)(B) may be demonstrated by: (1) the person's behavior; or (2) evidence of severe emotional distress and deterioration in the person's mental condition to the extent that the person cannot remain at liberty. (c) The peace officer may form the belief that the person meets the criteria for apprehension: (1) from a representation of a credible person; or (2) on the basis of the conduct of the apprehended person or the circumstances under which the apprehended person is found.). This is a very low and vague standard and Plaintiff will be subjected to harassing and costly arrests for the rest of her life. In addition, Plaintiff will continue to bear the inherent stigma associated with the underlying factual allegations as well as the defamatory *per se* allegations of being "a disturbed individual" (quoting HOBBS to the media on May 11, 2010), who has had "a complete break with reality," is "DANGEROUS" and requires "FORCED MEDICATION" (quoting MCCABE in malicious missive to NTSH on May 19, 2011), because this damage is permanent, which was the object and intent of the malicious conspiracy. These Defendants wanted Plaintiff permanently silenced, marginalized, and disbarred in retaliation against her for exposing their corruption. Defendants were able to so grossly violate all of Plaintiff's well recognized constitutional rights because they knew by unconstitutionally throwing her into the class of "mentally ill" citizens that all her rights would fall away because the courts have repeatedly allowed constitutional discrimination against this suspect class. Members of the 46B'd class are stripped of all their equal protection, due process and due course of law rights without any semblance of fairness, justice, or jury trial. It is a form of permanent punishment, banishment, and outlawry from citizenship—an outlawed citizen is summarily stripped of all indicia of citizenship as well as their autonomy, dignity, independence, credibility, and freedom. This permanent punishment is imposed without a jury trial, due process, or due course of law based upon one of the most dubious pseudo-sciences of psychiatry and psychology where the opinions or conclusions are subjective, not based on any objective tests, and not grounded in sound scientific methodology. *See Daubert v. Merrell Dow Pharmaceutical, Inc.,* 113 S.Ct. 2790 (1993); *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549 (Tex. 1995); *Kelly v. State,* 824 S.W.2d 568 (1992); *Merrell Dow Pharmaceutical, Inc. v. Havner,* 953 S.W.2d 706 (Tex. 1997). Tex.Rules Evid. 702. This is shown by the circular arguments without any basis or foundation that are routinely stated in reports to the court and then, the lawyers and judges blame it on the "experts" and the mental health "professionals" blame it on the courts, and the mental health patient is caught in the maelstrom. This permanent mar on Plaintiff's record and the resulting injuries and damages inflicted on Plaintiff will forever prevent her from earning a livelihood. Once stripped of all rights, 100% of the 46B'd defendants are forced to plea bargain by their court appointed lawyers and never have any meaningful opportunity to clear their name or hope of access to their right to a jury trial—they can no longer even represent themselves in blatant violation of Texas Constitution, Art. I, §§ 3, 3a, 9, 10, 13, 14, 15, 15-a, 16, 19, 27, 28, and 29; and this violates the 14th amendment to the United States Constitution, and allows a cause of action under 42 U.S.C. §§ 1983, and 1985(2). The malicious abuse of the civil commitment process converted it into a punitive act. The result is punitive rather than civil, and therefore unconstitutional, because it does not afford procedural due process rights, including the Fifth Amendment privilege against self-incrimination and the Sixth Amendment right to counsel, and because it violates the prohibitions against double jeopardy and *ex post facto* laws and even the suspension of existing laws. The Texas legislature placed the Act in the Health & Safety Code and labeled it as a civil commitment procedure. A civil label is not always determinative of the issue when the result is punitive. The statutory scheme is so punitive in effect as to negate the State's intention to deem it civil. *Kansas v. Hendricks,* 521 U.S. 346, 361, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997). In determining whether a statute is punitive, factors that may be considered include whether the sanction involves an affirmative disability or restraint; whether it has historically been regarded as punishment; whether it comes into play only on a finding of scienter; whether its operation will promote the traditional aims of punishment--retribution and deterrence; whether the behavior to which it applies is already a crime; whether an alternative purpose to which it may rationally be connected is assignable for it; and whether it appears excessive in relation to the alternative purpose assigned. *Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 168-69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). The harm is irreparable due to the pollution of the jury pool by the malicious defamation *per se* in the media and permanently posted on the Internet. Plaintiff was permanently and irreparably harmed by the vindictively forced labeling and stigma of "mental illness"

(37) be free from loss of all rights prior to trial, including right to appoint a power of attorney, to take care of business, to have equal access to the courts, to discovery of evidence and witnesses against the accused, to confront and cross-examine evidence and witnesses against one, to subpoena witnesses and present evidence favorable to the accused, to be present at hearings, to have a jury determination, to receive exculpatory evidence and witnesses in a timely and meaningful manner, to a fair and impartial tribunal, to a neutral and detached magistrate, to fair pretrial publicity, to a law library or Internet for research and to prepare motions and briefs, to a computer or word processor to prepare motions and briefs, to a copier to make copies, to timely mail service, to sufficient supplies like paper, pens, and envelopes, to represent one's self, to communicate with lawyers of one's choice, to communicate with clients, to communicate with family, to communicate with friends, to be in the least restrictive environment, to earn a livelihood, to provide for and protect one's children, to a speedy trial to clear one's name, to protect one's property from theft, dissipation, loss, and damage while being detained in an unlawful and unconstitutional captivity,[38]

---

and "mental commitment" and "incompetence to stand trial" that were all imposed unconstitutionally and unlawfully with utmost malice. *See* www.mindfreedom.org. *See* Caplan, Paula, "Psychiatry's Bible, the DSM, is doing more harm than good," Apr 27, 2012, Washington Post and Healy, Melissa, "Brain Shrinkage Seen in Those Taking Antipsychotic Medications," Feb 07, 2011, Los Angeles Times  See footnote with (35).

[38] United States Constitution, Amends. 1, 4, 5, 6, 8, and 14; Texas Constitution, Art. I, §§ 2, 3, 3a, 8, 9, 10, 11, 11b, 12, 13, 15, 15-a, 16, 19, 27, 28, and 29. In Texas, a person suffering from a mental illness, is guaranteed all the rights, benefits, responsibilities and privileges afforded by the constitutions and laws of the United States and Texas. *Barclay v. Campbell*, 704 S.W.2d 8, 11 (Tex.1986) (citing TEX.REV.CIV.STAT.ANN. art. 5547-80(a) (Vernon Supp.1985). However BARNES was summarily and routinely deprived of these valuable, inalienable, and forever inviolate rights. *See* Texas Health and Safety Code, Title 7, Subtitle C, Chapter 576: Sec. 576.001. RIGHTS UNDER CONSTITUTION AND LAW. (a) A person with mental illness in this state has the rights, benefits, responsibilities, and privileges guaranteed by the constitution and laws of the United States and this state. (b) Unless a specific law limits a right under a special procedure, a patient has:(1) the right to register and vote at an election; (2) the right to acquire, use, and dispose of property, including contractual rights; (3) the right to sue and be sued; (4) all rights relating to the grant, use, and revocation of a license, permit, privilege, or benefit under law; (5) the right to religious freedom;  and (6) all rights relating to domestic relations. Sec. 576.002. PRESUMPTION OF COMPETENCY. (a) The provision of court-ordered, emergency, or voluntary mental health services to a person is not a determination or adjudication of mental incompetency and does not limit the person's rights as a citizen, or the person's property rights or legal capacity. (b) There is a rebuttable presumption that a person is mentally competent unless a judicial finding to the contrary is made under the Texas Probate Code. Texas Health and Safety Code, Title 7, Subtitle C, Chapter 576: Sec. 576.003. WRIT OF HABEAS CORPUS. This subtitle does not limit a person's right to obtain a writ of habeas corpus. At all times, BARNES was deprived of equal protection and due process in violation of the 14th amendment, subjected to an unreasonable seizure in violation of the 4th amendment, and subjected to cruel and unusual punishment in violation of the 8th amendment. The courts are simply not free to impair "the exercise of free choice" *Faretta,*, 422 U.S., at 815 (quoting *Adams,* 317 U.S., at 280), for "whatever else may be said of those who wrote the Bill of Rights, surely there can be no doubt that they understood the inestimable worth of free choice." 422 U.S., at 833-834. *See also, Faretta,* at 821 (the Constitution guarantees the accused a right to his own defense, and to be free from the concocted defense of counsel forced upon him against his will). The "liberty" guaranteed by the due process clause includes personal, political and social rights and privileges. *Hampton v. Mow Sun Wong*, 426 U.S. 88, 102 & n.23 (1976). In Texas, those who are subject to ordinary civil commitments are entitled to a hearing prior to an order for an extension of their commitment. TEX. HEALTH & SAFETY CODE ANN. § 574.066(e) (Vernon 1992). An application for which a hearing is requested or set is considered an original application for court-ordered extended mental health services. *Id.* At a hearing on an original application for court-

(38) equal protection under the law and the same rights as a civil litigant to recuse or object to the assignment of a hand-picked or biased judge and to have a fair and impartial judge and neutral and detached magistrate,[39]

---

ordered extended outpatient mental health services, the proposed patient has the right to a jury and the State must establish commitment criteria by clear and convincing evidence. TEX. HEALTH & SAFETY CODE ANN. § 574.035(b)(2)(Vernon Supp.2003).  Plaintiff was deprived of due process and equal protection because the court denied Plaintiff's jury demand and did not provide for an initial determination or any periodic redetermination that Plaintiff met or continued to meet the standard for commitment, in a judicial hearing with the burden of proof upon the State.  The patient subject to possible renewal of a commitment is entitled to a hearing before a jury, where the State has the burden to establish commitment criteria by clear and convincing evidence.  Additionally, Texas places its highest priority crimes in its Health and Safety Code.  Many felony and misdemeanor drugs crimes are found in the Health and Safety Code Chapters 481, 482, 483 and 485.  These chapters delineate hundreds of criminal offenses, including manufacturing and distribution of controlled substances, dangerous drugs and abusable chemicals.  Several other chapters of the Health and Safety Code deal with criminal statutes and penalties.  These include: Chapters 195, 341, 501, 765 and 793, *inter alia.*  The Sexually Violent Predator statute in Chapter 841, immediately follows Chapter 840, which deals with the sterilization of cats and dogs.  "We conclude that the code placement in Texas does not necessarily implicate the act as civil, and rather is consistent with the placement of other criminal laws. The manifest punitive intent of many provisions of the Health and Safety Code is apparent." *Commitment of Fisher v. State,* 123 S.W.3d 828, 841 (Tex.App.—Corpus Christi 2003), *rev'd* 164 S.W.3d 637 (Tex. 2005).  "It is well settled that realities rather than benign motives or non-criminal labels determine the relevance of constitutional policies." *In re Winship,* 397 U.S. 358, 365-366, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *In re Gault,* 387 U.S. 1, 21, 27, 50, 87 S.Ct. 1428, 18 L.Ed.2d 527, (1967); *Breed v. Jones,* 421 U.S. 519, 528, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975); *Allen,* 478 U.S. at 369, 106 S.Ct. 2988.

[39] United States Constitution, Amends. 1, 5, 6, and 14; Texas Constitution, Art. I, §§ 3, 3a, 8, 9, 10, 12, 13, 16, 19, 27, 28, and 29.  Included in the definition of structural due process rights, is the right to an impartial judge, i.e., the right to a judge who follows the Constitution and Supreme Court precedent and upholds the oath of office. See, e.g., *Neder v. United States,* supra, 527 U.S. at 8 ("biased trial judge" is 'structural [error],' and thus [is] subject to automatic reversal"); *Edwards v. Balisok,* 520 U.S. 641, 647 (1997) ("A criminal defendant tried by a partial judge is entitled to have his conviction set aside, no matter how strong the evidence against him."); *Johnson v. United States,* 520 U.S. 461,469 (1997); *Sullivan v. Louisiana,* 508 U.S. at 279; *Rose v. Clark,* 478 U.S. 570, 577-78 (1986); *Tunney v. Ohio,* 273 U.S. 510, 523 (1927).  The judicial bias in this case, structural error in itself, required the judge and magistrate in the WILLIAMSON COUNTY prosecution, to-wit: CARNES and ANDERSON to recuse themselves voluntarily in a timely and meaningful manner.  ANDERSON was not neutral and detached and CARNES was not fair and impartial.  CARNES waited until the damage was irrevocable and then continued to allow his bias and prejudice to influence SHAVER, who was hand-picked and is clearly not fair, impartial, and unbiased. Despite the conflicts they created and their oaths of office to uphold the Constitution, SHAVER refused to recuse himself and summarily denied BARNES timely objection to his assignment.  SHAVER denied Plaintiff's objection to his assignment to her case without a hearing and stated that only parties in a civil case are entitled to object to the assignment of a visiting judge—defendants in a criminal case have no such right.  This is a blatant denial of equal protection under the law because there is far more at stake in a criminal case than in a civil dispute.  The continued oversight of the judges in this case compounded the structural error already created.  Plaintiff is irrevocably harmed, and deprived of her right to a speedy and fair trial before a fair and impartial jury.  Any trial resulting in an appeal would be a waste of judicial resources because this is a structural error not subject to a harm analysis. *See Neder v. United States,* 119 S.Ct. 1827, 1833 (1999) (biased trial judge is structural error not subject to harm analysis).  Under these circumstances, mandamus provides a remedy of respondent's immediate recusal. *See Walker,* 827 S.W.2d at 843 (party seeking mandamus relief "must establish the effective denial of a reasonable opportunity to develop the merits of his or her case, so that the trial would be a waste of judicial resources"); *Union Pacific Resources Co.,* 969 S.W.2d at 429 (Hecht, J., concurring) (mandamus may be appropriate where trial judge's ruling is almost certain to require a reversal of the final judgment on appeal); [5] *compare Buntion v. Harmon,* 827 S.W.2d 945, 948 (Tex.Cr.App. 1992) (appeal of trial court's arbitrary replacement

(39) be free from malicious abuse of process by misapplication of vague, ambiguous, or overly broad statutes,[40]

---

of appointed counsel to indigent defendant was inadequate legal remedy because trial judge's actions would "most likely result in a new trial") quoting *Stearnes v. Clinton,* 780 S.W.2d 216, 225-26 (Tex.Cr.App. 1989).

[40] Tex. C.C.P. Art. 46B(tracks the vague, ambiguous, uncertain, indefinite, and overly broad *Dusky* standard); The language of the statute is vague, ambiguous, and overly broad because judges would differ in the requirements they might impose, therefore, the statute is unconstitutionally vague, uncertain, and indefinite. *See, McNeil v. Director, Patuxent Inst.,* 407 U.S. 245, 92 S.Ct. 2083, 32 L.Ed.2d 719 (1972), where the Court held that the State had no basis for holding McNeil in a mental hospital. Also, in the TRAVIS COUNTY malicious prosecution under Tex. Penal Code Ann. § 38.15 (Vernon 2003), the act requirement of the statute is also vague, uncertain, indefinite, ambiguous, and overly broad because it includes interrupting, impeding, disrupting, or otherwise interfering with the performance of official duties. The act can be anything and the "performance of official duties" can include anything—like "duty to maintain the peace." One commentator has noted that the breadth of the conduct will probably require the State to allege specifically the manner and means used by an accused to interfere. *See, Sanders v. State Dep't of Pub. Welfare,* 472 S.W.2d 179, 182 (Tex.Civ.App.-Corpus Christi 1971, writ dism'd w.o.j.). The court stated that "[i]f a regulation is incomplete, vague, indefinite and uncertain and it forbids the doing of an act which is so vague, that men of common intelligence must necessarily guess at its meaning and that such men differ as to application, it violates the first essential of due process of law." *Id. See* Gerald S. Reamey, *Criminal Offenses and Defenses in Texas* 255 (West 1993) (hereinafter *Reamey*). Section 38.15 expressly provides in subsection (d) a defense when the interference consists of speech only. Even without this statutory defense, a verbal interference with a public servant or officer could be defended on grounds of the First Amendment to the United States Constitution. *See City of Houston v. Hill,* 482 U.S. 451, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987); *Reamey* at 258). "A statute or ordinance is violative of due process and fatally vague when persons regulated by it are exposed to some risk or detriment without fair warning of the nature of the proscribed conduct." *City of Webster v. Signad, Inc.,* 682 S.W.2d 644, 646 (Tex.App.-Houston [1st Dist.] 1984, writ ref'd n.r.e.). "When persons of common intelligence are compelled to guess at a law's meaning and applicability, due process is violated and the law is invalid." *Id.* The values that vague laws offend are two-fold: first, "'because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly'"; second, "'if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.'" *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982) (quoting *Grayned v. City of Rockford,* 408 U.S. 104, 108-09, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972)). A statute is impermissibly overbroad if, in addition to proscribing activities that may be constitutionally prohibited, it sweeps within its coverage speech or conduct protected by the First Amendment. *Bynum v. State,* 767 S.W.2d 769, 772 (Tex. Crim. App. 1989); *see also Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494, 102 S.Ct. 1186, 1191, 71 l.Ed.2d 362 (1982) (when there is a facial challenge to the over breadth and vagueness of a law, the court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct). A vagueness challenge is applicable to all criminal laws, not just those that regulate speech. *Webb v. State,* 991 S.W.2d 408, 416 (Tex. App. - Houston [14th Dist.] 1999, pet. ref'd). A statute will be declared unconstitutionally vague if "its prohibitions are not clearly defined." *State v. Markovich,* 77 S.W.3d 274, 279 (Tex. Crim. App. 2002) (quoting *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972)). The first inquiry is whether an ordinary, law-abiding person receives sufficient information from the statute that his conduct risks violating the criminal law. *State v. Fry,* 867 S.W.2d 398, 401 (Tex. App. - Houston [14th Dist.] 1993, no pet.). All penal laws must give notice to the populace about what activity is made criminal to provide fair notice to persons before making their activity criminal. *Id.* (citing *Bynum,* 767 S.W.2d at 773). The second inquiry involves a determination of whether the statute provides sufficient notice to law enforcement personnel to prevent arbitrary or discriminatory enforcement. *Id.* (citing *Bynum,* 767 S.W.2d at 773). A statute must be sufficiently definite to avoid the possibility of arbitrary and erratic arrests and convictions. *Fry,* 867 S.W.2d at 401 (citing *Papachristou v. City of*

(40) be free from malicious retaliatory conspiracies to harm, injure, and damage business and personal reputation, and to cause a chilling effect on 1st amendment rights,[41]

(41) be free of laws, customs, practices, habits, policies, or procedures, which abridge the privileges or immunities of the citizens of the United States,[42] and

---

*Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972)). Either of these inquiries forms an independent basis for a finding of vagueness. *Id.* (citing *Adley v. State*, 718 S.W.2d 682, 685 (Tex. Crim. App. 1985)). At the very least, these two statutes are unconstitutional as applied to BARNES. Tex. Penal Code Ann. § 38.15 and Tex. C.C.P. Art. 46B are unconstitutional under both the separation of powers and the void for vagueness doctrines, therefore, the obvious remedy is to enjoin their use as a penal statute or criminal procedure. This is the same vague statute that Plaintiff was maliciously prosecuted under by WILLIAMSON COUNTY, RYE, and HOBBS in BROOKS's court, the same group who maliciously prosecuted Arnold Garza under the same statute. Equally improper is the malicious arrest and prosecution by this same group for "filing a false police report" when all BARNES did was follow the instructions of the safe company and the insurance company for the repair of damages caused by WCSD deputies.

[41] United States Constitution, Amends. 1, 14; Texas Constitution, Art. I, §§ 3, 31, 8, 9, 13, 15, 16, 19, 20, 26, 27, 28, and 29; Texas Deceptive Trade Practices Consumer Protection Act. *Carter v. Georgevich,* 78 F.Supp.2d 332, 334 (D.N.J. 2000) (stating that "[r]ather than the acts of a prosecutor and judge being considered intervening causes which interrupted or destroyed the causal connection between the wrongful act and injury to the plaintiff, it appears to the Court that such subsequent acts were reasonably foreseeable by the officer. A tortfeasor is not relieved from liability for his wrongful conduct by the intervention of third persons if these acts are reasonably foreseeable"), *Schiller v. Strangis,* 540 F.Supp. 605, 621 (D.Mass.1982), *Lykken v. Vavreck,* 366 F.Supp. 585 (D.Minn.1973), *Brooks v. Moss,* 242 F.Supp. 531 (W.D.S.C.1965), and *McArthur v. Pennington,* 253 F.Supp. 420 (E.D.Tenn.1963). The "liberty" guaranteed by the due process clause includes personal, political and social rights and privileges. *Hampton v. Mow Sun Wong,* 426 U.S. 88, 102 & n.23 (1976). Plaintiff has been repeatedly and routinely retaliated against and punished for her exercise of 1st amendment rights for 15 years in WILLIAMSON COUNTY and their malicious defamation *per se* and "caution flags" on her driver's license caused the solicitation and joinder of other law enforcement personnel and the prosecutors who cover-up for the abuses and unlawful activity by the law enforcement personnel and deputies who continue to retaliate and discriminate against Plaintiff based on the malicious publications of WILLIAMSON COUNTY. Now, they have added the 3 involuntary psychiatric commitments, showing them as 3 episodes when it was one long continuous captivity, and the aggravated assault with a deadly weapon in order to permanently outlaw Plaintiff. This is the same kind of abuse they engage in with the "vexatious litigant" and "unauthorized practice of law" regulations. People are systematically marginalized and outlawed.

[42] United States Constitution amend. 14; 42 U.S.C. §§ 1983, 1985(2); *United States v. Atkinson,* 297 U.S. 157, 160 (1936) (explaining courts may notice errors "if they otherwise seriously affect the fairness, integrity or public reputation of judicial proceedings"). Texas Constitution, Art. I, §§ 3, 3a, 9, 12, 13, 16, 19, 27, 28, and 29. State action, within the requirements of the Fourteenth Amendment, is present here, because such action refers to exertions of state power in all forms, including judicial action. *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161; *Griffin v. People of State of Illinois,* 351 U.S. 12, 76 S. Ct. 585, 100 L.Ed. 891; *Douglas v. State of California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811; *Coffman v. Bomar,* 220 F. Supp. 343 (USDC Tenn., 1963). When the fourteenth amendment forbade any state from depriving any person of life, liberty or property without due process of law, it was supposed that the intent of the people of the United States was to prevent the deprivation of any legal right in violation of the fundamental guaranties and to "apply to all the instrumentalities of the state, to its legislative, executive, and judicial authorities; and therefore it has become a settled doctrine in the constitutional jurisprudence of this country that whoever by virtue of public position under a state government deprives another of property, life or liberty without due process of law, or denies or takes away the equal protection of the law, violates the constitutional inhibition, and he acts in the name and for the state, and is clothed with the state's power, his act is that of the state. This must be so, or, as we have often said, the constitutional prohibition has no meaning, and the state has clothed one of its agents with the power to annul or evade it." *C., B. & Q. Ry. v. Chicago,* 166 U.S. 226, 233, 234, 17 Sup. Ct. 581, 41 L.Ed. 979, *citing Ex parte Virginia,* 100 U.S. 346, 347, 25 L.Ed. 679; *Scott v. McNeal,* 154 U.S. 34, 14 Sup. Ct. 1108, 38 L.Ed. 896. "But a state may

(42) be free from a deprivation of life, liberty, property, privileges or immunities, or in any manner disfranchised, without procedural and substantive due process or due course of law.[43]

---

not, by any of its agencies, disregard the prohibition of the fourteenth amendment. Its judicial authorities may keep within the letter of the prescribed forms of procedure in its courts and give the parties interested the fullest opportunity to be heard, and yet it might be that its final action would be inconsistent with the amendment. In determining what is due process of law, regard must be had to substance, and not to form." *Chicago, Burlington, etc., Ry. v. Chicago,* 166 U.S. 226, 17 Sup. Ct. 581, 41 L.Ed. 979. Again, in another case, "though the law itself be fair on its face and impartial in appearance, yet if it is applied and administered by public authority with an evil eye and unequal hand, …it is still within the prohibition of the Constitution." *Yick Wo v. Hopkins,* 118 U.S. 373, 6 Sup. Ct. 1064, 30 L.Ed. 220. See, also, *Henderson v. Mayor,* 92 U.S. 259, 23 L.Ed. 543; *Chy Ling v. Freeman,* 92 U.S. 275, 23 L.Ed. 550; *Neal v. Delaware,* 103 U.S. 370, 26 L.Ed. 567; *Soon v. Crowley,* 113 U.S. 703, 5 Sup. Ct. 730, 28 L.Ed. 1145. Due process requires a person to be able to enjoy protected rights, such as effective assistance of counsel, rather than just an empty artifice. *Little v. Streater,* 452 U.S. 1, 16, 101 S.Ct. 2202, 68 L.Ed.2d 627 (1981) ("[A] statute … may be held constitutionally invalid as applied when it operates to deprive an individual of a protected right although its general validity as a measure enacted in the legitimate exercise of state power is beyond question."). Plaintiff was entitled to equal rights and equal protection under the law according to the Castle Doctrine, which was passed by the Texas Legislature to protect citizens from these prosecutions; BARNES was selectively prosecuted in violation of the equal protection under the law and due process. In his 1761 attack on Writs of Assistance, James Otis asserted that "one of the most essential branches of English liberty is the freedom of one's house. A man's house is his castle; and whilst he is quiet, he is as well guarded as a prince in his castle." James Otis, "Against Writs of Assistance," (Feb. 1761) http://www.nhinet..org/ccs/docs/writs.htm. The Texas Constitution affords greater protections due to the wording in Art. I, § 19: "Sec. 19. DEPRIVATION OF LIFE, LIBERTY, ETC.; DUE COURSE OF LAW. No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land." The United States now claims that it is within the scope of employment for its agents, representatives, employees, and attorneys to violate this basic, fundamental, and structural right.

[43] United States Constitution, Amends. 5, 6, and 14; Texas Constitution, Art. I, §§ 2, 9, 10, 19, 28, and 29. The rights to notice, confrontation, and compulsory process, when taken together, guarantee that a criminal charge may be answered in a manner now considered fundamental to the fair administration of American justice - through the calling and interrogation of favorable witnesses, the cross-examination of adverse witnesses, and the orderly introduction of evidence. In short, the (6th) Amendment constitutionalizes the right in an adversary criminal trial to make a defense as we know it. *See California v. Green,* 399 U.S. 149, 176 (Harlan, J., concurring). The "liberty" guaranteed by the due process clause includes personal, political and social rights and privileges. *Hampton v. Mow Sun Wong,* 426 U.S. 88, 102 & n.23 (1976). In *Bolling v. Sharpe* 347 U.S. 497 (1954), "the concepts of equal protection and due process, both stemming from our American ideal of fairness, are not mutually exclusive," reasoned Chief Justice Earl Warren. The Equal Protection Clause requires each state to provide equal protection under the law to all people within its jurisdiction. 14th Amendment, Section 1 states "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." The 5th amendment provides "nor be deprived of life, liberty, or property, without due process of law" whereas the Texas Bill of Rights protects those interest and more, including the protection of privileges and immunities and protection against being disfranchised in any manner. Tex.Const., Art.I, § 19. Under the Due Course of Law provision of article I, section 19, the State has a duty to preserve material evidence which has apparent exculpatory value, encompassing both exculpatory evidence and evidence that is potentially useful to the defense. *Pena v. State (Pena II),* 191 S.W.3d 133, 134 (Tex. Crim. App. 2006); *see also Pena v. State (Pena I),* 166 S.W.3d 274, 276-77 (Tex. App.--Waco 2005). *Pena v. State (Pena III),* 226 S.W.3d 634, 637, 656 (Tex. App.--Waco 2007). U.S. Const., Amend. XIV ("nor shall any State deprive any person of life, liberty or property without due process of law"); Tex. Const., Art. I, §19 ("No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land"). The

16.    Plaintiff has shown in the footnotes that, at all relevant times, these constitutional rights were clearly established and recognized.    Yet, the United States claims that any seasonal, part-time, or temporary employee can violate these rights and it will be deemed to be within the scope of their employments to violate the rights of the citizens of this State.    At all times, Plaintiff was under the impression that Kathleen Gittel engaged in trespass and lied and engaged in aggravated perjury for her own profit, desperation, to save her job, and to avoid prosecution for her criminal behavior by helping frame, commit, convict, and disbar Plaintiff.    Kathleen Gittel was paid to change her descriptions to implicate Plaintiff and to testify falsely under oath.    Now, after over 5 years, the United States for the first time claims that she was acting within the scope of her duties when she so grossly violated Plaintiff's constitutional rights and aided, abetted,

---

cumulative errors amount to structural errors. *Arizona v. Fulminante,* 499 U.S. 279, 309, 111 S.Ct. 1246, 1264, 113 L.Ed.2d 302 (1991). An error is "structural" if it is the kind of error that affects the framework in which the trial takes place and defies analysis by harmless error standards. *Id.* at 309-310, 111 S.Ct. at 1264-65. The Supreme Court has recognized the following as examples of structural error: total deprivation of effective assistance of counsel at trial, a biased judge, the unlawful exclusion of members of the defendant's race from a grand jury or improper manipulation of the members of the grand jury, denial of the right to self-representation at trial, and denial of the right to a public trial. *Id.* Those examples defy quantitative comparison because the entire trial process is tainted by the constitutional violation. The Supreme Court the Court repeatedly has reaffirmed that "[s]ome constitutional violations ....by their very nature cast so much doubt on the fairness of the trial process that, as a matter of law, they can never be considered harmless." *Satterwhite v. Texas,* 486 U.S. 249, 256 (1988); accord *Neder v. United States,* 527 U.S. 1, 7 (1999) ("[W]e have recognized a limited class of fundamental constitutional errors that 'defy analysis by "harmless error" standards'...Errors of this type are so intrinsically harmful as to require automatic reversal (i.e., 'affect substantial rights') without regard to their effect on the outcome."); *Sullivan v. Louisiana,* 508 U.S. 275, 279 (1993) ("Although most constitutional errors have been held to harmless-error analysis, some will always invalidate the conviction." (citations omitted)); id at 283 (Rehnquist, C.J., concurring); *United States v. Olano,* 507 U.S. 725, 735 (1993); *Rose v. Clark,* 478 U.S. 570, 577-78 (1986) ("some constitutional errors require reversal without regard to the evidence in the particular case...[because they] render a trial fundamentally unfair"); *Vasquez v. Hillary,* 474 U.S. 254, 263-264 (1986); *Chapman v. California,* 386 U.S. 18, 23 (1967) ("there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error"). *See* also, *University of Tex. Med. Sch. at Houston v. Than,* 901 S.W.2d 926, 929 (Tex.1995) (citing *Mellinger v. City of Houston,* 68 Tex. 37, 3 S.W. 249, 252-- 53 (1887)). There are two components of the protections afforded by the clause---substantive and procedural. The substantive component of the Due Course of Law Clause protects citizens from state action arbitrarily or capriciously depriving them of an interest in life, liberty, or property. *See Eiland v. Wolf,* 764 S.W.2d 827, 834 (Tex.App.---Houston [1st Dist.] 1989, writ denied). The procedural component provides that citizens are entitled to notice and an opportunity to be heard at a meaningful time in a meaningful manner before any rights in life, liberty, or property may be taken away by the state. *Than,* 901 S.W.2d at 930.

and assisted a conspiracy to harm, injure, and damage Plaintiff, her children, her practice, her business interests, her investments, her property, and her clients.

17.    The United States now claims that it was within the scope of employment for their part-time, seasonal, temporary employees to conspire with others to violate the constitutional rights of a Texas citizen and to conspire to wrongfully frame, commit, convict, disbar, and outlaw her. It is within the scope of employment for the agents, representatives, employees, and attorneys of the United States to engage in this criminal activity. If this is true, that these criminal and unconstitutional actions are within the scope of employment, then Plaintiff reserves the right to proceed in an international tribunal for these atrocities.

18.    The Texas common law causes of actions for malicious abuse of process, malicious prosecution, conspiracy, false arrest, false imprisonment, intentional infliction of emotional distress and mental anguish, tortious interference with contract, tortious interference with familial relations, aiding and abetting, and other state causes of action plead by Plaintiff are viable and ripe under the true facts of this case against the individuals who participated in the conspiracy.[44] Only, now, for the first time, the United

---

[44] *Gold v. Campbell,* 54 Tex.Civ.App. 269, 117 S.W. 463 (El Paso 1909, no writ). There, the court of appeals recognized that a victim of false imprisonment could pursue a tort cause of action against an officer. The cause of action alleged in *Gold* was the traditional common law tort of false imprisonment. *Gold* recognized that an officer who acts outside the scope of his authority is amenable to suit under a traditional common law cause of action. Further, "Sovereign immunity protects the State from lawsuits for money damages." *Tex. Nat. Res. Conservation Comm'n v. IT-Davy,* 74 S.W.3d 849, 853 (Tex.2002). But "an action to determine or protect a private party's rights against a state official who has acted without legal or statutory authority is not a suit against the State that sovereign immunity bars." *Fed. Sign v. Tex. S. Univ.,* 951 S.W.2d 401, 405 (Tex.1997). "Private parties may seek declaratory relief against state officials who allegedly act without legal or statutory authority." *Tex. Nat. Res. Conservation Comm'n v. IT-Davy,* 74 S.W.3d 849, 855 (Tex.2002) (citing *Tex Educ. Agency v. Leeper,* 893 S.W.2d 432 (Tex.1994) (suit challenging state officials' construction of compulsory school-attendance law)); *see also Fed. Sign.,* 951 S.W.2d at 404 ("A private litigant does not need legislative permission to sue the State for a state official's violations of state law."). A state official's illegal or unauthorized actions are not acts of the State. Accordingly, an action to determine or protect a private party's rights against a state official who has acted without legal or statutory authority is not a suit against the State that sovereign immunity bars. In other

States claims that the acts of participating in this conspiracy were within the scope of employment.

19.    The courts of Texas shall remain open for these transgressions.  Yet, the United States has violated the open court's doctrine by depriving Plaintiff of that forever inviolate right.  Plaintiff is due her right of redress to address her grievances and to a jury trial to hear those grievances.  It is a violation of the 9th and 10th Amendments for the federal courts to use a procedural device to strip these rights away from the people.[45] .  It would violate the 9th and 10th Amendments to impose the federal standards on a Texas Constitutional claim or state statutory or common law cause of action.  The undeniable fact that these transgressions and atrocities were committed on Texas soil does not negate the fact that they are inherently crimes against the peace and security of mankind and

---

words, we  distinguish suits to determine a party's rights against the State from suits seeking damages.  A party can maintain a suit to determine its rights without legislative permission.  *Fed. Sign*, 951 S.W.2d at 404 (citing *Dir. of the Dep't of Agric. & Env't v. Printing Indus. Ass'n of Tex.*, 600 S.W.2d 264, 265-66 (Tex.1980) (legislative consent not required for suit for injunctive relief against state agency to halt unauthorized printing equipment and printing activities), *Tex. Highway Comm'n v. Tex. Ass'n of Steel Imps., Inc.*, 372 S.W.2d 525, 530 (Tex.1963) (legislative consent not required for declaratory judgment suit against Highway Commission to determine the parties' rights), and *Cobb v. Harrington*, 144 Tex. 360, 190 S.W.2d 709, 712 (1945) (legislative consent not required for declaratory judgment suit  against State Comptroller to determine parties' rights under tax statute)).  Further, extending immunity to officials using state resources in violation of the law would not be an efficient way of ensuring those resources are spent as intended.

[45] All political power is inherent in the people, and all free governments are founded on their authority, and instituted for their benefit. Tex. Const. Art. I, §2.  No man, or set of men, is entitled to exclusive separate public emoluments, or privilege" Tex. Const. Art. I, §3.  The people shall be secure in their persons, houses, papers and possessions, from all unreasonable seizures or searches. Tex. Const. Art. I, §9. The writ of habeas corpus is a writ of right, and shall never be suspended. The Legislature shall enact laws to render the remedy speedy and effectual. Tex. Const. Art. I, §12.  All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law. Tex. Const. Art. I, §13.  No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land. Tex. Const. Art. I, §19.  Perpetuities and monopolies are contrary to the genius of a free government, and shall never be allowed. Tex. Const. Art. I, §26.  The citizens shall have the right, in a peaceable manner, to assemble together for their common good; and apply to those invested with the powers of government for redress of grievances or other purposes, by petition, address or remonstrance. Tex. Const. Art. I, §27.  No power of suspending laws in this State shall be exercised except by the Legislature. Tex. Const. Art. I, §28.

crimes against humanity as these have been recognized by international tribunals and agencies.[46]

20.     It is inconceivable that the United States would deem these acts to be within the scope of employment simply to deprive Plaintiff of her rights, remedy, and recourse.  It is inconceivable because the 9th and 10th amendments to the United States Constitution forbid this type of interference in state matters.  The United States is simply not free to abrogate or deprive Plaintiff of her rights secured by the Texas Bill of Rights as forever inviolate.[47]  These rights are inherent in the people and have all times been

---

[46] It is also undeniable that these acts violate the laws of Texas and were continuing violations of 18 USC §§241, 242, and 1512.  However, Plaintiff has no ability to bring criminal charges.  Plaintiff has been informed by the State authorities that neither the Texas Rangers nor the Attorney General will conduct an investigation into official corruption unless a prosecutor invites them in.  When Plaintiff attempted to take her complaints to the Texas Attorney General, she was referred to the FBI.  When she took her complaints to the FBI in 2010, she was immediately retaliated against, and when she attempted to take her evidence to the federal marshals and file her *habeas corpus* pleadings in the district court at the federal courthouse in 2010, she was denied admittance to the federal courthouse and further threatened, abused, and retaliated against, which lead, ultimately, to the eventual destruction of all her Bill of Rights' protections, summary disbarment, denial of pretrial bail or *habeas corpus* relief, and summary commitment to harsh captivity without any semblance of due process or  right of recourse, review, or remedy on appeal, wrongful conviction and false imprisonment, and permanent derogatory labeling.  When Plaintiff was thus labeled and marked as a "prisoner" and rendered "indigent" thereby, she was forced into a member of a suspect class that would forever prevent her from having equal protection under the law, open access to the courts, or any protection of her civil or constitutional rights or any remedy under any constitution, statute, or common law of this State or the United States, on either legal or equitable grounds.  Indeed, it is well-known that the labeling and branding of this segment of the civilian population—"indigent prisoner"—effectively suspends and removes all constitutional and civil rights and only 2% of the Section 1983 cases filed by this suspect class make it through the procedural "pleading" gauntlet set up by the federal courts to annihilate these people and deprive them of any access to the courts or any right to redress of grievance in clear violation of the Texas Bill of Rights and substantive laws of this State.  Plaintiff's speech, political activism, and ideas could have been protected by 18 USC §245 entitled Federally Protected Acts but that act does not prevent discrimination and criminal conduct perpetrated against someone based on gender.  Misogyny is still protected under the law and as long as it is, women will continue to be subjected to unequal treatment and protection under the law, including gross violations of due process and due course of law.  The activities of women simply are not federally protected as are the activities of foreign immigrants or people of different races.  Predatory prosecutors are still free to summarily commit women indefinitely and involuntarily under federal law.  Thus, even under the federal criminal statutes, there is no jurisdiction in this court.

[47] All political power is inherent in the people, and all free governments are founded on their authority, and instituted for their benefit. Tex. Const. Art. I, §2.  No man, or set of men, is entitled to exclusive separate public emoluments, or privilege" Tex. Const. Art. I, §3.  The people shall be secure in their persons, houses, papers and possessions, from all unreasonable seizures or searches. Tex. Const. Art. I, §9. The writ of habeas corpus is a writ of right, and shall never be suspended. The Legislature shall enact laws to render the remedy speedy and effectual. Tex. Const. Art. I, §12.  All courts shall be open, and every person for an

retained by the people and never delegated to any government. How now can the United States usurp those rights?

21.     At all times when Plaintiff sought the protection of this court and the intervention to prevent these atrocities, this court failed and refused to take effective, timely, and meaningful corrective and remedial action. Now, it seems clear that Plaintiff was deprived of her federal constitutional rights and equal protection and due process rights under 42 U.S.C. § 1983 because of the involvement of the United States in the underlying conspiracy, to which it now admits. If that is the case, then all the allegations made heretofore concerning Andy Austin are true and correct and proven by this judicial admission. He was aiding, abetting, and assisting the conspiracy by stalling and blocking Plaintiff's access to the federal courts.

22.     Now, finally knowing the involvement and the extent of the involvement of the United States, Plaintiff will seek declaratory judgment and permanent injunction from the federal courts to prevent these atrocities from being imposed and inflicted on others similarly situated.

23.     When Plaintiff took her complaints to the FBI in 2010, she was immediately retaliated against, and when she attempted to take her evidence to the federal marshals and file her *habeas corpus* pleadings in the district court at the federal courthouse in 2010, she was denied admittance to the federal courthouse and further threatened, abused, and retaliated against, which lead, ultimately, to the eventual

---

injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law. Tex. Const. Art. I, §13. No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land. Tex. Const. Art. I, §19. Perpetuities and monopolies are contrary to the genius of a free government, and shall never be allowed. Tex. Const. Art. I, §26. The citizens shall have the right, in a peaceable manner, to assemble together for their common good; and apply to those invested with the powers of government for redress of grievances or other purposes, by petition, address or remonstrance. Tex. Const. Art. I, §27. No power of suspending laws in this State shall be exercised except by the Legislature. Tex. Const. Art. I, §28.

destruction of all her Bill of Rights' protections, summary disbarment, denial of pretrial bail or *habeas corpus* relief, and summary commitment to harsh captivity without any semblance of due process or right of recourse, review, or remedy on appeal, wrongful conviction and false imprisonment, and permanent derogatory labeling.

24.    When Plaintiff filed for habeas corpus, it was summarily denied without hearing by Andy Austin.

25.    When Plaintiff sought relief pursuant to 42 U.S.C. §1983, Andy Austin again blocked Plaintiff's access to the courts.

26.    As a direct and proximate result of the conspiracy and this court failure and refusal to intervene due to the conflict of interest, Plaintiff was labeled and marked as a "prisoner" and rendered "indigent" thereby. Plaintiff was then forced into a suspect class that would forever prevent her from having equal protection under the law, open access to the courts, or any protection of her civil or constitutional rights or any remedy under any constitution, statute, or common law of this State or the United States, on either legal or equitable grounds. Indeed, it is well-known that the labeling and branding of this segment of the civilian population—"indigent prisoner"—effectively suspends and removes all constitutional and civil rights and only 2% of the Section 1983 cases filed by this suspect class make it through the procedural "pleading" gauntlet set up by the federal courts to annihilate these people and deprive them of any access to the courts or any right to redress of grievance in clear violation of the Texas Bill of Rights and substantive laws of this State.

27.    Plaintiff's speech, political activism, and ideas could have been protected by 18 USC §245 entitled Federally Protected Acts but that act does not prevent

discrimination and criminal conduct perpetrated against someone based on gender. Misogyny is still protected under the law and as long as it is, women will continue to be subjected to unequal treatment and protection under the law, including gross violations of due process and due course of law. The activities of women simply are not federally protected as are the activities of foreign immigrants or people of different races. Predatory prosecutors are still free to summarily commit women indefinitely and involuntarily under federal law. Thus, even under the federal criminal statutes, there is no jurisdiction in this court.

28.    The United States has proudly admitted that this misogyny and grossly disparate treatment of a suspect class of citizens forcefully marked "indigent prisoner" or "criminally insane" is just business as usual for and in the United States and they will take no action anywhere to correct or rectify these atrocities. Plaintiff is entitled to a declaratory judgment under the substantive laws of Texas concerning misogyny and the failure and refusal of the federal courts to protect women against these crimes of violence in violation of international law. Plaintiff is entitled to a declaratory judgment under the substantive laws of Texas declaring that the § 1915 and the labeling of innocent citizens as "indigent prisoners" is a violation of due process, equal protection, equal rights, and due course of law. Plaintiff was stripped of her rights under 42 U.S.C. § 1983 because of the unequal application and abuse of § 1915. The Star Chamber illegally and unconstitutionally imprisoned Plaintiff without NO BAIL pretrial and the federal courts labeled Plaintiff an "indigent prisoner" so that they could apply the discriminatory § 1915 to deprive Plaintiff of her rights, remedy, and recourse under false and fraudulent pretenses because this was all in the scope of employment and the United States was

going to obstruct justice, deprive a litigant of due course of law, and outlaw them. Plaintiff now seeks all the rights, remedies, and recourse she sought from Kathleen Gittel and her accomplices from the United States. If these matters are not resolved in an American court of law, Plaintiff will take this evidence to the international community.

29.     Under the *Erie* doctrine this court is duty bound to apply the substantive law of Texas and cannot permit the procedural rules of this court to deprive Plaintiff of purely state law claims and state law causes of action or claims for equitable relief based on the Texas Bill of Rights and other statutory and common laws of Texas. This court cannot use federal procedure to deny, denigrate, or destroy rights, remedies, and recourse to Plaintiff in violation of the Texas Bill of Rights and the open court's doctrine of Texas. This court, under the facts of this case removed to this court over Plaintiff's strenous objections, must permit Plaintiff the protection of and allow the benefit of the state procedural rules and laws.

30.     Thus, this court should order the defendants to file any special exceptions they may have first and allow Plaintiff a due process hearing on same so that she is specifically advised of any deficiencies or defects in her pleadings and given a reasonable opportunity to amend said pleadings to meet or address the court's ruling on said special exceptions. If Defendants truthfully believe they are protected by any immunity or other defense, then they should file a motion for summary judgment and submit sworn and admissible proof in support of these mere legal conclusions and meet the demands of Texas law with respect to motions for summary judgment, including granting the Plaintiff a reasonable and meaningful opportunity to conduct discovery to confront and disprove these unsupportable claims. Defendants sole intent is to continue to obstruct justice in

this matter and to further conceal the evidence of their crimes of violence, breach of the Texas Constitution, and international law. The substantive law of Texas would not permit such a legal subterfuge.

31.    Plaintiff would not have any viable claims or causes of action but for the undeniable fact that she was targeted, framed, and maliciously prosecuted in a Star Chamber and wrongfully convicted of a crime she did not commit on June 10, 2013 by the concerted conspiratorial or aiding and abetting actions of the individually named Defendants, which apparently now include the United States. Equally undeniable is the fact that Plaintiff would not have been wrongfully convicted but for the breaches of significant contracts, blatant violations of the Texas Bill of Rights and statutory and common laws of Texas, and the formation of the Star Chamber with the resulting suspension of *habeas corpus*, unconstitutional disbarment of Plaintiff, and the obstruction of justice and denial of equal and free access to the courts, including the appellate courts and federal court. Plaintiff was essentially outlawed and deprived of any meaningful or timely remedy, recourse, or relief as the courts were closed and the laws and *habeas corpus* suspended. Not one person who participated can claim that they were performing a public service in subverting the laws of Texas and trampling the Texas Bill of Rights for their own individual and improper purposes. Yet, the United States has now admitted that these actions are within the scope of employment and were, essentially, the acts of the United States.

32.    To accomplish the goal of the conspiracy[48] to retaliate against Plaintiff, set an example to have a chilling effect on others of similar mind to expose their corruption,

---

[48] The elements of a civil conspiracy claim are (1) two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5)

and to forever marginalize, discredit, silence, suppress, and oppress Plaintiff through false imprisonment, disbarment, and a permanent derogatory labeling and branding as a "felon," "convict," "mentally ill," "crazy," "insane" etc.—essentially the concocted fruition of years of defamation *per se*—these Defendants set up a scheme with a series of events that would congeal in concert to form the mechanism to bring about their desired result. Plaintiff had both the ability and the means to defend herself from these unwarranted attacks, as well as the evidence to prove their crimes. These individual defendants, acting in concert and assisting, aiding and abetting each other, engaged in a series of continuous and uninterrupted acts and steps over the course of time to separate Plaintiff from her ability and means to defend herself and to remove, conceal, and destroy the evidence that would expose their crimes and prove the truth. The United States claims this was all within the scope of employment.

33.    Plaintiff is an intended beneficiary of the Texas Bill of Rights and the public trust delegated in the Texas Constitution. These Defendants conspired to tortiously interfere with the full and equal enjoyment of those rights and aided and abetted each other in the tortious interference with Plaintiff's full and equal enjoyment of those rights. It is undisputed that these defendants all invaded Plaintiff's right to privacy, quiet and peaceful enjoyment of her home and curtilage, privacy in her papers and belongings, and right to be left alone—all rights secured and protected by the Texas Bill of Rights. Defendants have permanently marred her reputation and destroyed her right to

---

damages as the proximate result. *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983). These elements can be shown with circumstantial or indirect evidence that would lead a reasonable person to believe that the acts would not have occurred but for the conspiracy. The conspiracy in this case encompassed violations of both the civil and criminal laws of the state of Texas, thus depriving plaintiff of the protections afforded by those laws. Thus, she is entitled to equitable relief on the violations of the Bill of Rights, Code of Criminal Procedure, Penal Code, and to statutory relief set forth in the Texas Health and Safety Code and other statutory and common law causes of action.

earn a livelihood, practice her chosen profession, use her intellectual property rights, and provide for her children.

34.    Plaintiff was also an intended beneficiary of the Texas Health and Safety Code, Title 7, Subtitle C, as well as Tex. Const. Art. I, §§3a, 13, 15-a, and 19. These Defendants conspired to tortiously interfere with the rights and duties owed to Plaintiff as set forth in the Texas mental health code and they aided and abetted each other in the tortious interference with those rights and the duties owed under that statute. Plaintiff seeks recovery of the damages set forth in that statute as that is the substantive law of Texas.

WHEREFORE PREMISES CONSIDERED, Plaintiff continues to assert and seek her rights, remedies, and recourse under the Texas Constitution, and the common law, statutory law, and contract laws of Texas, including equitable relief under the Declaratory Judgments Act and a permanent Injunction to prevent these hostile atrocities in the future, against Plaintiff and others similarly situated.

Respectfully submitted,

Carolyn Barnes
419 Indian Trail
Leander, Texas 78641
281-467-8681

COUNTY OF WILLIAMSON

STATE OF TEXAS

Pursuant to Texas Civil Practices and Remedies Code Sec. 132.001, I, Carolyn Barnes, do hereby swear and affirm that the facts stated above are true and correct based on personal knowledge.  I declare under penalty of perjury that the foregoing is true and correct.

Executed in Williamson County, State of Texas on the 24th day of May 2015.

_____
Carolyn Barnes

## CERTIFICATE OF SERVICE

I hereby certify by my signature above that I have served a true and correct copy of the above and foregoing document on all counsel of record via electronic mail in accordance with the requirements of the Texas Rules of Civil Procedure, Rule 21a on this the 23rd day of June 2015.